March 29, 2016

United States District Court- Clerk
Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA  19106

Michael Mateja, Reg. No.  71081-066
Federal Medical Center- Devens, MA
P.O. Box 879
Ayer, MA  01432

Re: Writ of Habeas Corpus §2255   (Case #  13-575-1)

Clerk of the Court,

    I have enclosed two copies of my application, affidavit, and exhibits

supporting my Petition for 28 U.S.C. §2255 Writ of Habeas Corpus under

case number 13-575-1.  If you should have any questions, please contact

me at the above address.


## CERTIFICATE OF SERVICE

I declare (or certify, verify, or state) under penalty of perjury that
the foregoing is true and correct and that this Petition for Writ of
Habeas Corpus was placed in the prison mailing system on :

    03/29/2016            .
(month/day/year)


Executed (signed) on this  29  day of  March   , 2016



_____
Signature of Petitioner

PETITION FOR 28 U.S.C. §2255
WRIT OF HABEAS CORPUS

UNITED STATES OF AMERICA V. MICHAEL MATEJA
CASE NO. 13-575-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL MATEJA, REG. NO.  71081-066
FEDERAL MEDICAL CENTER- DEVENS, MA
P.O. BOX 879
AYER, MA  01432
PRO-SE

**MMB**

UNITED STATES OF AMERICA
EASTERN DISTRICT OF PENNSYLVANIA

United States District Court
Eastern District of Pennsylvania

Case No. 13-575-1

Michael Mateja
Federal Medical Center- Devens, MA

Prisoner No: 71081-066

United States of America v. Michael Mateja  **16    1594**

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY UNDER 28 U.S.C. §2255

1. (a) Name and location of court that entered the judgment of conviction you are challgening:
                        United States District Court
                        Eastern District of Pennsylvania
                        601 Market Street
                        Philadelphia, PA  19106
   (b) Criminal docket or case number (if you know):   13-575-1

2. (a) Date of judgment of conviction (if you know):  06/19/2014
   (b) Date of sentencing:  06/16/2014

3. Length of sentence:  33 Months

4. Nature of crime (all counts):
                        1) 18 U.S.C. §1343, 1349; 18:2 - Wire Fraud;
                           aiding and abetting
                        2) 18 U.S.C. §1505; 18:2 - Obstruction of
                           Justice; aiding and abetting

5. (a) What was your plea?  (check one)

            (1) Not guilty    (2) Guilty      (3) Nolo contendere (no contest)
   (b) If you entered a guilty plea to one count or indictment, and a not guilty
       plea to another count or indictment, what did you plead guilty to and
       what did you plead not guilty to?   NOT APPLICABLE

6. If you went to trial, what kind of trial did you have (check one)?

            Jury      Judge only                    NOT APPLICABLE

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?

                        NOT APPLICABLE

8. Did you appeal from the judgment of conviction?     Yes     No

9. If you did appeal, answer the following:    NOT APPLICABLE

A-1

10. Other than the direct appeals listed above, have you previously filed any
other motions, petitions, or applications concerning this judgment of
conviction in any court?

<u>YES</u>      NO

11. If your answer to Question 10 was "Yes", give the following information;
(a)(1) Name of Court:
United States District Court
Eastern District of Pennsylvania
   (2) Docket or Case number (if you know):  13-575-1
   (3) Date of filing (if you know):  07/03/2014
   (4) Nature of the proceeding:  Motion to Modify Restitution
   (5) Grounds raised:  Modify Restitution from Sentencing
   (6) Did you receive a hearing where evidence was given on **your** motion,
       petition, or application?      YES      NO      <u>UNKNOWN</u>
   (7) Result:  Partially Granted, Partially Denied
   (8) Date of result (if you know):  08/06/2014
(b)(1) Name of Court:
United States District Court
Eastern District of Pennsylvania
   (2) Docket or Case number (if you know):  13-575-1
   (3) Date of filing (if you know):  11/09/2015
   (4) Nature of the proceeding:  Amendment 791 Sentence Reduction Motion
   (5) Grounds raised:  Sentencing Guidelines change:  Amendment 791 app-
                        licability.
   (6) Did you receive a hearing where evidence was given on your motion,
       petition, or application?      YES      <u>NO</u>
   (7) Result:  DENIED
   (8) Date of result (if you know):  12/17/2015
(c) Did you appeal to a federal appellate court having jurisdiction over
    the action taken on your motion, petition, or application?      NO
(d) If you did not appeal from the action on any motion, petition, or
    application, explain briefly why you did not:

        Motion (a):  Counsel advised against Appeal
        Motion (b):  Amendment 791 of the Sentencing Commission was not made
                     retroactive according to U.S.S.G. §1B1.10(d)

12. For this motion, state every ground on which you claim that you are being
held in violation of the Constitution, laws, or treaties of the United
States.  Attach additional pages if you have more than four grounds.  State
the <u>facts</u> supporting each ground.

    GROUND ONE:  Ineffective Assistance made the plea not voluntary and intell-
                 igently entered.

                 -- Petitioner was charged with victims not substantiated by
                    the plea;
                 -- Petitioner did not understand the charges and their implic-
                    ations;
                 -- Petitioner was never counseled about the advantages of trial;
                 -- Counsel failed to negotiate the plea;
                 -- Counsel acted under the assumption of guilt.

    (b) Direct Appeal of Ground One:
        (1) If you appealed from the judgment of conviction, did you raise this
            issue?      NOT APPLICABLE

(2) If you did not raise this issue in your direct appeal, explain why:
NOT APPLICABLE

(c) Post-Conviction Proceedings:
    (1) Did you raise this issue in any post-conviction motion, petition, or
        application?      YES     <u>NO</u>
    (2) NOT APPLICABLE
    (3) NOT APPLICABLE
    (4) NOT APPLICABLE
    (5) NOT APPLICABLE
    (6) NOT APPLICABLE
    (7) NOT APPLICABLE

GROUND TWO:    Counsel failed to advocate and consult Petitioner related to
                   Restitution.

           -- Counsel failed to advocate regarding unreliable and unsub-
              stantiated loss claims;
           -- Loss was too complex to apply;
           -- Petitioner was charged with unrelated victim;
           -- Counsel failed to consult and advocate for Petitioner at
              the PSR, Sentencing Memorandum, and the subsequent Motion
              to Modify Restitution stages.

(b) Direct Appeal of Ground Two:
    (1) If you appealed from the judgment of conviction, did you raise this
        issue?  NOT APPLICABLE
    (2) If you did not raise this issue in your direct appeal, explain why:
           NOT APPLICABLE
(c) Post-Conviction Proceedings:
    (1) Did you raise this issue in any post-conviction motion, petition, or
        application?      YES     <u>NO</u>
    (2) NOT APPLICABLE
    (3) NOT APPLICABLE
    (4) NOT APPLICABLE
    (5) NOT APPLICABLE
    (6) NOT APPLICABLE
    (7) NOT APPLICABLE

13. Is there any grounds in this motion that you have <u>not</u> previously presented
in some federal court? If so, which ground or grounds have not been pre-
sented, and state your reasons for not presenting them:

        This entire claim is a claim of ineffective assistance of Counsel and
        has not been brought before the Court previously. Petitioner relied
        upon Counsel for interpretation and guidance related to law and was
        not aware of how deficient his performance was until after the Court
        ruled on the Motion to Modify Restitution. Petitioner seeks remedy
        via §2255 as the understood appropriate vehicle for an ineffective
        assistance claim.

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not
decided yet) in any court for the judgment you are challenging? YES <u>NO</u>

15. Give the name and address, if known, of each attorney who represented you
in the following stages of the judgment you are challenging:
(a) At preliminary hearing:

John J. Waldron
Huber and Waldron
The Capri Building
Suite 301
535 Hamilton Mall
Allentown, PA 18101

(b) At arraignment and plea:

John J. Waldron
Huber and Waldron
The Capri Building
Suite 301
535 Hamilton Mall
Allentown, PA 18101

(c) At trial:

NOT APPLICABLE

(d) At sentencing:

John J. Waldron
Huber and Waldron
The Capri Building
Suite 301
535 Hamilton Mall
Allentown, PA 18101

(e) On appeal:

NOT APPLICABLE

(f) In any post-conviction proceeding:
        (MOTION TO MODIFY RESTITUTION)

John J. Waldron
Huber and Waldron
The Capri Building
Suite 301
535 Hamilton Mall
Allentown, PA 18101

(g) On appeal from any ruling against you in a post-conviction proceeding:
        NOT APPLICABLE

16. Were you sentenced on more than one count of an indictment, or on more than
one indictment, in the same court and at the same time?   YES   NO

17. Do you have any future sentence to serve after you complete the sentence
for the judgment that you are challenging?   YES   NO

   (a) NOT APPLICABLE
   (b) NOT APPLICABLE
   (c) NOT APPLICABLE

18. TIMELINESS OF MOTION:  If your judgment of conviction became final over one
year ago, you must explain why the one-year statute of limitations as con-
tained in 28 U.S.C. §2255 does not bar your motion.

   Petitioner filed a motion for extension to file §2255 until April 15,
   2016 and was granted by the United States District Court - Eastern
   District of Pennsylvania on 01/28/2016.

A-4

Therefore, movant asks that the Court grant the following relief:

Petitioner asks that the Court Vacate, Set Aside, or Correct Sentence that he received by this Court, or any other relief to which movant may be entitled.

_____
Signature of Attorney (if any)
(Pro-Se)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion Under 28 U.S.C. §2255 was placed in the prison mailing system on __03/29/2016__.

Executed (signed) on ____03/29/2016____(date).

_____
Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

NOT APPLICABLE

A-5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | :     CRIMINAL NO. |
|           v. | :     No. 13-575-01 |
| MICHAEL MATEJA | : |

### ORDER

**AND NOW** this 28th day of January, 2016, it is hereby **ORDERED** that the defendant's

motion to extend the deadline to file a motion for post-conviction relief under 28 U.S.C. § 2255

to April 15, 2016 (ECF 73) is **GRANTED**. No further extensions will be granted.

**BY THE COURT:**

**MICHAEL M. BAYLSON, U.S.D.J.**

O:\CRIMINAL CASES\13CR575-1\13CR575 ORDER GRANTING EXT OF TIME TO FILE 2255.01.28.16.DOCX

A TRUE COPY CERTIFIED TO FROM THE RECORD
DATED: 1/28/16
ATTEST:
DEPUTY CLERK, UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

C C: Defendant

PETITION FOR 28 U.S.C. §2255
WRIT OF HABEAS CORPUS

UNITED STATES OF AMERICA V. MICHAEL MATEJA
CASE NO. 13-575-1

AFFIDAVIT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL MATEJA, REG. NO. 71081-066
FEDERAL MEDICAL CENTER- DEVENS, MA
P.O. BOX 879
AYER, MA  01432
PRO-SE

# TABLE OF CONTENTS

## Introduction

-- Request for Remedy........................................... 1
-- Statement of Case........................................... 1
-- §2255 vs. Appeal............................................ 3
-- §2255 Waiver............................................... 4
-- Strickland Framework....................................... 6

## I. Plea Agreement Claim

-- Plea Vulnerability.......................................... 8
-- History & Background........................................ 9
-- Voluntary & Intelligent Nature............................. 13
    A) Plea was not Voluntary................................. 13
        1) Unsubstantiated Charges........................... 13
        2) No Understanding of Charges and Implications... 16
    B) Plea was not Entered Intelligently.................... 22
        1) Counsel Never Weighed the Advantages of Trial.. 23
        2) Counsel Never Negotiated with Prosecutor....... 24
        3) Assumption of Guilt............................. 27

## II. Restitution/Loss Claim

-- §2255 Valid Restitution Claim............................. 29
-- Victim Loss Background...................................... 29
A) Failed to Advocate for Petitioner Regarding Restitution.... 30
        1) Loss Statements Unreliable and Unsubstantial....... 30
        2) Restitution Figures too Complex to Evaluate........ 34
        3) Restitution Inconsistent with Accused Crimes........ 40
B) Failed to Consult with Petitioner......................... 43
        1) PSR Deficiencies................................... 43
        2) Ignored Objections to Sentencing Memorandum......... 49
        3) Failed to Consult Regarding Motion to Modify Restit-
           ution............................................. 61

## Conclusion

-- Conclusion................................................. 72
-- Footnotes.................................................. 73
-- Exhibits................................................... 80

REQUEST FOR REMEDY

Petitioner motions the Court to Vacate, Set Aside, or Correct Sentence via 28 U.S.C. §2255, because ineffective assistance of Counsel violated Petitioner's Sixth Amendment right to effective Counsel.  Deficient performance of Counsel occured at multiple stages of the judicial process, prejudicing Petitioner.  These claims are related to the (1) plea agreement stage, and (2) restitution/loss used to sentence Petitioner.

(1) The plea agreement was not voluntary and intelligently entered by the Petitioner because the plea agreement was ambiguous.  Petitioner was charged with victims not substantiated when signing the plea, did not have an understanding of charges and implications, was never counseled about the advantages of trial, Counsel did not negotiate the plea, and Counsel acted under the assumption of guilt without researching and applying relevant law and facts.

(2) Restitution/loss was inappropriately calculated and increased Petitioner's incarceration period due to failure of Counsel to advocate regarding unreliable and unsubstantiated loss claims, loss that was too complicated to apply, and restitution/loss on victims unrelated to accused crimes.  Counsel failed to consult with Petitioner regarding restitution and loss at the presentence report stage, the sentencing memorandum stage, and the subsequent Motion to Modify Restitution stage, which collectively and individually prejudiced Petitioner.

Petitioner challenges the validity of his sentence according to these issues and claims his right to due process of law has been violated due to Counsel's defective representation.

STATEMENT OF CASE

Petitioner signed a plea agreement to 1 count of Wire Fraud in vio-

1

lation of 18 U.S.C. §1343 and 1 count of Obstruction of Justice in violation of 18 U.S.C. §1505. Petitioner pled guilty on December 19, 2013 and was sentenced on June 16, 2014. Due to issues in the Sentencing process, the Court recommended a subsequent Motion be filed to address the restitution/loss issues that arose at sentencing.

While the Plea Agreement does not specify substantiation behind either charge, Petitioner was accused in subsequent documentation of altering a handful of energy contracts from "all-inclusive" to "energy-only" contracts (Exhibit C). He was also accused of erasing company computers to substantiate the Obstruction of Justice charge in subsequent documentation. Petitioner received a 33 Month sentence, 3 Years of probation, and $818,903 in restitution/loss (later adjusted to $790,533 on 08/06/2014).

§2255 VS. APPEAL

    Petitioner recognizes that the evidence provided may have substantial grounds for direct appeal according to 18 U.S.C. §3742, but this "does not preclude a §2255 remedy for fundamental sentencing errors" <u>United States v. Essig</u>, 10 F. 3d 979 (3rd. Cir. 1993)

    While claims historically required issues to be raised on direct appeal unless Petitioner can demonstrate cause and prejudice according to <u>Frady's</u> standard, <u>States v. Frady</u>, 456 U.S. 157, 167-168, 71 L. Ed. 2d 816, 102 S. Ct 1584 (1982); this framework has been reversed by Justice Kennedy where he says "there is no procedural default for failure to raise an in-effective-assistance claim on direct appeal." This §2255 filing is the appropriate vehicle for a claim of ineffective assistance and the reasoning is described as:

> "Applying the usual procedural-default rule to ineffective-assistance claims would have the opposite effect, creating the risk that defendants would feel compelled to raise the issue before there has been an opportunity fully to develop the factual predicate for the claim. Furthermore, the issue would be raised for the first time in a forum not best suited to assess those facts. This is so even if the record contains some indication of deficiencies in counsel's performance. The better-reasoned approach is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under §2255. We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under §2255, whether or not the petitioner could have raised the claim on direct appeal.
>     In light of the way our system has developed, in most cases a motion brought under §2255 is preferable to direct appeal for deciding claims of ineffective assistance." <u>Massaro v. United States</u>, 538 U.S. 500, 155 L. Ed. 2d 714

    Petitioner did not appeal because of direct advice from Counsel against appeal ( F.1). Petitioner relied upon these statements due to his dependence on Counsel for interpretation of law and for strategic options that were never provided.

    Many of the issues raised within this petition include reference to communications. This information is not on the record and is required to

3

support the arguments presented because that information ultimately rested
on and failed with Counsel's actions or lack thereof:

> "Finding the defendant's claim of ineffective assistance of counsel,
> to the extent that it was premised on trial counsel's failure to in-
> vestigate and call certain witnesses, involved matters dehors the
> record and was therefore not properly presented on direct appeal"
> People v. McDonald, 255 A.D. 2d 688,681, N.Y.S. 2d 193, 195 (2d Dep't
> 2007) also quoted in McDowell v. Heath, (2nd appeals 2012) and People
> v. Haynes, 39 A.D. 3d 562, 564, 883, N.Y.S. 2d 193, 195 2d, Dept 2007

Matters dehors the record require §2255 and not direct appeal as an
appropriate vehicle. The matters involved in this case includes addition-
al information, dehors the record.

§2255 WAIVER TO COLLATERALLY ATTACK

Petitioner demonstrates the plea agreement had two §2255 provisions:
Not to collaterally attack, Exhibit J, item #9, page 4, and other provision
allowing Petitioner collateral relief under §2255, Exhibit j, item #9c,
page 5:

> "Notwithstanding the waiver provision set forth in this paragraph,
> the defendant may file a petition for a collateral relief under
> 28 USC §2255, but may only raise a claim that the attorney who rep-
> resented the defendant at the time of the execution of this agree-
> ment and the entry of the defendant's guilty plea provided constit-
> utionally ineffective assistance during any part of the represent-
> ation."

Petitioner considers these two provisions contradictory, making the
waiver not to collaterally attack invalid. A Writ of Habeaus Corpus has
been replaced by §2255, noted in Hill v. United States,368 U.S. 424, 427,
428, and n5, 82 S. Ct. 468, 7 L.Ed. 2d 417 (1962), that §2255 provides a
remedy in the sentencing court that is "exactly commensurate" with the
pre-existing federal habeas corpus remedy. Black's Law Dictionary (9th
Edition), defines under 'Collateral Attack' as "A petition for a writ of
habeas corpus is one type of collateral attack." This suggests that any
§2255 motion is a 'collateral attack.' Furthermore, in Wall v. Kholi,

4

179 2 Ed. 252, 562 U.S. 545, 131 S. Ct. 1278, 'collateral review' and
'collateral attack' is considered related and pointing in the same direct-
ion, making the two definitions difficult to distinguish in relation to
their applicability:

> "The term "collateral," in its customary and preferred sense, means
> lying aside from the main subject, line of actions, issue, purpose,
> etc.; subordinate, indirect. This suggests that "collateral" review
> is review that is lying aside from the main review, i.e., that is
> not part of direct review. The definition of the related phrase
> "collateral attack" points in the same direction. A "collateral
> attack" is an attack on a judgement in a proceeding other than a
> direct appeal. This usage buttresses the conclusion that "collateral
> review" means a form of review that is not part of the direct appeal
> process" <u>Wall v. Khali</u>, 179 2 Ed. 252, 562, U.S. 545, 131 S. Ct. 1278

<u>Mabry</u>, 536 F. 3d @ 443, is the overwhelming opinion deciding the
validity of a waiver and the decision depends upon determining if the
underlying facts give rise to a miscarriage of justice;

> "The court looks to the underlying facts to determine whether enforc-
> ing the waiver would give rise to a miscarriage of justice" <u>Mabry</u>,
> 563 F. 3d @ 443

Petitioner brings forth many claims with the §2255 motion, but points to
the plea agreement itself was not valid (Section I: PLEA).

> "A plea agreement waiver of the right to seek post-conviction relief
> pursuant to 28 U.S.C. §2255 does not waive defendant's right to chal-
> lenge that his or her guilty plea was not knowingly and voluntarily
> entered because of ineffective assistance of counsel." <u>Deroo v.
> United States</u>, 223 F. 3d 919, 923 (8th Cir. 2000)

Petitioner demonstrates in his claim that the errors were so serious as to
significantly prejudice the Petitioner and the Petitioner attempted to ob-
ject at multiple stages with ineffective representation thwarting those
efforts.

Additionally, the signing of such waivers has been raised as controv-
ersial regarding Counsel's representation:

> "The Third Circuit acknowledged the ethical concerns raised by the
> National Association of Criminal Defense Lawyers and at least eight
> states' legal ethics arbiters, such as defense counsel's "ethical
> and constitutional duty" to object to and refuse to sign any plea
> agreement provision that amounts to a waiver of post-conviction

remedies. This protects the rights of the client challenge the representation of the lawyer" <u>United States v. Grimes</u>, 739 F. 3d @ 130 n.3 (3rd Cir. 2014)

Since Counsel's representation has been shown as ineffective at every stage of the judicial process, it is important to consider lack of representation regarding the waiver and consider this brief in its entirety.

§2255 STRICKLAND VS. WASHINGTON FRAMEWORK

"28 USC §2255 allows a prisoner in federal custody to challenge the validity of his sentence" [<u>Accord Morelli v. United States</u>, 285 F. Supp. 2d 454, 458 (D.N.J. 2003).] "The prisoner has the right to be released if his sentence was imposed in violation of the constitution... such relief is available only if the Petitioner can establish "a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." <u>United States v. Deluca</u>, 889 F. 2d, 503, 506 (3rd Cir. 1989)"

Petitioner brings forth a §2255 claim for relief that his Sixth Amendment right was violated by ineffective assistance of Counsel. Two standards exist for evaluating claims of ineffective assistance: <u>United States v. Cronic</u>, 466 US 648, 80 L Ed. 2d 657, 104 S. Ct. 2039 (1984) and <u>Strickland v. Washington</u>, 466 US 668; 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). <u>Cronic</u> requires an extremely high showing of ineffective assistance where prejudice can be presumed. <u>Glover v. Milo</u>, 262 F. 3d 268 (4th Cir. 2001). In this case, the pro-se prejudice standard of <u>Cronic</u> is inappropriate and therefore, Petitioner seeks the individualized adjudication of the <u>Strickland v. Washington</u> standard.

In <u>Strickland v. Washington</u>, 466 US 668; 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court established the legal framework for determining Sixth Amendment claims of ineffective assistance of Counsel.

6

Strickland sets forth a two-part test for claims of ineffective assistance of Counsel:

> "First the defendant must show that performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "Counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense...prejudice requires a petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome"" Stickland v. Washington, 466, 687, 694 (emphasis added)

Accordingly, Petitioner positions his claims of ineffective assistance in reference to this two-prong test: 1) performance, and 2) prejudice.

SECTION I- PLEA AGREEMENT CLAIM

PLEA VULNERABILITY

Petitioner brings forth a §2255 claim of ineffective assistance of Counsel in violation of his Sixth Amendment right to effective assistance during the critical point of the plea agreement:

"a proceeding in which defendants cannot be presumed to make critical decisions without counsel's advice" Lafler v. Cooper, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012)

Petitioner brings forth that his misrepresentation was so extreme as to prove that his guilty plea was invalid and not knowingly and intelligently entered.

Petitioner establishes that according to the Supreme Court, the rules of Strickland v. Washington, 466 U.S. 668; 690, 104 S. Ct. 2052, 2066, 80 L. Ed. 2d 674, 695 (1984) and the associated two-prong test of (1) performance, and (2) prejudice applies to this challenge:

"Established claims of ineffective assistance in plea bargains are governed by Strickland" Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985)

The plea bargaining stage is considered a 'critical stage' (F.2) whereby, it requires utmost legal aptitude due to "it being a position where defendant's give up significant rights." These rights include the following as quoted from Parke v. Raley, 121 L. Ed. 2d 391, 118 S. Ct. 517 (1992):

"right to jury trial, right to confront one's accusers, and privaledge against self-incrimination."

In Padilla v. Kentucky, 559 U.S. 356, 372, 130 S. Ct. 1473, 176 L. Ed. 2d 70 S. Ct. 910 (1950), the plea bargain process is quoted as 'critical':

"the negotiation of a plea bargain is a 'critical stage' for ineffective assistance purposes."

Denial of a proper measure of attorney performance introduces unfairness into the process at a critical time where Counsel is essential

8

to a defendant because the plea bargain is a 'critical stage' (F.2) of the judicial process. <u>Lafler v. Cooper</u>, 132 S. Ct 1376, 182 L. Ed 2d 398 (2012) identifies the time period after the Government has proposed a plea agreement as the critical period, and requires the Court to look at what events took place at the time.

> "Holding that to invalidate a plea of guilty a prisoner must establish that for want of benefit of counsel, an ingredient of unfairness actively operated in the process that resulted in his confinement" <u>Hill v. Lockhart</u> (citing <u>Quicksall v. Michigan</u>, 339 U.S. 660, 94 L. Ed. 1188

Petitioner received no additional plea offers and Counsel's lack of representation and legal scrutiny in accepting the plea led the Petitioner to enter a plea offer that was not fully understood, under pretenses that were subtle enough in detail to not be brought up in the plea colloquy, but significant enough to inveigle Petitioner to plead guilty to an ambiguous plea and prejudice the Petitioner where he likely would have gone to trial.

HISTORY AND BACKGROUND

Petitioner received a subpoena from F.B.I. agent Neeson on 06/16/2013 for a request of "all company documents" for Coastal Energy that the Petitioner was a principal party in. The Petitioner then sought legal representation in the matter and engaged attorney John Waldron, inferred for his specialty in "white collar" defense (Exhibit E). The subpoena required the Petitioner to provide the documents and report to Court shortly thereafter. The Petitioner reported to Court as instructed by attorney Waldron and no one showed up at this subpoena hearing. Counsel Waldron then contacted Assistant United States Attorney Axelrod and later returned a phone call to the Petitioner telling him that another principal in Coastal Energy and now a co-defendant, Samuel Puleo, was assisting

9

the Government and the Assistant United States Attorney said that he had a wire recording compromising the Petitioner.   Attorney Waldron advised that his course of representation would have been to assist the Assistant United States Attorney and obtain a 5K.1 sentencing departure by cooperating ( F.3).   Counsel never reviewed the case material, discussed guilt, and never obtained or reviewed the supposed wire recording; rather, Counsel set up a proffer with the Assistant United States Attorney Axelrod and F.B.I. Agent Neeson on 08/09/2013. At the proffer, Neeson and Axelrod asked the Petitioner questions re-garding electricity contracts and validity of signatures.   This was the first time Petitioner reviewed any case information with Attorney Waldron and was in the presence of the Assistant United States Attorney and F.B.I. agent.   In particular, a supposed victim 'Valley Farm Market' was brought up and Petitioner dutifully explained the situation and its irrelevance to discussion about "energy only" vs. "all-inclusive" con-tracts.   'Valley Farm Market' was later reintroduced as a victim in the P.S.R., and was never agreed to in the plea agreement, nor were any other specific victims, dollar amounts, or described actions related to those victims.

   After the proffer, Petitioner was emailed a plea agreement by Counsel and told to sign it because the only other course of action was a 5K.1 departure and that was missed because Petitioner's Counsel was not engaged in the investigation early enough.   Counsel never offered alternative pleas, negotiations/strategy, or the option of going to trial. Counsel is quoted stating "Mr. Mateja met with the government to explain his crimes" (Exh. G  ) admitting that he took Petitioner to a proffer with the assumption of guilt.

   Petitioner was concerned about the terms of the plea agreement,

10

particularly the obstruction of justice charge, but Counsel rebutted "Don't worry about that, it's the wire fraud charge that really matters in this case" and suggests that time would be spent in the case arguing the specifics of the wire fraud charge.

At the signing of the plea and during the plea colloquy on 12/19/2013, Petitioner still was concerned about his guilt and the charges he was being charged with. Petitioner still believed that his role was limited, but thought that the proximity of the events made him possibly guilty of the wire fraud charge. Still, the Petitioner had a different understanding of his role in relation to the accusations and underlying facts of the charges. Petitioner had no knowledge he was being charged with 7 victims and approximately $800,000 of accused losses. Petitioner's understanding of his role in relation to the accusations was insignificant compared to the seriousness of the allegations brought in the Sentencing Memorandum and Petitioner was under the impression the victim and related losses were to be determined and litigated in Court at a later date ( F.4). Petitioner admitted his guilt based on his Counsel's guidance and due to the close proximity of two of the victims as he handled a lot of dialog between the company and Rastelli Brothers and communicated with a sales agent regarding the Property Management, Inc. account; however, Petitioner had no direct role in the alteration of contracts. Petitioner may have plead guilty under nolo contendere if he knew it was an option because Petitioner admitted guilt based on Counsel's advice, due to the proximity to the case and an understanding that his involvement was so minor he was not facing serious consequences.

Counsel never explained alternatives to pleading guilty such as "nolo contendere" under <u>North Carolina v. Alford</u>, 400 US 25, 27 L. Ed. 2d 162, 91 S. Ct. 160 (1970) or explained potential prison sentences and

11

consequences to his plea agreement.  Counsel never obtained the

Prosecution's information of which would be used to make certain the

underlying accusations were consistent and create an estimate of outcome

as outlined in 4-4.1(a) and 4-5.1(a) of the American Bar Association

Standards:

> "Defense counsel should conduct a prompt investigation of the
> circumstances of the case and explore all avenues leading to facts
> relevent to the merits of the case and the penalty in the event of
> conviction.  The investigation should include efforts to secure
> information in the possession of the prosecution and law enforcement
> authorities.  The duty to investigate exists regardless of the
> accused's admissions or statements to defense counsel of facts con-
> stituting guilt or the accused's stated desire to plead guilty."
> American Bar Association 4-4.1(a) - Duty to Investigate

> "After informing himself or herself fully on the facts and the law,
> defense counsel should advise the accused with complete condor con-
> cerning all aspects of the case, including a candid estimate of the
> probable outcome"  American Bar Association 4-5.1(a) - Advising the
> Accused

Petitioner was ignorant of the legal process and was depending on Counsel

for his advice as he was present at the proffer and was understood to be

the Petitioner's advocate.  Petitioner did not think that he was opening

himself to indiscriminate accusations by the Government and thought he

was pleading to the limits of the proffer.  It is because of this lack

of understanding and lack of advocacy from Counsel upon which Petitioner

builds his challenge and exerts that extraordinary circumstances from

the lack of effective Counsel existed with: (1) objective evidence of

unsubstantiated claims by the Prosecution with victim 'Valley Farm

Market' ( F.5), (2) no understanding of charges and implications, (3)

no strategic discussion of strategy or trial, (4) no negotiations with

the Prosecution, and (5) assumed guilt from Counsel.  If Petitioner

knew he was opening himself up to uncontestable ( F.6) future allegations,

it is reasonable to assume he would have taken the option of trial to

confront his accusers to properly defend himself against ex-

12

cessive claims (F.6). For example, the Petitioner did not learn
about co-defendants actions with most of the alleged victims until
months later, after the investigation began.

## VOLUNTARY AND INTELLIGENT REQUIREMENT

Petitioner challenges the voluntariness and intelligent nature of
the plea as the defined vulnerability of the guilty plea and the areas
where Counsel can be shown as ineffective:

> "[W]hen a criminal defendant enters a plea, he may not thereafter
> raise independent claims relating to the deprivation of constit-
> utional rights that occured prior to the entry of the guilty plea.
> Rather, a person complaining of such antecedent constitutional
> violations is limited...to attacks on the voluntary and intelligent
> nature of the guilty plea, through proof that the advice received
> from counsel was not within the range of competence demanded of
> attorneys in criminal cases" <u>Blackledge v. Perry</u>, 417 U.S. 21, 29-
> 30, 94 S.Ct. 2098, 40 L.Ed. 2d 628 (1974)

> "A guilty plea must be a voluntary and intelligent decision of the
> defendant" <u>Boykin v. Alabama</u>, 395 U.S. 238, 242, 89 S. Ct. 1709,
> 23 L. Ed. 2d 234 (1969)

> "A guilty plea is constitutionally valid only if the defendant
> entered into it knowingly, willingly, and with an understanding
> of the essential consequences" <u>Park v. Raley</u>, 121 L. Ed. 2d 391,
> 113 S. Ct. 517

> "It is beyond dispute that a guilty plea must be both knowing and
> voluntary. The standard was and remains whether the plea represents
> <u>a voluntary and intelligent choice among the alternative courses
> of action</u> open to the defendant. That is so because a guilty plea
> constitutes a waiver of three constitutional rights: the right to
> a jury trial, the right to confront one's accusers, and the priv-
> ilege against self-incrimination." <u>Park v. Raley</u>, 121 :. Ed. 2d
> 391, 113 S. Ct. 517 (emphasis added)

The voluntary and intelligent nature of the plea assumes an understanding
of the charges and the alternative courses of action.

## A) PLEA WAS NOT VOLUNTARY
### 1) UNSUBSTANTIATED CHARGES

Petitioner contested to multiple victims and their proposed loss
amounts at multiple stages in the judicial process. Petitioner emphas-
izes 'Valley Farm Market' as his primary example of unsubstantiated
charges because there is objective evidence of incongruency between the

Assistant United States Attorney's allegations and the actual contract in question ( F.5). There is also objective evidence of Petitioner questioning the validity and objecting to this victim repeatedly in emails to Counsel and in the presence of the Assistant United States Attorney and F.B.I. Neeson ( F.5). Petitioner's misunderstanding of the charges extends to other 'victims', but is limited in this discussion for brevity and the overwhelming evidence related to 'Valley Farm Market.'

Petitioner uses <u>Bousley v. United States</u>, 140 L. Ed. 2d 828, 118 S. Ct. 1604 (1998) as a foundation for involuntariness of the plea because similarily, <u>Bousley</u> did not understand the essential elements of the accused crime and that foundation invalidated the plea.

> "Neither accused, nor his counsel, nor court correctly understood essential elements of crime with which accused was charged, then plea would be invalid under Federal Constitution"

During the plea colloquy, no underlying details or elements of the accused crime were discussed that demonstrated understanding of the charges by all the parties involved. Charge technicalities and maximum penalities were discussed, but discussions related to the underlying elements of the crime were missing. These elements and details were missing from the P.S.R. and became fully exposed during sentencing ( F.7). It was apparent that neither Counsel nor the Assistant United States Attorney understood how to calculate losses ( F.8), but more importantly, both Counsel and the Government concluded that proximity of a dispute 'Valley Farm Market' automatically includes it in the charges brought on Petitioner ( F.5). Adding victims unrelated to the accused crime (Exh. B ) undermines the voluntary nature of the plea.

> "A guilty plea is more than a confession that admits that the accused did various acts; it is an admission that the accused committed the crime charged against him; by entering a guilty plea, the accused is not simply stating that he did the discrete acts described in the indictment, but is admitting guilt of a

14

substantive crime; thus, (1) a defendant must, under Rule 11(c)(1) of the Federal Rules of Criminal Procedure, be instructed in open court on the nature of the charge to which the plea is offered, and (2) the plea cannot be truly voluntary unless the defendant possesses an <u>understanding of the law in relation to the facts</u>" <u>United States v. Broce</u>, 488 U.S. 563, 102 L.Ed. 2d 927, 109 S. Ct. 757 (1989) (emphasis added)

"If the defendant does not understand his constitutional protections and the charges made against him, the guilty plea is invalid" <u>Henderson v. Morgan</u>, 426 U.S. 637, 645, 96 S. Ct. 2253, 49 L.Ed. 108 (1976)

The key to being a voluntary decision is the information upon which that decision is upheld. With the plea agreement and the plea colloquy lacking facts, and contest about 'Valley Farm Market' occuring before and after the plea, disparity of fact makes the decision to plea uninformed.

"Rather, the purpose...[is] to insure that an accused is appraised of the significant effects of his plea so that his decision to plead guilty and waive his right to trial is an informed one" <u>Bye v. United States</u>, 435 F. 2d 177, 179 (2d Cir. 1970)

The result of this uninformed decision was <u>direct and not collateral</u>. While collateral or peripheral consequences have been determined not to affect the voluntariness or intelligence of a plea, victims and related restitution are direct consequences. Loss directly affects jail time according to U.S.S.G. §2B1.1(b)(1)(H); therefore, loss directly impacts the consequences of pleading guilty. <u>All</u> direct consequences need to be made known to a defendant.

"[A] valid plea of guilty requires that the defendant be made aware of all 'the direct consequences of his plea'" <u>Cuthrell v. Director Patuxent Inst.</u>, 475 F. 2d 1364, 1365 (4th Cir.), cert denied, 414 U.S. 1005, 94 S. Ct. 362, 38 L. Ed. 2d 241 (1973) (quoting <u>Wade v. Coiner</u>, 468 F. 2d 1059, 1060 (4th Cir. 1972))

The lack of disclosure by the Government and subsequently Counsel's advice to plea to such an agreement represents involuntariness because the technical details of the charge in the plea agreement and plea colloquy are not sufficient independently to defend the validity of the plea:

15

"conviction on charge...based on defendant's plea of guilty, is entered without due process of law where defendant did not receive adequate notice of offense, since he was not informed that intent to cause his victim's death was element of offense; hence his plea was involuntary, and this was so even though Supreme Court would examine totality of circumstances and determine whether substance of charge, as opposed to its technical elements, was conveyed to defendant. (emphasis added)" Henderson v. Morgan, 426 U.S. 637, 645, 96 S.Ct. 2253, 49 L.Ed 2d 108 (1976)

The Supreme Court has concluded that substance of charge and not simply its technical elements are needed to convey meaning of a charge. The extraordinary circumstances in this plea relate to a lack of substance of charge. Substance of charge is missing from both the plea agreement and the plea colloquy, violating due process of the Petitioner. Neither victims nor related restitution values were made available from the Government or Counsel, upon where Petitioner could reliably understand the charges. The accusations Petitioner later faced were substantially greater.

## 2) NO UNDERSTANDING OF CHARGES AND IMPLICATIONS

Petitioner did not understand the conditions that defined wire fraud under 18 U.S.C. §1343 and therefore did not make his decision voluntarily. Counsel failed to inform or explain to Petitioner the meaning of the charges, investigate facts, and discuss possible strategy for Petitioner and led him to believe he was guilty and a plea was his only option.

The Third Circuit defines that conviction of this statute §1343, requires proof beyond a reasonable doubt of three elements (1) a scheme to defraud; (2) the use of the mails or wires for the purpose of executing the scheme; and (3) participation by the defendant in the scheme with the intent to defraud. United States v. Phoris, 298 F. 3d 278, 234 (3d Cir. 2002)

Petitioner was led to believe by the Assistant United States Attorney that Matt Morgan and Sam Puleo led a scheme to defraud. Petitioner had

16

contact with Rastelli Brothers, Inc. and a sales representative for Property Management Inc. and felt overwhelmed by the investigation and Petitioner's proximity to the events. Moreover, Counsel led Petitioner down a road of guilt and never questioned Petitioner's involvement.

United States v. Pearlstein, 576 F.2d 531, 546 (3d Cir. 1978) defines that illegal intent needs to be involved:

> "and participation in it with the intent that its illegal objective be attained"

Victim Friedmans Market supposedly had a contract changed first ( F.9) by Matt Morgan, and later Atlantic States Pipe Company, by Samuel Puleo. Petitioner had no meetings or dialog with co-defendant's discussing changing contracts, was not involved in those actions in any way, and was not even aware of any changes until long afterwards. The specificity demonstrates that Petitoner had no intent, since all of these accusations occured without Petitioner's knowledge.

> "it must be established that the defendants facilitated the principals' crime with the intent to do so" United States v. Pearlstein, id at 546

Counsel failed Petitioner and allowed him to enter a guilty plea under the false understanding that he was guilty due to the Petitioner's proximity to co-defendant's without guiding Petitioner through the legal process and discussing Petitioner's ability to fight any charges by going to trial(F.38).

The same situation occured in regarding to the Obstruction of Justice charge under 18 U.S.C. §1505. Coastal Energy became insolvent in August of 2012 and had to close its office. With 25+ computers, Petitioner had to sell existing equipment to liquidate assets, including chairs, desks, and other office furnishings. All the company's computers were erased and reset before resale. Such an action had no potential effect on an

17

investigation because Coastal used all Cloud based services such as Google Apps for email and calendar functions as well as Dropbox for document storage and redundancy. All the company's documentation was retained.

When Petitioner told Counsel he did not want to sign the plea agreement because he did not agree with the Obstruction of Justice charge, Counsel simply told him that it didn't matter and the wire fraud charge was all that mattered. Petitioner did not understand that it would mean additional sentencing points and increased incarceration.

> "Defense Counsel should not intentionally understate or overstate the risks, hazards, or prospects of the case to exert undue influence on the accused's decision as to his or her plea" American Bar Association 5-1(b) - Advising the Accused

The maximum penalties described to Petitioner in the plea colloquy appeared to be a formality and its relation to Petitioner was not understood.

The law has an interpretation where acceptance of responsibility (Petitioner received U.S.S.G. §3E1.1(a) and §3E1.1(b)) could not, as a matter of law, also receive obstruction of justice except under extraordinary circumstances:

> "both §3C1.1 and §3E1.1 may apply in extraordinary case" United States v. Hooper, 27 F. 3d 378 (1994) (CA7 Nev.)

> "which allows for both increase for obstruction of justice and reduction for acceptance of responsibility in extraordinary case" United States v. Marin, 916 F. 2d 1536 (1990, CA11 Fla)

No such 'extraordinary' circumstances are described on the record and it appears to Petitioner that neither Counsel or the Government engaged in any adversarial negotiation in regards to either charge(F.39).

Both the wire fraud and obstruction of justice charge had related, calculative sentencing results according to the Sentencing Commission Guidelines that neither the Government nor Counsel used as a guide with Petitioner. The lack of negotiation and use of the guidelines supports

18

that entering the plea was irrational and not voluntary because the sub-
stantiation behind the crimes and the related sentencing outcome were
not clearly stated to demonstrate transparency and expectation. The
maximum terms described in the plea and plea colloquy failed to create
realistic expectations and Counsel erred by not creating reasonable ex-
pectations:

> "First, the guidelines create a fair, definite expectation in respect
> to the sentence that a court will impose if a trial takes place. In
> the event a prosecutor and defense attorney explore the possibility
> of a negotiated plea, they will no longer work in the dark. This
> fact alone should help to reduce irrationality in respect to actual
> sentencing outcomes." 2014 Historical Sentencing Guidelines Manual
> Chapter 1, (A)(4)(c) - Plea Agreement

Petitioner expected no incarceration time due to his misunderstanding of
the accusations the Assistant United States Attorney would later make and
Petitioner's lack of involvement with co-defendants. Through this course,
Counsel led Petitioner to sign a plea that was not voluntary.

> "defendant must make related waivers knowingly, intelligently, and
> with sufficient awareness of relevant circumstances and likely con-
> sequences" United States v. Ruiz, 153 L. Ed. 2d 586, 122 S. Ct. 2450
> (emphasis added) (2002)

> "The plea cannot be truly voluntary unless the defendant possesses
> an understanding of the law in relation to the facts" United States
> v. Broce, 488 U.S. 563, 102 L. Ed. 2d 927, 109 S. Ct. 757 (1989)

Entering into such agreement questions the role of Counsel and his
competence. Being at the proffer, Counsel was knowledgeable of Petitioner's
limited role in the accused events and had a professional responsibility to
guide Petitioner towards an agreement that protected him from additional
claims in the future:

Counsel's responsibilities here are again guided by ABA Standards:

> "The basic duty defense counsel owes to the administration of Justice
> and as an officer of the court is to serve as the accused's counselor
> and advocate with courage and devotion and to render effective, quality
> representation." American Bar Association - 4-1.2(b)

'Effective' and 'quality' implies Counsel should ensure that unrelated

charges, accusations, and scope of involvement are limited by the agree-

ments made and any errors are promptly addressed:

> "When inadequacies or injustices in the substantive or procedural
> law come to defense counsel's attention, he or she should stimulate
> efforts for remedial action" American Bar Association - 4-1.2(d)

Counsel failed to protect due process for Petitioner:

> "where a defendant is represented by counsel during the plea process
> and enters his plea upon the advice of counsel, the voluntariness of
> the plea depends on whether counsel's advice was within the range of
> competence demanded of attorneys in criminal cases" Hill v. Lockhart,
> 474 U.S. at 56 (quoting McMann v. Richardson, 397 U.S. 759, 771, 90 S.
> Ct. 1441, 25 L.Ed 2d 763 (1970))

The type of 'information and communications' provided Counsel can

also be considered to determine if Counsel made strategic decisions re-

lated to the contested issues. While the lack of due process is itself

significant miscarriage of justice, the Supreme Court defines the inform-

ation of communications standards as:

> "The reasonableness of counsel's actions may be determined or sub-
> stantially influenced by the defendant's own statements or actions.
> Counsel's actions are usually based, quite properly, on informed
> strategic choices made by the defendant and on information supplied
> by the defendant. In particular, what investigation decisions are
> reasonable depends critically on such information. For example,
> when the facts that support a certain potential line of defense are
> generally known to counsel because of what the defendant has said,
> the need for further investigation may be considerably diminished
> or eliminated altogether. And when a defendant has given counsel
> reason to believe that pursuing certain investigations would be
> fruitless or even harmful, counsel's failure to pursue these invest-
> igations with the defendant may be critical to a proper assessment
> of counsel's investigation decisions, just as it may be critical to
> a proper assessment of counsel's other litigation decision."
> Strickland v. Washington, 466 U.S. 668; 690, 104 S.Ct. 2052, 2066, 80
> L. Ed. 2d 674, 695 (1984)

To evaluate information and communication according to this standard,

Petitioner identifies three areas of assessment: (1) defendant's own

statements/actions, (2) information supplied by the defendant, (3) facts

known to support a plea. The only statements/actions Counsel could have

used for the plea agreement included the proffer with the Assistant United

States Attorney as that was the only time prior to the plea where Petition-

er discussed the facts of the case with Counsel ( F.10). (1) Petitioner's statements/actions included contesting 'Valley Farm Market' and other victims he was later charged with. (2) & (3) Information and facts were limited to the proffer, suggesting no effort from Counsel to understand the facts of the case, but more importantly concludes there could be no additional conversation to consider regarding the discussion of facts prior to the plea.

Finally, discussion of the facts of a case at a proffer is not sound professional action. The ABA recommends immediate investigation of case facts:

> "As soon as practicable, defense counsel should seek to determine all relevant facts known to the accused. In doing so, defense counsel should probe for all legally relevant information without seeking to influence the direction of the client's responses" <u>American Bar Association- 4-3.2(a) - Interviewing the Client</u>

Counsel never analyzed the facts of the case after an initial engagement ( F.10) meeting and failed to consider any available procedural steps, delivering Petitioner to the Government under the guise of representation and assumption of guilt at a proffer.

> "Defense Counsel should inform the accused of his or her rights at the earliest opportunity and take all necessary action to vindicate such rights. Defense counsel should consider all procedural steps which in good faith may be taken, including, for example....moving for severance from jointly charged defendants, and seeking dismissal of the charges" <u>American Bar Association- 4-3.6 - Prompt Action to Protect the Accused</u>

No such procedural steps were taken as could be considered strategic choice. 'Strategic Choice' as considered in <u>Strickland v. Washington</u>, 466 U.S. 668; 690, 104 S.Ct. 2052, 2066, 80 L Ed. 2d 674, 695 (1984) has limited context regarding a plea as later defined by the Supreme Court in <u>Flordia v. Nixon</u>, 543 US 175, 125 S. Ct. 551, 160 L.Ed 2d 565 (2004):

> "While guilty plea may be tactically advantageous for defendant, plea is not simply strategic choice; it is itself conviction, and high stakes for defendant require utmost solicitude"

21

As shown, 'strategic choice' has limited, if any contest in analyzing a
habeas corpus §2255 claim regarding a plea. When analyzing for strategic
choice, it is evident that a single meeting with the Assistant United
States Attorney is insufficient to bring enough support in favor of the
plea where disparities between Prosecution and Petitioner existed at that
meeting. The plea presented was not valid because it lacked specifications
of substance of crimes that allowed Petitioner to engage an agreement that
implied and accused the Petitioner of more than the Petitioner agreed.
Counsel's failure to advocate upon such serious grounds represents a fail-
ure of Counsel to advocate and uphold due process for Petitioner  and
could subsequently be determined to be inadequate and ineffective, fulfill-
ing the 1st prong of Strickland v. Washington, 466 U.S. 668; 690, 104 S. Ct.
2052, 2066, 80 L. Ed. 2d 674, 695 (1984): performance.

 The Government may contend they had a lack of fair opportunity due
to their lack of knowledge of the extent of attorney-client communications;
however, Justice Kennedy had opined in Missouri v. Fyre, 132 S. Ct. 1399
(2011) that this contention cannot contest the seriousness of ineffective
representation regarding a plea:

 "Discussions between client and defense counsel are privileged.  So
 the prosecution has little or no notice if something may be amiss
 and perhaps no capacity to intervene in any event.  State contends
 it is unfair to subject it to the consequence of defense counsel's
 inadequacies, especially when the opportunities for a full and fair
 trial...the states contentions are neither illogical nor without
 some persuasive force, yet they do not suffice to overcome a simple
 reality.  Ninety-seven percent of federal convictions...are the
 result of guilty pleas"  Missouri v. Fyre, 132 S. Ct. 1399 (2011)

B) PLEA WAS NOT ENTERED INTELLIGENTLY

 The intelligent nature of the plea is challenged as an intelligent
choice among alternative actions available to the Petitioner.

22

"a voluntary and intelligent choice among the alternative courses
of action open the defendant" Hill v. Lockhart, 474 U.S. at 55, 106
S. Ct. at 369 (citing North Carolina v. Alford, 400 U.S. 25, 31, 91
S. Ct. 160, 27 L. Ed. 2d 162 (1970)

Petitioner experienced three significant failures in respect to Counsel
ineffectively advising Petitioner that led to a failure to provide alter-
native courses of action:

    1) Counsel never weighed the advantages of trial;
    2) Counsel never negotiated the plea with prosecutor;
    3) §5K1.1 is not a valid course of action when defendant did not
       claim guilt.

## (1) COUNSEL NEVER WEIGHED THE ADVANTAGES OF TRIAL

Counsel never discussed trial as an option in any stage of the plea
process.  Petitioner did not fully understand that he had alternative courses
of action to take because his attorney's only advice was to sign a plea
deal.  This case was Petitioner's first and only encounter with the jud-
icial system.  Petitioner had no prior criminal history.  In pleading guilty
Petitioner believed he could help shorten the judicial process and was under
the impression that he still has the opportunity to argue the applicability
of the victim(s) and his role in relation to the other co-defendants, where
he considered his role to be so minor that it lacked significance.  It was
not until the PSR and Sentencing Memorandum came out that the Petitioner
would understand that the Government intended to target Petitioner as a
major role relevant to co-defendants and Petitioner lacked the appropriate
means to confront his accusers by entering the guilty plea.

Petitioner states that he did not have adequate understanding of his
trial options because Counsel failed to weigh the advantages of trial and
pleading guilty.  The first time Petitioner was made aware that he was
waiving his right to trial was at the plea colloquy and a statement of
technicality by the judge does not constitute effective weighing of options
by Counsel.

23

"With the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty" Brady v. United States, 742 U.S. 25 L. Ed. 2d 747, 397 (1970)

Judge Baylson concurs with the necessity to convey meaningful inform-ation regarding trial options in United States v. McGurn, U.S. Dist LEXIS 68200:: May 2014.

"Petitioner made the decision in the dark and without any meaningful understanding of the risks and consequences of pleading not guilty and going to trial, versus what he would gain by way of accepting the plea offer"

Since there was no conversation regarding the option of trial and Counsel admits on the record of bringing Petitioner to a proffer with the intent to admit guilt without analyzing facts of the case, Petitioner did not have full information and advice about all relevant considerations. There was also no exploration of possible outcomes required by the ABA standards (4-4.1 and 4-5.1) to assist the accused of making an intelligent decision.

"[Counsel] never explained to Petitioner how the Presentence Report would compute a sentencing guideline range of imprisonment... This conversation would have given Petitioner some idea of what Sentence he faced by going to trial if he was found guilty." United States v. McGurn, U.S. Dist. LEXIS 68200:: May 2014

The failure of Counsel to consult alternative courses of action also includes alternatives among the plea(F.40).

(2) COUNSEL NEVER NEGOTIATED WITH THE PROSECUTOR

Petitioner had no understanding that guilty pleas were negotiable in any way. Since Counsel did not consider Petitioner's concerns on the phone ( F.10), Petitioner was unaware that terms such as the charges, waivers, and related items were negotiable. Petitioner would have known Counsel was ineffective by not bartering with the Government over the terms of the guilty plea if Petitioner was aware of the opportunity.

Rule 11(c)(1) allows plea agreements to negotiate terms, recommend-

24

ations, and various factors that the Prosecution and Counsel can agree

upon and ask of the Court. The lack of bartering over the plea agreement

is the nexus of ineffective Counsel as the bartering process has replaced

trial as the primary vehicle for the justice system.

> "The reality is that plea bargains have become so central to the
> administration of the criminal justice system that defense counsel
> have responsibilities in the plea bargain process, responsibilities
> that must be met to render the adequate assistance of counsel that
> the Sixth Amendment requires in the criminal process at critical
> stages."

> "Because ours "is for most part a system of pleas, not a system of
> trials," Lafler, post, 132 S. Ct. 1376, 182 L. Ed. 2d 398, it is in-
> sufficient simply to point to the guarantee of a fair trial as a back-
> stop that inoculates any errors in the pretrial process. "To a large
> extent...horse trading [between prosecutor and defense counsel] det-
> ermines who goes to jail and for how long. That is what plea bargain-
> ing is. It is not some (182 L. Ed. 2d 390) adjunct to the criminal
> justice system; it is the criminal justice system." Scott & Stuntz,
> Plea Bargaining as Contract, 101 Yale L. J. 1909, 1912 (1992). See
> also Barkow, Separation of Powers and the Criminal Law, 58 Stan. L.
> Rev. 989, 1034 (2006) ("[Defendants] who do take their case to trial
> and lose receive longer sentences than even Congress or the prosecutor
> might think appropriate, because the longer sentences exist on the
> books largely for bargaining purposes. This often results in indiv-
> iduals who are less morally culpable but take a chance and go to trial"
> (footnote omitted)). In today's criminal justice system, therefore,
> the negotiation of a plea bargain, rather than the unfolding of a trial
> is almost always the critical point for a defendant.

> To note the prevalence of plea bargaining is not to criticize it. The
> potential to conserve valuable prosecutorial resources and for def-
> endants to admit their crimes and receive more favorable terms at sen-
> tencing means that a plea agreement can benefit both parties. In
> order that these benefits can be realized, however, (182 L. Ed. 2d
> LedHR8)[8] criminal defendants require effective counsel (132 S. Ct.
> 1408) during plea negotiations. "Anything less...might deny a defend-
> ant 'effective representation by counsel at the only stage when legal
> aid and advice would help him.'" Massiah, 377 U.S. at 204, 84 S. Ct.
> 1199, 12 L. Ed. 2d 246 (quoting Spano v. New York, 360 U.S. 315, 326,
> 76 S. Ct. 1202, 3 L Ed. 2d 1265 (1959) (Douglas, J. concurring)).
> Lafler v. Cooper, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012)

As Justice Kennedy opined, ineffective assistance during the plea process

denies a defendant of the negotiation process that is essential to a def-

endant's due process rights and has replaced trial as the primary vehicle

for conviction (97% of federal convictions are pleas), Department of

Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice

25

Statistics online, Table 5.22.2009. Since Petitioner was unaware of his ability to negotiate at this stage and Counsel failed to <u>attempt to</u> negotiate terms, Counsel's representation was ineffective at a critical stage in the legal process.

Prejudice under <u>Strickland's</u> second prong was produced from this lack of consultancy:

> "Defense Counsel may engage in plea discussions with the prosecutor. Under no circumstances should defense counsel recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed, including an analysis of controlling law and the evidence likely to be introduced at trial" <u>American Bar Association - 4-6.1</u>

The Petitioner lacked advocacy from Counsel because Petitioner would have insisted on negotiating better terms if he knew negotiation was available to him. (Terms such as removal of the Obstruction of Justice charge (F.11), clearly stated victims and losses, and rejection of waivers). While Petitioner cannot prove negotiations would have been accepted by the Government, Petitioner would have been aware of the Government's accusation of victims and losses, and understood his only course of strategy to confront these accusations would be trial and that decision would have been reasonable and informed. Without the negotiation process, Counsel pursuaded Petitioner to plead guilty to items Petitioner contested and denied Petitioner the ability to plead intelligently, invalidating the plea. Ultimately, Petitioner would not have pled guilty if he was made aware that the accused crimes were beyond the scope of his willingness to plea to. Justice Scalia helps define this concept in his dissenting opinion of <u>Lafler v. Cooper</u>, 132 S. Ct. 1376 (2011):

> "That is what Strickland's requirement of "prejudice" consists of: Because the right to effective assistance has as its purpose the assurance of a fair trial, the right is not infringed unless counsel's mistakes call into question the basic justice of a defendant's conviction or sentence"

Since 'Valley Farm Market' was unrelated to the charges and Petitioner told

both Government and Counsel he was not involved with other victims as well, there is reason to believe the charges were not appropriate and Counsel's mistakes call into question the basic justice of both the plea and the related sentence.

Finally, as Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985) mentions, the failure to investigate or discover could influence recommendation to plea.

## (3) ASSUMPTION OF GUILT

Counsel advised that the only strategic option would have been to seek a §5K1.1 departure by assisting the Government, but that opportunity has passed due to co-defendant, Samuel Puleo, taking that opportunity first. Since Counsel never obtained or listened to the Government's supposed wire recording, Counsel's recommendation to plea is similar in nature to McMann v. Richardson, 397 U.S. 759, 25 L. Ed. 2d 763, 90 S. Ct. 1441 (1970) where a plea was opined invalid by Justices Brennan, J., Marshall, and Douglas, JJ because a defendant was motivated to plea by the influence of an un-constitutionally obtained confession (F.12). Defendant in this case had no adequate means to challenge and was opined to "be relieved of the con-sequences of his guilty plea." The opinion made reference in Harrison v. United States, 392 U.S. 219, 20 L. Ed. 2d 1047, 88 S. Ct. 2008 (1968) where Justice White "pointed out that an inadmissable confession preceding a plea of guilty would taint the plea."

Because Counsel failed to discover the contents of the wire recording, Counsel was ineffective in recommending a course of action upon where un-known information tainted the plea and Counsel relied upon it. Petitioner never admitted guilt to Counsel; therefore, Counsel used inappropriate in-formation to deduce guilt and failed to consult Petitioner appropriately

27

about options.  A §5K1.1 sentencing departure is a sentencing ramification that assumes guilt of the party and is dependant upon conviction.  Since Counsel had no information from Petitioner (never reviewed facts of case), his recommendation of a §5K1.1 strategy assumes guilt of Petitioner and demonstrates Counsel's ineffective assistance by failing to evaluate the benefits of going to trial.

It has thus been demonstrated that the plea was involuntary and not intelligent due to ineffective Counsel and that ineffective assistance prejudiced the Petitioner because he had reasonable evidence against the Government's case.

> "When, as here, a defendant pleads guilty on the advice of counsel, he must demonstrate, in order to later claim that his plea was involuntary because of some infirmity in the advice, that the advice was not within the range of competence demanded of attorneys in criminal cases"  Taylor v. Bower sox, 329 F. 3d 963, 971 (8th Cir. 2003

It had been demonstrated here that Counsel's assistance was so egregious that Petitioner's choices could not have been voluntary or intelligent when Petitioner relied upon Counsel taking professional control over the case and Counsel failed to advocate and consult in a manner considered reasonable by professional standards.

28

## II. RESTITUTION/LOSS CLAIM

Petitioner identifies two subjects with three subsections each, of ineffective assistance related to restitution that both cumulatively and individually prejudice the Petitioner according to the standards of Strickland v. Washington, 466 U.S. 668; 690 104 S. Ct. 2052, 2066 80 L. Ed. 2d 674, 695 (1984).  Counsel failed to subject the Prosecution's case to meaningful adversarial testing (F.13) by:

A) Failed to Advocate for Petitioner Regarding Restitution

    1) Loss Statements Unreliable and Unsubstantial
    2) Restitution Figures too Complex to Evaluate
       a) Mark-to-Market Loss
       b) Savings and Loss Complexity
       c) Sales and Use Tax (SUT)
    3) Restitution Inconsistent with Accused Crimes

B) Failed to Consult with Petitioner

    1) PSR Deficiencies
    2) Ignored Objections to Sentencing Memorandum
    3) Failed to Consult Regarding Motion to Modify Restitution

## §2255 VALID RESTITUTION CLAIM

Issues regarding restitution are valid §2255 claims according to:

"A claim that Counsel rendered ineffective assistance with respect to the amount of restitution is cognizable in a §2255 motion" Weinberger v. United States, 268 F. 3d 346, 351-52 (6th Cir. 2001)

## VICTIM LOSS BACKGROUND

Petitioner was charged with seven restitution victims:

| | | |
|---|---|---|
| 1) AEP Energy | | $527,240 |
| 2) Atlantic States Pipe | | 141,399 |
| 3) Friedman's Plaza, Inc. | | 6,020 |
| 4) Rastelli Brothers, Inc. | | 46,687 |
| 5) Valley Farmer's Market | | 51,428 |
| 6) Silvi Group | | 46,129 |
| 7) Property Management, Inc. | | 0 |
| TOTAL: | | $818,903 |

AEP Energy further describes their losses in four (F.14) categories,

29

which requires definition for this discussion.  Exhibit O describes:

| | | |
|---|---|---|
| 1) Prepaid Commissions | $ 80,017 | |
| 2) Early Termination Fees | 365,685 | |
|   a) Lost Profit Margin | | $275,496 |
|   b) Mark-to-Market Losses | | 90,189 |
| 3) Attorney Fees and Other Legal Costs | 31,490 | |
| 4) Internal Costs and Expenses | 50,000 | |
| TOTAL: | $527,192 | |

AEP's "lost profit margin" is included in loss discussions here. Mark-to-market losses are also discussed here, where additional and remainder loss claims are further discussed in Exhibit A for further development and explaination.

## (A) FAILED TO ADVOCATE FOR PETITIONER REGARDING RESTITUTION

## (1) LOSS STATEMENTS UNRELIABLE AND UNSUBSTANTIAL

Counsel obtained complete victim loss information statements for the first time on June 17, 2014, the day after sentencing.  Counsel was unprepared for sentencing:

" Waldron: I'm just getting discovery today, your Honor
  Court:    Oh, Why is that?
  Waldron: I don't know"   (Exhibit K, page 14, ln 1-4)

The Court identifies this lack of preparation during sentencing:

" Court:    Well-Well, just let's wait, Mr. Waldron.  All right.
            You had opportunities for discovery.  I assume that one
            of the things that you, either got from the government
            or could have gotten, if you had requested it would have
            estimates of the amount of loss by the victims...you've
            had three months to get additional information from Mr.
            Axelrod or from the Probation Department and so forth"
            (Exhibit K, page 15, ln 22-25; page 16, ln 1-2, 4-6)

Petitioner raised issues with the incomplete victim loss statements that became available at sentencing (F.15), but had ineffective and inept advocacy from Counsel.  Petitioner argued that one-page loss summaries could not be accurately evaluated at sentencing without getting the underlying detailed information (F.16), but Counsel failed to address this issue during sentencing and in the subsequent motion to modify (F.17).

"The district court erred by relying exclusively on the one-page
loss summaries provided by the victims and in not requiring more
detailed explainations of the losses each victim suffered."
United States v. Waknine, 543 F. 3d at 557

The failure to challenge restitution figures is a failure among
basic duties for Counsel as there was reasonable belief that large dis-
crepencies existed (F.18). Combined with not obtaining discovery prior
to sentencing, this behavior demonstrates ineptness and failure of the
"duty to advocate the defendant's cause" Rickman v. Bell, 131 F. 3d 1150
(6th Cir 1997).

Counsel had a responsibility under the American Bar Association
standards 4-4.1, 5.1, and 6.1 to learn and investigate relevant facts of
the case prior to an entry to a plea.

At the time of sentence, Counsel had a responsibility to be aware
of all relevant information and to challenge it where necessary.

"Defense Counsel should present to the court any ground which will
assist in reaching a proper disposition favorable to the accused.
If a presentence report or summary is made available to defense
counsel, he or she should seek to verify the information contained
in it and should be prepared to supplement or challenge it if nec-
essary" American Bar Association - 4-8.1- Sentencing

Beyond Counsel's failure to advocate Petitioner's doubt in the victim
loss statements' restitution figures, Counsel failed to confront the Gov-
ernment's lack of preparation and proof of loss before the Court.   In
United States v. Napae Luta Young, 272 F. 3d 1052 (2001, CA8 SD), a lack
of evidence to prove lost profits ( F.19) was considered plain error, yet
Petitioner's Counsel made no objections.

The Government has a clear responsibility to document losses suf-
ficiently:

"there is inadequate explaination and insufficient reasoning why
the district court relied on the face of the government's document
without requiring evidence that the costs reported were directly
and reasonable demanded" United States v. Hosking, 567 F. 3d 329,
333-34 (7th Cir. 2009)

31

"The Government must provide sufficient documentation and explanation for victims' claimed losses" United States v. Quillen, 335 F. 3d 219 (3rd Cir. 2003)

The second circuit had made clear that a court "may not just accept [a party's] statement of the damages" Transatlantic, 109 F. 3d at 111 (reversing district court's determination, after default judgment, that accepted at face value plantiff's unsubstantiated estimation of damages in complaint), yet this is what the Government asked and Counsel accepted in this case. Petitioner argued with Counsel that underlying documentation, such as actual utility bills and market settlement reports could provide more substantial information (F.20) with no response or action from Counsel. The Government admitted to have unsubstantiated claims:

" Axelrod: I have not reached out and spoke to AEP about that
$50,000 number, because I didn't know that I was
going to have to defend it" (Exhibit K, page 8, ln 10-12)

"Issuing an order of restitution unsupported by the evidence is not an option" United States v. Ferdman, 779 F. 3d at 1140-41

Counsel erred by not challenging the Government's figures, requiring valid supporting information (F.20). Examples of information needed is described in Exhibit A and Section II(A)(2), displaying the incredibly dense amount of underlying details affecting restitution and how Counsel made significant error by accepting the Government's loss statements.

Counsel continually evaded the necessity for "accurate" information. In Court, Counsel was corrected by the Judge:

" Waldron: restitution has to be reasonable
Court:   Well, it has to be accurate, first of all"
(Exhibit K, page 7, ln 12-14)

and he further attempts to evade the issue in his letter (Exhibit N) by agreeing with the Government and referring to 18 U.S.C. §3663A (Mandatory Victims Restitution Act "MVRA") which gives the Judge broad discretion for

restitution.   This type of conclusive reasoning without research of law and fact is unreasonable and inept as Counsel has a duty to advocate for his client and lay the burden of proof upon the Government.

> "The government has the burden of proving the amount of the loss by a preponderance of the evidence"  United States v. Anderson, 741 F. 3d at 951

By not understanding the 'MVRA' and how it applies to the facts of Petitioner's case is a failure of basic research.   Petitioner had very complex issues regarding the calculation of restitution without the guiding hand of Counsel to advise him related to law and fact.

> "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under the Strickland rule."  Hinton v. Alabama, 134 S. Ct. 1081, 1089, 188 L. Ed. 2d 1 (2014)

Case law refutes Counsel's conclusivity:

> "Although the [Mandatory Victims Restitution Act ("MVRA")] does not require courts to calculate restitution with exact precision, some precision is required - speculation and rough justice are not permitted."  United States v. Kilpatrick, 798 F. 3d 365, 388 (6th Cir. 2009)

> "Although the MVRA grants district courts "a degree of flexibility in accounting for a victim's complete losses," the court may "utilize only evidence that possesses 'sufficient' indicia of reliability to support its probable accuracy'"" United States v. Waknine, 543 F. 3d 546, 557 (9th Cir. 2008) (quoting United States v. Garcia-Sanchez, 189 F. 3d 1143, 1148-49 (9th Cir. 1999)

> "In all cases, it is the committee's intent that highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution.   The committee believes that losses in which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly casually linked to the offense, should not be subject to mandatory restitution"  S. Rep No. 104-17a at *19 (1996), reprinted in 1996 USC CAN 924, 931-32

Counsel was both unprepared for representation and negligent in his responsibility to advocate for his client at all stages of the judicial process (F.21).   Counsel's reference to 18 U.S.C. §3663A was an excuse for his lack of advocacy and is not consistent with case law interpretation:

33

"While the abuse-of-discretion standard under which we ultimately review a district court's aware of restitution is differential and highly so, such standard will not countenance a finding of lost sales based on a victim's unverified claim that "my losses are x and the value is x"  United States v. Ferdman, 779 F. 3d at 1140-41

These loss summaries (F.22) were the extent of the Government's restitution arguments for each victim. Not only did Counsel fail to prepare for sentencing, he advocated against his client on issues he had no qualifications or preparedness to verify:

" Waldron: Well, I think it should be this Judge. It should be the $365,000. They're asking for profits. They did resell the energy, and there was a loss that we should pay"  (Exhibit K, page 9, ln 20-23)

Not only was Counsel not in a position to make such a statement since he never reviewed the figures or questioned the authenticity of the Government's information, but Counsel had no understanding about energy contracts to discern such a drastic statement. Counsel reveals a critical misunderstanding regarding AEP's claim of $365,733, where Counsel is confusing their 'mark-to-market' losses, which involves re-selling energy, and lost profit margins. (a) Mark-to-market losses, (b) complexity of calculating loss, and (c) billing details regarding New Jersey accounts (F.23) demonstrates that restitution was too complex to calculate and that Counsel and the Government did not understand the complexity of these issues.

(2) RESTITUTION FIGURES TOO COMPLEX TO EVALUATE

(a) MARK-TO-MARKET LOSSES

"[C]ourts are most likely to conclude that determining the amount of a fine or restitution would unduly complicate or prolong the sentencing proceeding when there are: multiple victims, the causation issues are disputed; or disputed future losses are involved"  United States v. BP Products North America Inc., 610 F. Supp. 2d 655, 691 (S.D. Tex. 2009)

Petitioner explicitly informed Counsel (F.24) that 'mark-to-market' figures derived by AEP are not reliable because they do not represent

34

objective, 'out-of-pocket' loss. Counsel brought up the 'resale' of
energy at sentencing because Petitioner informed him that AEP purchased
energy futures contracts on the commodities market to service clients
who later had their contracts supposedly (F.25) cancelled. Petitioner
was concerned that AEP Energy had sold the energy to someone else and
was inflating their claim here to receive payment twice. This is proved
probable because of their use to mark-to-market accounting to claim losses.

Mark-to-market accounting can be reasonably understood by 26 U.S.C.
§1256, where the Internal Revenue Service defines equity/trade positions
and their year-end valuations. If a trade has not been closed (stock,
commodity, and futures contracts can be interchangeable for such account-
ing language) at a particular point in time, an estimate of the trade's
value is taken, but the estimate does not represent a finalized value
because the trade is still open and exposed to market fluctuations. An
example is as follows:

        Day 1: Company A buys stock B for $100
        Day 2: Stock B can be sold for $95
        Day 3: Stock B can be sold for $105

Company A would have a mark-to-market loss of $5 from Stock B on
day 2, but a $5 gain on day 3. Depending on the day in the example, the
mark-to-market value is different. Even more important, since Company A
still has Stock B, they have lost nothing out-of-pocket, because they have
not sold Stock B yet.

        "A futures contract requires the delivery of a commodity at a
        specified price at a specified future time, though most contracts
        are liquidated before physical delivery occurs. For each day when
        the contract remains open (ie: before delivery or liquidation),
        NYMEX's clearing house 1 evaluates the change in value of its cus-
        tomers (497 F. 3d 111) open contracts. This process, known as
        "marking-to-market" the customer's open position, determines whether
        a customer must post additional margin or, instead, receives payments
        on margin. The settlement prices are used to value the open positions"
        N.Y. Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc., 497
        F. 3d 109 (2006)

In the case of AEP Energy, the energy purchased has different mark-to-market values every day, so the selection of what day to evaluate the energy changes its value. Using the previous pages example, we do not know if AEP is quoting Day 2 or Day 3. This is a moot point because AEP Energy would have liquidated or sold ( F.26) the energy futures immediately after discovering the supposed fraud, unless they had plans to take delivery of that energy to service other clients (if a futures contract is not sold/ liquidated, the purchaser must take delivery of the item as explained in the example). The fact that AEP is using mark-to-market language suggests the positions were still open and AEP was taking delivery for (a) client(s) ( F.26).

The complexity of such an issue is beyond the scope of MVRA. Similar concepts to AEP Energy's claims have existed and thrown out as speculation or overly complex:

"Frito-Lay's restitution request for this amount fails to address whether it may have offset any loss from higher costs through other means, for example by raising its prices charged to its own customers. The district court recognized that, if Pac Ship had been able to pass on to Navy the inflated charges from Gamma Tech and Tidelands when negotiating the price of the modifications, Pac Ship would have suffered no loss" United States v. Randell Lee Rahal LEXIS 148436:: Nov 1, 2015 (referencing Gamma Tech Industries Inc., 265 F. 3d at 926)

Exactly how AEP Energy handled their futures contracts are unknown and at best speculative (see Exhibit A ).

If AEP sold or liquidated the energy, the Government could have produced market open/close reports from their exchange to support a loss or gain (F.26). Instead, AEP quotes a loss at an unspecified date, of a futures contract they have not substantiated to be sold.

As this discussion demonstrates, the issues at hand were significantly more complicated than:

" Waldron: It should be the $365,000. They're asking for profits. They did resell the energy, and there was a loss that we should pay" (Exhibit K, pg. 9, ln 20-23)

"And in the event the actual-loss calculation is in fact too complex
to permit a timely calculation of reasonable restitution, the MVRA
envisions the appropriate path for a district court is to hold ad-
ditional proceedings or to decline to order restitution at all, not
to issue an order unsupported by the evidence" Fair, 699 F. 3d at 516

The fairest reading of Lama Holding Co. v. Smith Barney, Inc., 88 N.Y. 2d

413, 668 N.E. 2d 1370, 1373, 646 N.Y.S. 2d 76 (N.Y. 1996) clarifies a dis-

tinction by demonstrating that 'out-of-pocket' losses and mark-to-market

losses are not the same and only 'out-of-pocket' losses are recognized by

law as loss.  Mark-to-market figures are a type of valuation speculation

and not 'out-of-pocket' loss.  AEP Energy failed to prove 'out-of-pocket'

losses by including line-item summaries that are insignificant when eval-

uating commodity futures because they did not provide underlying market

settlement data with their exchange to prove 'out-of-pocket' loss.

"We have stated in applying §3663A(c)(3)(B) that a burdensome, com-
plicated, or speculative calculation provides a good reason for the
district court to decline to exercise its discretion" United States
v. Martinez, 690 F. 3d 1083, 1089 (8th Cir. 2012)

Counsel had no professional grounds that would be considered "sound" to

qualify such data, especially since accepting such statements resulted in

prejudice towards the Petitioner.

Counsel, who claims to specialize in "white-collar" defense on his

website (Exhibit E), should be expected to be knowledgeable about standard

mercantile exchange and accounting concepts.

"At sentencing, the district court is permitted to consider any in-
formation with sufficient indicia of reliability, so long as the
court makes explicit findings of credibility and the defendant is
given an opportunity to rebut the evidence.  A defendant has a due
process right, however, not to be sentenced based on the courts
consideration of false or unreliable information." Anderson v. United
States, 2015 U.S. App LEXIS 20832:: December 2, 2015

The Petitioner attempted to rebut these issues, but Counsel's lack of

advocacy violated Petitioner's due process rights.

While Petitioner had an expectation of competant knowledge and under-

standing of the subject from Counsel, it is clear that the Government also

37

lacked such understanding:

> " <u>Axelrod</u>: Well, I guess he's contesting the underlying facts, too
> through-- so, that's a different issue...and whether the
> numbers are, in fact, accurate... I am not in a position.
> If the court is disinclined to take the statement of AEP
> in this e-mail as what their testimony would be, to--to
> debate this any further today, then I would have to bring
> in a witness from the company" (Exhibit K, page 11, ln 1-10

The Assistant United States Attorney did not have any certainty to
the figures and Counsel should have objected to the lack of certainty as
well as to the suggestion that a witness from the company somehow quant-
ifies data that has never been substantiated.

> "Where the alleged loss is not quantifiable to any degree of certainty,
> the government's burden has not been satisfied, and no restitution
> should be ordered." <u>United States v. Anderson</u>, 741 F. 3d at 954

The figures presented were too complicated for the Government to under-
stand and Counsel had a professional responsibility to take action since
the burden of proof is on the Government.  The restitution figures could
and should have been dismissed due to the complexity and lack of understand-
ing by the Prosecution:

U.S.C.A. §3663(c)(3)(b)

> "The court does not have to order restitution when determining com-
> plex issues of fact related to the cause or amount of the victim's
> losses would complicate or prolong the sentencing process to a deg-
> ree that the need to provide restitution to any victim is outweighed
> by the burden on the sentencing process."

U.S.S.G. §5E1.1(b)(2)(b)

> "determining complex issues of fact related to the cause or amount
> of the victim's losses would complicate or prolong the sentencing
> process to a degree that the need to provide restitution to any
> victim is outweighed by the burden on the Sentencing process"

Instead of arguing against the mark-to-market loss claims based on in-
applicability of mark-to-market losses or requesting the court waive
restitution through applicable law, Counsel acquisced to the Government's
claim and failed to provide meaningful adversarial testing (F.13).  See

(Exhibit A) for similar applications for all of AEP Energy's claims.

(b) SAVINGS AND LOSS COMPLEXITY

The complexity of calculating loss includes an inability to obtain objective figures from which loss is calculated. In Exhibit X, Rastelli Brothers was paying $0.0978/kwh (F.27). After Coastal Energy Consultants LLC engaged Rastelli Brothers in a contract, they claimed to be paying between $0.0810 to $0.0840/kwh (Exhibit AA) instead of $0.0706/kwh as they thought was expected (F.28). The rate of $0.0810/kwh still represents a realized savings of approximately $60,000 or 17.1% from their previous rate of $0.0978/kwh for this one account. There is no objective evidence suggesting an alternative rate of $0.0706/kwh was available at the time.

> "These cases demonstrate that the measure of damages in a fraud case depends critically upon comparing a plantiff's investment with the alternatives that would have existed were it not for the defendant's fraud" 2015 US Dist LEXIS 749629:: In re libor - Based Fin Instruments, Antitrust Litig:: Nov 2015

Without an objective alternative option, the figures from Rastelli's prior energy rate show a savings and drop in price, negating the argument that the supposed victims' incurred losses. This example transcends Rastelli Brothers and includes all of the energy contracts accused by the Assistant United States Attorney (F.24) making loss impossible to calculate, if loss even occurred.

(c) SALES AND USE TAX (SUT)

Exhibit D demonstrates the complexity of calculating restitution from another perspective. "All-inclusive" or "energy-only" (Exhibit C) contracts from AEP Energy do not include sales tax in their contracts. In Pennsylvania, SUT is a separate line item on a client's electricity bill. In New Jersey, sales use tax or SUT is added to the "all-inclusive" energy rate on the electricity bill. Energy contracts in New Jersey will show a 7% (F.30)

increase in rate on a bill compared to the contract rate because of this
practice. Petitioner had three victims with some or all of their locations
in New Jersey: Silvi Concrete, Atlantic States Pipe, and Rastelli Brothers,
where 50-100% of their restitution figures could be sales tax related dem-
onstrating prejudice from this lack of understanding where there may have
been no or significantly less loss to these clients, enough to drastically
affect restitution and loss figures.

(a) Mark-to-Market losses, (b) Savings and Loss Complexity, and (c)
Sales and Use Tax constructively demonstrates the complexity of the sit-
uation and the error of Counsel not considering such complaints from Pet-
itioner. Constructively, these figures challenge the majority of the
restitution, providing significant prejudice towards the Petitioner.

(3) RESTITUTION INCONSISTENT WITH ACCUSED CRIMES

Failure of Counsel to advocate for Petitioner includes the imposition
of restitution for an accused crime that is inconsistent with the alleged
charges. In the Government's sentencing memorandum in Exhibit F, the
Government accuses the Petitioner of "changing the terms of the contract
from "fixed all-inclusive" contracts to "energy only."" Exhibit U,
Valley Farm Market received an "all-inclusive" rate (F.31) and does not
meet the criteria of the offense the Government charged the Petitioner.

> "a court may award restitution under the MVRA only for loss that
> flows directly from 'the specific conduct that is the basis of the
> offense of conviction'" "seeking restitution for losses caused by
> an unprosecuted offense rather than by the offense of conviction is
> something the government "may not do"" United States v. May, 706
> F. 3d 1209, 1214 (9th Cir. 2013) (quoting United States v. Gamma
> Tech Indus., Inc., 265 F. 3d 917, 927 (9th Cir. 2001)) see also
> United States v. Archer, 671 F. 3d 149, 170 (2nd Cir. 2011)

The Petitioner raised this issue with Counsel, noted in the PSR objections,
again at 7:36 A.M. on 06/13/2014 in an e-mail objecting to the

40

Government's Sentencing Memorandum and again just before sentencing in the presence of the Government (F.5). The fact that the contract is inconsistent with the Government's claims and Counsel chose to agree (F.5) with the Government's determination demonstrates a complete lack of advocacy and questions the integrity of the entire case, because Counsel is not even advocating congruency between charges and victims, infering that neither Counsel nor the Government has any fundamental understanding of the charges brought upon the Petitioner or simply did not care;

'Valley Farm Market' is significantly important because it demonstrates inconsistency between the plea agreement and the understanding of the charges being pled to, the fundamental issue in Bousley v. United States, 140 L. Ed. 2d 828, 118 S. Ct. 1604 (1998). This is further developed in the explaination of ineffective Counsel in regards to the plea agreement Section I(A) and the resulting prejudice is the Petitioner would not have signed a plea agreement knowing of these accused offenses.

RESTITUTION PREJUDICE

Glover v. United States, 531 U.S. 198, 203, 121 S. Ct. 696, 148 2. L. Ed. 2d 604 (2001) establishes that a lesser charge or a sentence of less prison time establishes prejudice under the second prong of Strickland v. Washington, 466 U.S. 668; 690, 104 S. Ct. 2052, 2066 80 L. Ed. 2d 674, 699 (1984).

"[A]ny amount of [additional] jail time has Sixth Amendment significance"

The Petitioner received 14 points under U.S.S.G. §2B1.1(b)(1)(H) for a loss amount greater than $400,000 but less than $1,000,000. Petitioner has demonstrated the error of basing restitution and loss on the victim loss statements and the related loss-summary issues could potentially bring restitution down to $0 in loss, demonstrating 14 points of

41

speculation in sentencing. Counsel's failure to demonstrate the complexity of the restitution calculation, failure to request dismissal of restitution, and the additional lack of advocacy and due process claims provides solid foundations for prejudice against the Petitioner, in as much as 14 points related to sentencing.

> " Court     : So, it's not affecting the guideline range
> Waldron   : It probably isn't
> (Exhibit K, page 15, ln 7-8)

> " Court     : this debate isn't going to change the guideline range
> Waldron   : I don't think it is, your Honor"
> (Exhibit K, page 16, ln 7-9)

The sentencing transcript (Exhibit K) clearly demonstrates Counsel's failure to address restitution in a meaningful way, prejudicing the Petitioner.

Counsel should have suggested here, or in the subsequent restitution modification motion, that restitution was too complicated to calculate and relying on the loss summaries provided was arbitrary and speculative.

> "Congress plainly intended that Sentencing courts not become embroiled in intricate issues of proof,as it provided that the MVRA is to be inapplicable if the court finds that the determination of complex factual issues related to the cause or amount of the victims' losses would unduly burden the Sentencing process." Reifler, 446 F. 3d at 136

42

## (B) FAILED TO CONSULT PETITIONER

The issues brought up at the sentencing hearing are not isolated events. Counsel's ineffective representatives transcends many critical points in the judicial and sentencing process including: The PSR, the Sentencing Memorandums, and the post-sentencing Restitution Motion and hearing.

Counsel ignored most of Petitioner's objections to the Sentencing Memorandums and submitted official documentation to the Court without Petitioner's review or consultation. While section II(A) is itself a conclusive claim, section II(B) adds significant objective evidence to support the restitution claim and the plea agreement claim (section I). This section also contains its own claim of lack of consultation and advocacy from Counsel that can be individually evaluated under the first prong of <u>Strickland</u> for ineffective performance. <u>United States v. Zemba</u>, 2007 U.S. Dist. LEXIS 15305, outlines a framework for claims of ineffective consultation from Counsel, requiring 1) amount of, 2) timing of, and 3) quality of consultation to satisfy an ineffective representation claim related to consultation. The list of events and the underlying substantiation behind concerns is discussed as follows to meet the requirements of this framework.

## (1) PSR DEFICIENCIES

The Presentence Report/Presentence Investigation ("PSR") is an important development for creating sentencing expectations and for guiding the Court to a sentencing decision. Beyond stating relevant facts of the case, the probation department is responsible for verifying restitution and loss claims by the Government and victims. Counsel failed Petitioner at the PSR stage of the judicial process by (a) not ensuring the probation

43

department adhered to appropriate due process and by (b) failing to con-

sult and advocate with Petitioner regarding the PSR.

(a) PSR FAILED DUE PROCESS REQUIREMENTS

Petitioner received a draft copy of the PSR on 03/11/2014.  The draft

copy did not include restitution amounts, defendant's offense level, guide-

lines and policy statements of the Sentencing Commission, sentencing range,

or information sufficient for a restitution order.  All of these items are

required of probation under Rule 32:

Rule 32(c)(1)(B):   If the law permits restitution, the probation
                    officer must conduct an investigation and sub-
                    mit a report that contains sufficient inform-
                    ation for the court to order restitution.

Rule 32(d)(1)   :   The presentence report must:
                        (A) identify all applicable guidelines
                            and policy statements of the Sentencing
                            Commission
                        (B) Calculate the defendant's offense level
                        (C) State the resulting sentencing range and
                            kinds of sentences available

Rule 32(d)(2)(D):   When the law provides for restitution, inform-
                    ation sufficient for a restitution order

Petitioner never received another copy of the PSR, after receiving the

draft, from either probation or Counsel.  The addendum or amendments to

the PSR (noted on PSR as section 20, 25-30, 70, 79, 81, 110) were never

sent to Petitioner.

Rule 32(g)      :   At least 7 days before sentencing, the probation
                    officer must submit to the court and to the part-
                    ies the presentence report and an addendum contain-
                    ing any unresolved objections, the grounds for
                    those objections, and the probation officer's
                    comments on them.

This due process issue is directly related to Counsel's failure to rep-

resent Petitioner regarding restitution/loss because probation is sup-

posed to investigate and report regarding restitution, and neither Pet-

itioner nor Counsel (F.32) saw this information prior to sentencing

44

(see Exhibit K). If Counsel reviewed the PSR at sentencing or during the Motion to Modify Restitution, he would have seen that probation failed to verify all restitution figures in their revised version and completely relied on loss statements and Government documentation:

- "Through statements to the F.B.I., representative of 2 victim companies reported the following losses as a result of their relationship with Coastal"
- "Through a statement provided by Rastelli Brothers Inc"
- "Through a statement provided by the Silvi Group"
- "According to the Government, Valley Farm Market sustained a loss of"
  Presentence Report of Michael Mateja

It was completely unacceptable for probation to rely on these statements and not investigate or verify the underlying information.

"It appears that the Probation officer's PSR relied entirely on letters drafted by [victims] counsel. No evidence, however, has been submitted in support of those letters. Without sufficient documentation it is the undersigned's view that the court cannot, at this time and without further delay, determine [victim's] actual loss attributable to defendant" United States v. Randell Lee Rahal, LEXIS 148436:: November 1, 2015

Counsel failed to question probation's reliance on insufficient documentation in determining loss and the lack of documentation alone is enough to dismiss the determination of loss/restitution at sentencing.

At sentencing, Rule 32(i) applies:

At sentencing, the court
(A) Must verify that the defendant and the defendant's attorney have read and discussed the presentence report and addendum to the report;
(C) must allow the parties' attorney to comment on the probation officer's determinations and other matters relating to an appropriate sentence.

Counsel failed to represent Petitioner by not obtaining discovery and the presentence report to challenge them and provide adverserial testing:

"Defense Counsel should make a resonably diligent effort to comply with a legally proper discovery request" American Bar Association - 4-4.5 - Compliance with Discovery Procedure

"Defense Counsel should present to the court any ground which will assist in reaching a proper disposition favorable to the accused. If a presentence report or summary is made available to defense counsel, he or she should seek to verify the information contained

in it and should be prepared to supplement or challenge it if nec-
essary." <u>American Bar Association - 4-8.1 - Sentencing</u>

Petitioner's objection to the inclusion of victim 'Valley Farm Market' is

brought up in the PSR with completely unreasonable conclusions and no

comment or dispute from Counsel:

> "Regarding 'Valley Farm Market,' the defendant believes that no bus-
> iness was conduced that reflected the crimes noted in this report.
> However, co-defendant Samuel Puleo reportedly handled the majority
> of the communication, and the defendant may not be personally aware
> of the details." <u>PSR- Michael Mateja- 'Objections'</u>

As seen in Exhibit B, Petitioner was not only aware of the details, but

Counsel failed to comment on complete speculation in these reports.

> "Although specific information has not been provided, based upon
> the average of reported losses of the other victims companies, it
> is reasonable to estimate that the remaining victim customer,
> Property Management Inc, sustained an approximate loss of $75,000"
> <u>PSR- Michael Mateja</u>

This exemplifies the thoroughness of probation's investigation and con-

clusion, speculating loss figures with no foundation upon which to do

so except other estimated, unsubstantiated figures.  In regards to AEP

Energy, probation depended upon their victim impact statement and again

did not substantiate their claim:

> "Probation Office contends that AEP Energy sustained a loss of
> $445,750...it should be noted that the company also incurred
> legal fees totaling $31,940 and internal and external costs
> totaling $50,000; however, such amounts were not used to deter-
> mine the loss of restitution numbers." <u>PSR - paragraph 20 & 25</u>

Except the Government did include the $31,940 and $50,000 figures that

neither the Government nor probation verified.  (The $50,000 figure was

adjusted to another <u>estimated</u> figure at the Motion to Modify Restitution

stage).

Counsel entirely failed to advocate for Petitioner in response to

speculated loss figures and loss that was not substantially documented

to appropriately sentence defendant or to apply restitution.

46

"The MVRA demands that restitution be awarded for the victim's actual, provable loss" <u>United States v. Innarelli</u>, 524 F. 3d 286 294 (1st Cir. 2008) (emphasis added)

## (b) COUNSEL FAILED TO CONSULT & ADVOCATE

Counsel failed to consult Petitioner by never explaining how the PSR was going to be used and its importance related to sentencing. Probation department is not a self-explainatory term.  Since Petitioner had a probation officer prior to sentencing, Petitioner understood that probation's report was internally used to classify probation related activities and had no expectation that sentencing would rely on its information.  Counsel failed to inform Petitioner of the PSR's role.

Because of the lack of attention from Counsel, the PSR was never given significant effort regarding objections.

Counsel called Petitioner one time to ask if Petitioner had any questions regarding the PSR.  Petitioner was driving when he took Counsel's phone call and did not have the PSR in front of him, and asked Counsel questions casually about the victims that were listed.  Petitioner had no idea that Counsel would be filing formal objections and, therefore, did not object to the entire list as he would have knowing the PSR was involved in sentencing.  Specifically, Petitioner asked Counsel a question regarding how restitution worked considering Coastal Energy had an outstanding audit contract with Atlantic States Pipe Company, and Counsel objected according to that inquiry without Petitioner's knowledge, blurring the line between client-attorney privilege when internal conversations, not appropriate for public disclosure, were disclosed.

Coastal Energy had over 400 clients at the time of the offense and 5 contracts came up disputed during this legal investigation (Property Management Inc, Silvi Concrete, Rastelli Brothers, and Friedman's) (F.33).

47

All of these contracts occured within a 60 day period in 2012. Probation, on the other hand, describes events as:

> "From June 2011 to February 2013 devised a scheme to defraud business-
> es seeking to pay lower energy prices and to obtain money by means of
> false and fraudulent pretenses, representations, and promises"
> PSR- page 5, line 11

Probation and the Assistant United States Attorney completely exagerate and embelish the scope and circumstances upon which their arguments stand and Counsel makes no attempt to correct errors; rather, Counsel quotes this exact statement from the PSR in his sentencing memorandum (Exhibit G), demonstrating no advocacy from Counsel and no consultation to assist Pet-itioner with correcting the cases' facts through an adverserial presence and initiative.

Counsel never explained that Petitioner had a sentencing range of 33-41 months or that this information was supposed to be present in the PSR. This was in important factor in <u>United States v. McGurn</u>, U.S. Dist. LEXIS 6822:: May 2014

> "[Counsel] never explained to Petitioner how the presentence report
> would compute a sentencing guideline range of imprisonment...This
> conversation would have given Petitioner some idea of what Sentence
> he faced by going to trial if he was found guilty"

and was enough to find Counsel incompetent according to the <u>Strickland</u> standard. The lack of information prevented Petitioner from actively objecting and supplying Counsel with relevant rebuttals at one of the few chances Petitioner had to confront accusations from the Government.

Petitioner was prejudiced for 100% of his loss/restitution amounts that were unsubstantiated by the Government and went uncontested by Counsel because of a lack of consultation or advocacy.

## (2) IGNORED OBJECTIONS TO SENTENCING MEMORANDUM

### SENTENCING MEMORANDUM BACKGROUND

The Government's Sentencing Memorandum ("GSM") was filed and entered on 06/06/2014. Petitioner received the Defendant's Sentencing Memorandum ("DSM") from Counsel at 5:05 P.M. on 06/12/2014 with notice that the DSM would be filed the following day (filed and entered 06/13/2014). Petitioner received less than twenty-four hours from Counsel to respond to the DSM. Petitioner submitted an email to Counsel at 7:36 A.M. on 06/13/2014, raising many objections regarding the GSM and the corresponding DSM in the limited time he had to respond. Counsel submitted the original DSM to the Court on 06/13/2014 without any changes and without consultation of Petitioner. Petitioner believes his communications were ignored or disregarded by Counsel because a plethora of issues were brought up in his communications to Counsel that prejudiced Petitioner and were not addressed.

### (a) GOVERNMENT SENTENCING MEMORANDUM ISSUES

Petitioner raised many issues regarding the GSM with Counsel. These issues included:

    1) Petitioner's role in accusations
    2) Accusations of unproven/unsubstantiated victim loss
    3) Lack of specification and inaccurate statements
    4) Government erring by relying on loss statements
    5) Character prejudice
    6) Victim unrelated to charges
    7) AEP's calculation of restitution/loss figures

These seven points are developed individually to qualify the importance of Petitioner's concerns and demonstrates how egregious it was for Counsel to ignore these concerns.

### (1) PETITIONER'S ROLE IN ACCUSATIONS

Petitioner had a different understanding of the accusations and underlying facts of the charges he pled guilty to (see Section I PLEA) than what

49

the Assistant United States Attorney brought up in the GSM. While the GSM continuously makes reference to Petitioner in conjunction to co-defendant's Samuel Puleo and Matthew Morgan, Petitioner never agreed to plead guilty of such serious allegations. Petitioner was not involved with the majority of victims listed and had no connection or influence in any alleged contract changes related to victims: Atlantic States Pipe, Friedman's Plaza, Silvi Group, (and had relations with Property Management, Inc. and Rastelli's Brothers not related to the contract changes) (F.9) or their related accused impact on AEP Energy. Petitioner pled guilty to charges under different understanding of his role in relation to the charges. In the GSM, the Government created a larger, orchestrating and dominant role of Petitioner in criminal activity that did not actually occur (note sentence disparities for further indication: Mateja- 33 Months, Puleo- 30 Days, Morgan- 12 Months). This dominating role can be seen in the GSM as:

   a) "In the middle of 2012, Mateja and Puleo decided to alter a
      number of contracts" (GSM, page 2)
   b) "Mateja and Puleo had Coastal client sign" (GSM, page 2)
   c) "Mateja and Puleo altered the signed POA" (GSM, page 2)
   d) "co-defendant Matthew Morgan helped Mateja and Puleo alter the
      contracts" (GSM, page 2)
   e) "As a result of the actions of defendants Mateja, Puleo, and
      Morgan" (GSM, page 3)
   f) "Mateja and Puleo had Morgan alter the document" (GSM, page 3)
   g) "Mateja and his co-defendants sought" (GSM, page 5)
   h) "Mateja and his co-defendants" (GSM, page 6)
   i) "Summarizing the restitution owed to each of Mateja's victims"
      (GSM, page 7)

Petitioner never had such a dominant role and was not even involved in procuring energy contracts. Petitioner led a different division of the company, handling utility bill audits and managing internal administrative issues while co-defendant Samuel Puleo managed all sales efforts and worked exclusively with Matthew Morgan for the procurement of energy contracts. Petitioner never altered any contracts, never instructed Matthew Morgan

to do so, and made no cooperative decisions with co-defender Samuel Puleo to alter contracts. Petitioner was not aware of the seriousness of the allegations and the difference in understanding of the substantiation behind the charges until the Sentencing Memorandum was issued and attempted to object in his communications with Counsel. Additionally, there was no mention of such a role or victims in the guilty plea Petitioner signed (Exhibit J), and the plea colloquy, or in the PSR (Section II(B)(1)).

2) ACCUSATIONS OF UNPROVEN/UNSUBSTANTIATED VICTIM LOSS

The Government continuously makes references to "higher prices" that victims paid on their energy bills:

"Clients ended up paying much higher rates" (GSM, page 3)
"the customers were duped into entering contracts that provided just the opposite- higher prices" (GSM, page 6)

As described in Section II(A)(2), the Government makes wild accusations without any objective proof. As seen in Exhibits C & D, the Government had no understanding of reading energy bills, does not provide any bills as part of discovery, and cannot factually make such allegations. The Government continually erred by relying on victim statements instead of empirical evidence.

3) LACK OF SPECIFICATION AND INACCURATE STATEMENTS

The Government continuously used vague language that obscures the subjects of the conversation making details hard to specify and understand. The Government is suspected of pluralizing single events to enlarge the impact of their statements:

"Many of the customers" (GSM, page 3)
"Some customers received" (GSM, page 3)

The Government's use of such language is obscure and even false by ex-agerating potential issues without explanation. In this section:

"These energy suppliers, located in Illinois, New Jersey, and other
places, assumed that the Coastal POA were valid and entered into
energy supply agreements with Coastal's clients" (GSM, page 2)

the pluralization 'suppliers' is false.  Coastal Energy dealt with no

suppliers in New Jersey and only one supplier, AEP Energy, was related

to the accusations.  The assumption of validity is false as AEP Energy's

Vice President of Sales called each customer directly to discuss the

contract terms and validate the contracts before paying commissions to

Coastal Energy.  The Government continuously uses vague statements,

victimizing the parties involved and vilifies Petitioner through verbal

prestidigitation.

4) GOVERNMENT ERRING BY RELYING ON LOSS STATEMENTS

Petitioner continually sought proof for statements of loss through-

out the sentencing process and was continually stonewalled by inaccurate

and inappropriate statements from the Assistant United States Attorney

and Counsel.  It has been clearly described in Section II(A)(1) that the

Government errs by relying on loss summaries from victims.  The nature of

the accusations are regarding specific actions (changing "All-inclusive"

contracts to "energy-only" (Exhibit C) contracts) that supposedly affected

customers' utility bills.  Ironically, the Government did not produce a

single utility bill to justify loss that supposedly occured on utility

bills.

"does not overcome Atlantic States Pipe's contention (and signed
declaration) that it sustained losses of $141,399" (GSM, page 8)

Petitioner's objection did overcome a contention and signed declaration

because relying on loss summaries is plain error by the Government accord-

ing to United States v. Napae Luta Young, 272 F. 3d 1052 (2001, CA8 SD).

The Government continued to assert validity of these statements throughout

the restitution modification motion (Section II(B)(3)) without pause to

to fix their erroneous methods of providing evidence and without con-
tention from Counsel.

"The government has submitted a letter to the Court from AEP Energy
which fully supports the losses this company sustained" (GSM, page 8)

This 'letter' was never given to Petitioner by the Assistant United States
Attorney and was not requested until after sentencing, whereby, it proved
to be additional summary information with no underlying facts (Section II
(B)(3)).  The Government continued to use erroneous legal reasoning through
the restitution modification motion without objection from Counsel.

5) CHARACTER PROFILE

Petitioner objected to the selective insertion of facts by the Govern-
ment and corresponding adjectives that were used to prejudice the character
of Petitioner.  On 06/16/2014, Petitioner and his father met with Counsel
shortly before sentencing where Petitioner raised such claims to Counsel.
Specifically, Petitioner opposed the Government's use of negative language
regarding his work history:

"Working both menial jobs and starting his own business"  (emphasis
added) (GSM, page 6)

Petitioner did not accept that it was appropriate to consider a job 'menial'
where at many times he made the national median income.  At Data Based
Systems Int'l (F.34), Petitioner worked as a Technical Writer and later
as a Document Coordinator for a large data center and disaster recovery
company and detests the Assistant United States Attorney's attempt to be-
little a defendant through suggestive adjectives.  Counsel's response was:

"Really?  I think he makes you look very good here"

A negative connotation of adjectives of the word menial is one example
of how Counsel demonstrates a disregard for advocacy of the Petitioner.

"Trial Counsel's failure to object to the prosecutor's inflammatory
statements constitutes ineffective assistance of counsel"  Debria v.
Smith, 197 F. 3d 390 (9th Cir. 1999)

53

Counsel has a duty to advocate for Petitioner and accepting negative character profiling from the Government without contest is inept.

6) VICTIM UNRELATED TO CHARGES

Petitioner demonstrated heavily in an email to Counsel on 06/14/2014 that 'Valley Farm Market' had nothing to do with the accused crimes (Section II(A)(3)). Petitioner heavily opposed the inclusion of 'Valley Farm Market' and considered it completely inconsistent with the accused crimes, friviliously included by the Government. Petitioner again brought this up minutes before sentencing with the Assistant United States Attorney and F.B.I. Agent Neeson citing the irrelevance of this victim to the accusations. The Assistant United States Attorney responded <u>that the victim was included because it was around the same time period and that makes it relevant</u>. Petitioner asked Counsel if this is valid and Counsel responded by nodding his head and saying "Yes, they can do that." There is no legal basis for charging Petitioner for a victim that does not meet the description of the accusations and undermines the plea agreement of which Petitioner would not have signed if he knew it implicated him to unrelated crimes.

7) AEP'S CALCULATION OF RESTITUTION/LOSS FIGURE

AEP's calculation of loss is described in Section II: <u>(A)(1) Mark-to-Market</u>, <u>Exhibit (A) AEP</u>, and <u>(B)(3) RMM AEP</u>. Petitioner brought up arguments with Counsel that the claims are unsubstantiated without appropriate, supporting documentation, including market settlement data to prove purchase and sale of energy futures contracts. Counsel again failed to address over $500,000 of controversial restitution figures and prejudiced the Petitioner by exposing Petitioner to a higher guideline range of sentencing as a result.

54

## (b) DEFENDANT'S SENTENCING MEMORANDUM ISSUES

Petitioner raised concerns and issues with the DSM in his email on 06/13/2014 that are very similar to the GSM. Many statements in the DSM re-word statements from the GSM with no rebuttal of the inaccuracies or prejudiced statements from the Government. Issues with the DSM include:

1) Counsel reworded and restated GSM
2) Confuses company's activities from Petitioner's
3) Promises to address restitution issues at sentencing hearing
4) Gives Petitioner less than 24 hours to respond
5) Counsel admits to assuming guilt of his client

### 1) COUNSEL REWORDED AND RESTATED GSM

Petitioner's concerns over the DSM, particularly <u>Section I: Background B. Factual Background</u> infer that Counsel copied the GSM without regard for consulting Petitioner about the truth or concern for the advocacy of Petitutioner.

"It's clients ended up paying much higher rates for energy that they contracted for...the fraud scheme did not work well. Many of the customers immediately noticed their energy bills were much higher" <u>GSM, page 3, Exhibit F</u>
"This effectively cost the customers higher rates for energy. Such a scheme did not work very well and many clients immediately noticed the higher bills" <u>DSM, page 6, Exhibit G</u>

Not only is the information false as explained in section II(B)(2)(a), it is apparent that Counsel failed to advocate for Petitioner by not questioning the validity of the Government's arguments and failing to provide meaningful adversarial testing.

### 2) CONFUSES COMPANY'S ACTIVITIES FROM PETITIONER'S

Petitioner operated as the company's only advocate for Coastal Energy as Samuel Puleo abandoned company operations in August 2012. Samuel Puleo made payment arrangements with some victims on Coastal's behalf (Silvi Group and Friedman's) and Petitioner ensured company obligations were met as the sole custodian of the business. Counsel did not recognize the

55

difference between company obligations initiated by the co-defendant:

> "Mr. Mateja has made payment arrangements with both Silvi Group
> and Friedman's. Mr. Mateja has paid over $15,000 to Friedman's
> and over $6,000 to Silvi" DSM, page 8, Exhibit G

Counsel implies Petitioner is responsible for these victims and admits

responsibility where Petitioner clearly explained his lack of participation

with these two victims at the proffer (see PLEA: SECTION I).

3) PROMISES TO ADDRESS RESTITUTION ISSUES AT SENTENCING HEARING

Counsel implies in the DSM that he will be prepared to discuss

Sentencing issues at the sentencing hearing:

> "Counsel respectfully requests to address any issues in regards to
> restitution at the Sentencing hearing" DSM, page 9, Exhibit G

> " Court:    That should have been an objection. If you--if you object
>            to the amount of a loss, that's grounds to object"
>            (Exhibit K, page 13, ln 23-25)

Counsel had no intention of addressing issues at sentencing as he never

even attempted to obtain discovery:

> " Waldron: I'm just getting discovery today, Your Honor
>   Court:   Oh, Why--Why is that?
>   Waldron: I don't know"
>   (Exhibit K, page 14, ln 1-4)

Counsel delayed addressing sentencing issues in the Sentencing Memorandum

and then failed to address them at sentencing, demonstrating false intent-

ions in his documentation.

> "Defense Counsel's failure to adequately prepare or investigate
> plausible lines of defense for Sentencing constitutes ineffective
> assistance of counsel" Osborn v. Shillinger, 861 F. 2d 612 (10th Cir.
> 1988)

4) GIVE PETITIONER LESS THAN 24 HOURS TO RESPOND

Counsel provided Petitioner with less than twenty-four hours to res-

pond to his sentencing memorandum. Since Counsel's sentencing memorandum

failed to address significant issues involved in the GSM and contained its

own factual inaccuracies, Petitioner did not think less than twenty-four

56

hours was appropriate to allow Petitioner to develop a significant response to Counsel. Petitioner developed the best response he could in such a limited time, emailing a multiple page objection to the documents; however, Counsel had a responsibility to give Petitioner more time and more consultation related to official correspondence with the Court.

5) COUNSEL ADMITS TO ASSUMING GUILT OF HIS CLIENT

Counsel admits to assuming the guilty of his client which is one of the fundamental issues is Section I(B)(3):

"Mr. Mateja met with the government to explain his crimes and helped conclude the government's investigation" DSM, page 7

Petitioner never met with the Government at the proffer to admit anything; rather, Petitioner met with the Government to help discern his proximity or lack thereof in relation to accused victims and co-defendants. This assumption of guilt by Counsel where Petitioner never admitted guilt and never discussed case details (See Section I) underlies the lack of advocacy from Counsel.

SENTENCING MEMORANDUMS- FAILURE OF COUNSEL TO CONSULT

Prompt communication and consultation is an established standed of the American Bar Association Standards from Criminal Justice Standards 4-1.3(2), 4-2.1, 4-3.8, and 4-5.2(c) and is also established in multiple state bar professional standards.

Giving a client less than 24 hours to review and respond to a document is not sufficient:

"Defense Counsel should act with reasonable diligence and promptness in representing a client" American Bar Association - 4-1.3(2)

A client has the right to prompt and timely communication.

"right of an accused person to prompt and effective communication with a lawyer." American Bar Association - 4-2.1

57

A client also has a right to be timely notified of developments:

> (a) "Defense counsel should keep the client informed of the developments in the case and the progress of preparing the defense and should promptly comply with reasonable requests for information;
> (b) Defense counsel should explain developments in the case to the extent reasonable necessary to permit the client to make informed decisions regarding the representation." <u>American Bar Association - 4-3.8</u>

> "The American Bar Association Standards is a guide in determining reasonable professional behavior" <u>United States v. Boigerain</u>, 155 F. 3d 1183 (10th Cir. 1998)

Giving a client less than 24 hours is insufficient time to allow Petitioner the opportunity to deliver meaningful comments or to consult regarding Petitioner's objections and concerns.

Ignoring a client's objections without consulting or addressing his issues is constitutionally deficient behavior because the action is so serious that Counsel was not functioning as the 'Counsel' guaranteed by the Sixth Amendment. <u>United States v. Narducci</u>, 18 F. Supp/ 2d 481, 493 (E.D. PA 1997) defines deficiency in this context:

> "To be sufficiently deficient only if he either fails completely to consult with his client, or if the decision was itself inept or incapable of interpretation as sound"

When Petitioner raised concerns, it was Counsel's duty to handle these concerns and objections in a professional manner:

> "If a disagreement on significant matters of tactics or strategy arises between defense counsel and the client, defense counsel should make a record of the circumstances, counsel's advice and reasons, and the conclusion reached" <u>American Bar Association - 5-5.2(c)</u>

A disagreement about the accusations and charges that undermine the understanding of the plea entered are significant and in need of professional attention and remedy.

Ignoring a clients' objections can be considered inept or incapable of interpretation as sound.

> "An attorney's duty is to take professional responsibility for the conduct of the case, after <u>consulting</u> with his client" (emphasis

added)  Jones v. Barnes, 463 U.S. 745, 753n. 6, 103 S. Ct. 3308,
3313 n. 6, 77 L. Ed. 2d 987 (1983)

The lack of consultation with client regarding objections and official
correspondence with the Court is not only professionally inept and not
sound, it fails the responsibility of Counsel to provide meaningful ad-
versarial testing (F.13):

> "Equally important is the case in which counsel entirely fails to
> subject the prosecution's case to meaningful adversarial testing,
> because then there has been a denial of U.S. Const. amend. VI
> rights that make the adversary process itself presumptively unrel-
> iable"  Rickman v. Bell, 131 F. 3d 1150, 1154 (6th Cir. 1997)

Counsel failed to provide meaningful adversarial testing by agreeing with
Government's accusations, even where significant discrepencies existed.
Counsel assumed guilt and therefore, never operated as a meaningful ad-
versary to the Government, prejudicing the Petitioner.

FACTORS PREJUDICING PETITIONER

While failure to consult with Petitioner is cognizable as a §2255
claim, prejudice of significant magnitude is needed to meet the second
prong of Strickland's two-prong test.  The prejudice of that magnitude
from Counsel's actions include: 1) Affecting loss/restitution figures
and related sentencing guidelines; 2) The accusations by the Government
diverged from substantiation behind guilty plea.

1) AFFECTING LOSS/RESTITUTION FIGURES AND RELATED SENTENCING GUIDELINES

Petitioner objected to implication with victims and victims' calcul-
ations/verity of loss.  Counsel failed to investigate necessary law and
fact to determine that loss summaries were insufficient means of proving
loss (see Section II(A)(1)).  Counsel never advocated against accusations
from victims that Petitioner clearly objected.  The result of this lack
of consultation and advocacy was up to 14 points of enhancement of the
Sentencing Guidelines (U.S.S.G. §2B1.1(b)(1)(4)) and associated increased

59

time incarcerated.

2) THE ACCUSATIONS BY THE GOVERNMENT DIVERGED FROM SUBSTANTIATION BEHIND
   GUILTY PLEA

        As explained in Section II(b)(1), the PSR is the first time Petitioner

heard that the substantiation behind his charges was the accusation of

'energy-only' v. 'all-inclusive' contracts.  As described in Section I,

Petitioner had no intention to plead guilty to such terms and therefore,

the plea was not entered voluntarily and intelligently.  If Petitioner

knew his scope of responsibility related to co-defendant's would increase

after pleading guilty, he would not have pled guilty.  Counsel's failure

to understand defendant's factual or legal claim fails to provide perform-

ance within the competency expected from criminal defense counsel according

to Young v. Zant, 677 F. 2d 792, 798 (11th Cir. 1982).  The plea was am-

bigous, and ambiguous pleas amount to ineffective assistance of counsel

according to U.S. v. Borders, 992 F. 2d 563 (5th Cir. 1993).  Counsel,

failed to protect his client from future allegations outside the scope of

the plea, and does nothing during the Sentencing Memorandum stage to add-

ress these objections.

## (3) FAILED TO CONSULT REGARDING MOTION TO MODIFY RESTITUTION

Petitioner's claim that Counsel failed to consult with Petitioner extends beyond sentencing and includes the Motion to Modify Restitution ("MMR"). Counsel further demonstrates a failure to advocate for Petitioner at a stage where the Court recognized Counsel and Government's failure to prepare and gave Counsel another opportunity to properly prepare restitution figures.

> " Court:   Now, Mr. Waldron, and your client wants you to do it, you are free to file a motion to adjust the amount of restitution. And I will have a hearing...and I'll have some kind of hearing, you know, in September. Any you'll have lots of time to get me to change the amount of restitution." Exhibit K, page 15, ln 1-8

The Court suggested a hearing would occur in September, giving both parties substantial time to prepare. Counsel failed at this stage and satisfies the two-prong test of Strickland.

## RESTITUTION MODIFICATION MOTION: BACKGROUND

Petitioner received discovery from the Assistant United Stats Attorney, through an email from Counsel, on June 18, 2014 at 11:17 A.M. Petitioner responded within four hours, at 2:56 P.M. on 06/18/2014 with some of the points Petitioner wanted to discuss, primarily 'Valley Farm Market' and detailed spreadsheets describing the amount of commissions AEP Energy withheld (see Exhibit A) and never applied towards restitution (among other issues). A couple emails were exchanged, one on June 19, 2014 at 3:02 P.M., where Petitioner explains he cannot calculate objective numbers for accounts such as Atlantic States or Rastelli Brothers without copies of the utility bills being discussed, and a final email on July 1, 2014, where Michael Stitt of Huber & Waldron said he would be writing the motion and John Waldron would review.

Petitioner received no emails back from Counsel discussing the application of law or consultation regarding the MMR, only a couple of emails from Michael Stitt asking for various professional opinions from Petitioner.

On 07/03/2014, seventeen days after sentencing, Counsel filed the MMR with the Court without notification to Petitioner. Petitioner never reviewed, approved, or consulted in its creation beyond a few one sided emails sent to Counsel. Petitioner self-surrendered on 07/16/2014 and added Counsel and three of his associates/employees to his Bureau of Prisons email list so that he could contact Counsel and Counsel ignored those attempts at contact. It took Petitioner several weeks to get material to mail to Counsel (stamps, envelopes, additional information for Counsel). Petitioner received a letter from Counsel, dated 08/04/2014, where Counsel responded to the Financial Litigation Unit that a hearing regarding restitution would occur in September (Exhibit L). Petitioner received a letter on 08/11/2014 (Exhibit M) stating: "I will be present for any upcoming hearing for modification of restitution." The order for the MMR had already been filed on 08/06/2014, five days prior to Counsel's letter. Petitioner received an additional letter, dated 08/14/2014 (Exhibit N), with the Judge's order and a recommendation from Counsel against appeal: "I do not believe an appeal is of merit." The Government's response to the MMR was never received by Petitioner and Petitioner never had an opportunity to respond.

MOTION TO MODIFY RESTITUTION ISSUES

Petitioner never saw drafts of the MMR, received consultation from Counsel regarding Petitioner's opinions/questions, and never had the opportunity to object to Counsel's arguments. As a result, Petitioner brings forth issues with the MMR that occured due to Counsel's lack of

consultation with Petitioner. These issues include:

1) Counsel was supposed to work with co-defendants' Counsel
2) Failure to object to all the victims
3) Counsel only partially and poorly contested AEP's claim
4) Never substantiates his complexity argument
5) Files motion early

1) COUNSEL WAS SUPPOSED TO WORK WITH CO-DEFENDANTS' COUNSEL

Counsel was offered by the Court to work with the co-defendants'
Counsel to collaboratively address restitution issues:

" <u>Court</u>        : Right. Well, I would suggest, Mr. Waldron, that you
                  get together, if you want, with the lawyers for the
                  other two defendants, and maybe you can have some kind
                  of joint effort, and maybe you can make a proposal to
                  Mr. Axelrod that he would find acceptable or he could
                  communicate to the victims to see if they can all agree
                  on some lesser amount of restitution.
<u>Waldron</u>    : I'll get together with them, Judge. I appreciate that"
<u>Exhibit K, page 23, ln 7-15</u>

Counsel failed to provide any indictation of intention to Petitioner that

Counsel would collaborate with co-defendants' Counsel. Petitioner did not

receive a single communication regarding collaboration and Counsel filed

the MMR without Petitioner or co-defendants' Counsel's review or opinion.

2) FAILURE TO OBJECT TO ALL THE VICTIMS

"Mateja's motion solely challenges the $527,240 in restitution owed
to victim AEP Energy ("AEPE")" <u>Government response to MMR, page 2</u>

Petitioner insisted that 'Valley Farm Market' was not an applicable victim

in his email on 06/18/2014 because they did not have a contract altered

from 'all-inclusive' to 'energy-only' (Exhibit B). Counsel completely

ignored Petitioner's objection to this victim. Petitioner also stressed

the need for additional information, particularly utility bills to attempt

to calculate restitution values based on objective data. The Govrnment

offered to obtain any information Petitioner needed to file his claim:

" Mr. Axelrod: I just wanted to say that the Government did not
intend to not provide Mr. Waldron or his client
incomplete information regarding the restitution.
The Court  : Right
Mr. Axelrod: And I want to extend that since that...since Mr.
Waldron and his client will have a chance to re-
litigate the restitution issue, if they choose,
my files are open, and I will provide the defend-
ant with any document.
The Court  : Right.
Mr. Axelrod: he so requires, regarding the restitution that he
requests."
Exhibit K, page 22, ln 21-25, page 23, ln 1-6

Utility/Electric bills would be the fundamental, objective evidence
needed to calculate restitution since victims (F.35) claim to incur
a higher energy price according to the Assistant United States Att-
orney in the Government's sentencing memorandum (Exhibit F).  Petit-
ioner explained to Counsel in his email dated 06/19/2014, that calcul-
ating restitution of victims required the objective, underlying utility
bills to calculate figures for these victims, particularly considering
all the complexities explained in Section II(A)(2).  Counsel ignored
these concerns and never requested these bills from the Government, and
failed to properly represent Petitioner regarding approximately $300,000
worth of restitution/loss in regards to this issue.

3)  COUNSEL ONLY PARTIALLY AND POORLY CONTESTED AEP'S CLAIM

Counsel failed to contest all of the items regarding the restitution
for AEP Energy.  For the items Counsel did contest, Counsel failed to
specify the issues Petitioner had with these figures.  The uncontested
figures include:

a) Prepaid Commissions
b) Mark-to-Market Loss
c) Cost to Serve Loss

a) 'PREPAID COMMISSIONS'

'Prepaid Commissions' was a substantiated claim that Petitioner made
in his

64

in his email to Counsel on 06/18/2014.   The claim included spreadsheets
with commission data from AEP Energy as well as Petitioner's interpret-
ation of that data.   (see Exhibits A, Q, R).   Counsel completely ignored
this claim of which, Petitioner had significant supporting evidence.

b) 'MARK-TO-MARKET' LOSS

'Mark-to-Market' Loss is described in detail in Section II(A)(2)
and Exhibit A.   Counsel performed no research into law and fact for a
type of restitution that is both an inappropriate claim as well as un-
substantiated.

c) 'COST TO SERVE' LOSS

'Cost to Serve' Loss is obviously uncontested because the Govern-
ment never introduced this line item until the Government's response to
MMR (F.36).   Counsel's responsibility to argue the introduction of new
accusations at this point is significant.

The 'contested' items contain arguments that defy Petitioner's fund-
amental concern that the Government never produced substantiation and
objective evidence of 'attorney fees,' 'internal costs,' and 'Lost Profit'
(see Exhibit A).   Instead, Counsel created new arguments that Petitioner
never saw or approved of (F.41).

Counsel makes a one sentence claim on line 14:

"Defendant contends that no information was provided to substantiate
such internal costs and amounts" (Exhibit H)

and then abandons the claim, arguing that attorney fees were 'consequential'
and not recoverable (Exhibit H, ln 15).   Petitioner's claim was that none
of AEP's claims had substantiation and objective evidence as required.
Counsel's claims lacked significant case law and failed to relate to the
inability of the Government to use unsubstantiated documentation and dem-
onstrates a lack of attempt to address fundamental issues regarding restit-

ution/loss (described in Section II(A)(1).

4) NEVER SUBSTANTIATES HIS COMPLEXITY ARGUMENT

Petitioner demonstrates in Section II(A)(2) that section 18 U.S.C.
§3663A(c)(3)(b) should have been considered in the sentencing process
due to complexities involved in calculating restitution.  Counsel included
a single reference to this clause, in boiler-plate style, without the
substantiation, explaination, or advocacy necessary to demonstrate the
need to exclude restitution in sentencing:

> "The court does not have to order restitution when determining
> complex issues of fact related to the cause or amount of the
> victim's losses would complicate or prolong the sentencing pro-
> cess to a degree that the need to provide restitution to any
> victim is outweighed by the burden on the sentencing process.
> 18 U.S.C.A. §3663A(c)(3)(b)"   Exhibit H, ln 28

By failing to demonstrate why the restitution was too complicated to
calculate, Counsel makes no attempt to advocate related law and the
facts of the case.  Instead, Counsel recites statute and avoids arguing
related issues such as the complexity of calculating restitution, failing
to provide the necessary adversarial testing to the Government's claim.

5) FILES MOTION EARLY

Counsel filed this motion on 07/03/2014 and the order took place on
08/06/2014.  It was understood by Petitioner that a hearing would occur
in September, giving Petitioner more time to work with Counsel to develop
the MMR.  Instead, the MMR was filed without Petitioner's knowledge and
Petitioner never had the opportunity to approve of Counsel's documentation
or to actively assist with inaccuracies or misstatements as they occured.

> "  Court    : I'll have some kind of hearing, you know, in September"
>   (Exhibit K, page 18, ln 6-7)

Counsel claimed he would be present at the associated hearing in a letter

dated 08/11/2014 to the Petitioner:

> "I will be present for any upcoming hearing for the modification of restitution" (Exhibit M)

Since this letter was issued <u>after</u> the order to this motion was issued, it is inferred that Counsel never attended such hearing and misled the Petitioner of his commitment to Petitioner's advocacy.

Counsel sent his letter with the results of the motion and information regarding appealability on Thursday 08/14/2014 (Exhibit N), of which Petitioner did not receive until 08/19/2014. Counsel notified Petitioner the deadline to file appeal was on 08/20/2014, failing to timely notify Petitioner of his right to appeal. Counsel failed to send timely notifications by mail and failed to accept Petitioner's Bureau of Prisons email request, failing to communicate with Petitioner of critical information related to due process rights.

## THE GOVERNMENT'S RESPONSE TO MOTION TO MODIFY RESTITUTION - ISSUES

Petitioner never received a copy of the Government's response to Motion to Modify Restitution ("GRMMR") prior to the Court's decision (F.37). Petitioner and Counsel have a due process right to rebut this document especially considering the Assistant United States Attorney introduced new information that was not previously disclosed. Counsel erred by not allowing Petitioner to review this document and by not attempting to rebut the main issues:

1) Government introduces "Cost-to-Serve" portion of AEP Claim
2) Government continues to accept statements without substantiation
3) AEP's claims assume Petitioner was guilty for all the victims

## 1) GOVERNMENT INTRODUCES "COST-TO-SERVE" PORTION OF AEP CLAIM

The Government attached Exhibit A, Victim Impact Statement from AEP Energy to the GRMMR (Exhibit I) and selectively ommitted parts of their

67

exhibit. A summary page and spreadsheet were attached to the victim impact statement and are attached in Exhibit O in its entirety. It can be demonstrated that AEP Energy separates each account into "Lost Margin" and "Loss on Market Value (MTM Losses)" or Mark-to-Market Losses that combine to create their 'Early Termination Fees' in their spreadsheet. In the AEP Emails (Exhibit P), AEP may also make this distinction that 'Early Termination Fees' include 'Mark-to-Market' Loss and 'Lost Margin' (F.36). The mention of 'Cost-to-Serve' is a footnote in the victim impact statement (Exhibit O) referring to its inclusion in 'Lost Margin' (F.36). When Counsel attempts to contest 'Lost Margin,' the Government separates the contested item into subcategories, claiming Petitioner did not contest 'Cost to Serve' and therefore, the Government selectively removed $192,882 of restitution from the contest, undermining Counsel's contest of 'Lost Margin' that included the $192,882 of 'Cost to Serve' loss for a total contest of $275,545 not the $82,663 the Government claims was contested.

> "and (2) the lost retail margin that includes the a) cost to serve the contracts and (b) the lost profit" Exhibit GRMMR, page 5

This demonstrates where they split the lost margin into two new subcategories undermining Counsel's claim.

> "Mateja does not contest the "cost to serve" portion"
> Exhibit GRMMR, page 5

Of course Petitioner could not contest the "cost to serve" portion because the Government used it for the first time in the GRMMR, failed to document and use it earlier, and never delivered the GRMMR to Petitioner. Then the Government did not provide any substantive documentation to support the figures.

> "AEP Energy estimates that based on its business operations in 2012 and 2013 that approximately 70% of the "lost margin" is attributable to the "cost to serve" component and 30% is "lost profit""
> Exhibit GRMMR,page 5

The Government admits that AEP Energy does not know what its markup is on its contracts (inferring AEPE does not know its costs either). The Government claims AEP Energy is "estimating" and is therefore, not providing any objective data. The fact that "Cost to Serve" loss is not defined and is assumed to mean 'fixed costs' by Petitioner, demonstrates invalidity because 'fixed costs' are neither direct or consequential in accounting or legal frameworks as explained in Exhibit A.

> "Presented with just the bare requests for these amounts, however, it is not clear from the record that the defendant's criminal conduct was the cause of those particular loses[sic] in whole or in part, or if instead some or all of those costs were the result of normal operating procedures, business decisions, etc" United States v. Randell Lee Rahal  LEXIS 148436:: November 1, 2015

Counsel erred by not providing a copy of this document to Petitioner in a timely manner as the basis for the Assistant United States Attorney's arguments are subjective, if not completely misleading or false. The fifth amendment due process clause required defendant not to be sentenced on bases of materially untrue assumptions of misinformation according to United States v. Pugliese, 805 F. 2d 1117, 1123 (2d Cir. 1986). Introduction of new evidence requires Counsel's direct attention, particularly because these new arguments undermined Counsel's contest. Counsel had a responsibility to advocate for Petitioner, and failed to do so meaningfully.

2) GOVERNMENT CONTINUES TO ACCEPT STATEMENTS WITHOUT SUBSTANTIATION

The Government continued to use loss summaries to justify their figures which are inadmissable in Court.

> "there is inadequate explanation and insufficient reasoning why the district court relief on the face of the government's document without requiring evidence that the costs reported were directly and reasonable demanded" United States v. Hosking, 567 F. 3d 329, 333-34 (7th Cir. 2009)

Nonetheless, the Assistant United States Attorney continued to justify figures that AEP Energy claimed with no substantiation:

69

"After Mateja filed the instant motion the government contacted AEPE regarding Mateja's claims.  AEPE responded that taking a conservative approach, the 'internal cost' figure should be reduced to $21,650"  GRMMR, page 3

AEP Energy continuously "estimates" their figures, removing almost 60% of their original figure with a new "estimate" (changed $50,000 claim to $21,650).

"declining toward restitution where any estimate would be too arbitrary to sustain and that a hearing to achieve a non-arbitrary result would involve protracted proceedings that, even if conducted, might well not produce a non-arbitrary result"  United States v. Adorno, 950 F. Supp. 2d 426, 431 (E.D.N.Y. 2013)

There appears to be no research or substantiation of fact that would be required for valid production of figures (see Exhibit A) and Counsel had a professional responsibility to understand that claims need substantiation and to contest the Government accordingly.

3) AEP'S CLAIMS ASSUME PETITIONER WAS GUILTY FOR ALL THE VICTIMS

The Government and AEP's claim assume Petitioner is responsible for all of AEP Energy's "all-inclusive" to "energy-only" claims.  As seen in the plea agreement (Exhibit J), Petitioner never admitted guilt to all of these victims and the inclusion of them undermines the substantiations behind the Plea (see Section I(A)(1)).  Petitioner had no knowledge of some events and zero proximity to others, creating incongruencies between the Government's accusations and the underlying substance of which Petitioner plead guilty, exposing Petitioner to ambiguities that undermine the plea's validity.

FAILURE TO CONSULT

Counsel's lack of consultation and advocacy in regards to the Motion to Modify Restitution qualifies as failure to consult, meeting the first prong of the Strickland v. Washington test for ineffective assistance.

70

"Counsel's failure to consult adequately with defendant amounted to ineffectiveness of counsel" Harris By and Through Ramseyer v. Wood, 64 F. 3d 1432 (9th Cir. 1995)

"Counsel's failure to consult with Petitioner resulted in counsel's poor understanding of case and constitutes ineffective assistance of counsel" White v. Godinez, 143 F. 3d 1049 (7th Cir. 1998)

Petitioner has outlined 1) amount of; 2) timing of; and 3) quality of consultation according to the framework described in United States v. Zemba, U.S. Dist. LEXIS 15305:: 2007

PREJUDICE

Petitioner has also demonstrated prejudice regarding the entire restitution/loss amount charged towards Petitioner and Counsel's failure to address the issues previously raised in the Sentencing Memorandum and Sentencing process. The Court gave Counsel an opportunity to fix prior errors and Counsel again failed to properly consult with Petitioner and advocate thoroughly. Petitioner therefore, demonstrates that 14 points of prejudice related to the 14 points of enhancement according to U.S.S.G §2B1.1(b)(1)(4) and associated increase in incarceration; whereby: "[A]ny amount of [additional] jail time has Sixth Amendment significance" according to Strickland v. Washington, meeting the second prong requirement of prejudice.

71

CONCLUSION

Petitioner motions the Court to Vacate the Sentence and expunge the conviction (<u>Satler Lee v. Wolfenbarger</u>, 453 F.3d 362, 364-371 (6th Cir. 2006) determined that habeas court has remedial authority to order conviction expunged) because the plea agreement was not voluntarily and intelligently entered due to ineffective Counsel's erroneous advice, the ambiguousness of the plea bargain, and a failure of Counsel to meet the rudimentary demands of Counsel under the American Bar Association Standards and applicable law as cited throughout this motion. While the restitution and loss issues demonstrated here are independently substantial under <u>Strickland's</u> standard, it cumulatively demonstrates Counsel's lack of professional regard for fact and law from engagement through post-conviction remedy, undermine's the Government's evidence and charges, and fully demonstrates that the conviction should be vacated and expunged as the remedy of the habeas court. Petitioner respectfully requests to consider this motion for the inherent unfairness and prejudice Counsel imparted upon Petitioner.

I declare under the penalty of perjury that the information contained within this document is true and correct and to the best of my knowledge.

_____          03/29/2016
    (Signature)                      (date)

72

FOOTNOTES FOR §2255

## FOOTNOTES

| FOOTNOTE | DESCRIPTION/INFORMATION |
|---|---|

F.1    Petitioner was explicitly told by Counsel in his letter (Exhibit N) that an appeal had no merit and advised against it. Petitioner relief upon Counsel's expertise.

F.2    'Critical Stages' identifies a legal framework for identifing crux positions in the judicial process where legal assistance is of the utmost importance. Padilla v. Kentucky identifies the plea bargain process as one of these critical points.

F.3    Attorney advised Petitioner on a phone call that his course of action in such a case is to approach the Government and assist them as soon as possible to seek a U.S.S.G. §5K1.1 'Substantial Assistance to Authorities.' Since a co-defendant had taken the opportunity to cooperate, it was too late to take that option and no alternative strategies were presented.

F.4    Everytime Petitioner asked Counsel about victims and loss, Counsel instructed Petitioner that victims and loss are litigated at Sentencing. Petitioner did not question the lack of inclusion of victim and loss in the Plea Agreement or the lack of loss amounts in the PSR due to this direction by Counsel.

F.5    Valley Farm Market is described in Exhibit B. The circumstances of the alleged crime were different than what the Government was accusing Petitioner of and was contested at multiple times by Petitioner with little support from Counsel. Petitioner asked the Assistant United States Attorney and Counsel why this victim was included a few minutes before Sentencing (It was objected to in the PSR as well and never addressed) and the Assistant United States Attorney responded that the proximity of the dispute to the contracts involved in the case made it applicable even though it did not include the crime Petitioner was accused of. Counsel nodded his head and said that this was admissable.

F.6    Petitioner did not agree to sign guilty to 7 victims and $800,000 in loss. Petitioner had relations with two clients in a limited capacity, and believed no loss was involved. The allegations were significantly higher than Petitioner's understanding of the loss figures and reasoning behind those loss figures appeared exagerated without substantiations. Petitioner did not have adequate means to fight these accusations because Counsel waited until Sentencing to obtain the loss figures and Petitioner was limited to Counsel's willingness to confront these issues. Counsel put these issues off until the Motion to Modify Restitution and then filed that documentation without Petitioner's review.

## FOOTNOTES- Con't

| FOOTNOTE | DESCRIPTION/INFORMATION |
|---|---|

F.7        'All-inclusive' v. 'Energy-only' contracts are described
           is Exhibit C . The changing of a contract from 'All-
           inclusive' to 'Energy-only' does not directly mean higher
           prices and can ofter lead to <u>lower</u> prices. The complexity
           of calculating these figures <u>is beyond</u> the scope of this
           filing, but overviews can be seen in Section II and Exh-
           ibit D .

F.8        Calculating loss is referenced in Section II(A)(2) as
           well as Counsel and Government's failure to evaluate loss
           accurately.

F.9        Friedman's Market was contracted by co-defendant Matthew
           Morgan. Petitioner has no relationship with the client,
           the sales representative, or the contracting process.
           Since Petitioner was unaware that this contract was alter-
           ed until months into the investigation, it was not poss-
           ible for Petitioner to have an intent to defraud. This
           contract was the first contract of the victims to the
           best of Petitioner's knowledge since these contracts were
           not provided as evidence by the Government.

F.10       Petitioner had limited contact with Counsel prior to the
           plea. Petitioner met with Counsel to engage his services,
           spoke over the phone about §5K1.1 strategy and then met
           with the Assistant United States Attorney and F.B.I. at
           the proffer. One additional phone call occured where
           Counsel dismissed Petitioner's concerns about the plea
           and no significant discussion regarding law and fact oc-
           cured. Those concerns included the applicability of
           obstruction of justice and the lack of victim and loss
           descriptions.

F.11       Petitioner did not know he could negotiate a more favor-
           able plea agreement. Since Petitioner did not agree with
           the obstruction of justice charge and only agreed because
           Counsel ensured it was not of importance; it would have
           been reasonable for Petitioner to negotiate the removal
           of a charge for the acceptance of another.

F.12       Petitioner did not make a confession or knows the content
           of the Government's 'wire recording'. Petitioner uses
           this example to demonstrate the usage of unverified or
           unconstitutionally obtained information to taint a plea.

F.13       Petitioner uses the term 'meaningful adversarial testing'
           as synonymous to lacking in effort or deficient and not
           completely not present as used in <u>United States v.
           Cronic</u>. Petitioner is not arguing the lack of presence
           of Counsel; rather, the lack of performance of Counsel.

## FOOTNOTES - Con't

| FOOTNOTE | DESCRIPTION/INFORMATION |
|---|---|
| F.14 | AEP Energy defines their loss this way in their Victim Loss Statement (Exhibit O). The Government extends the 'Lost Margin' category into additional subcategories in the Government's Response to Modify Restitution (Exhibit I). |
| F.15 | Victim Loss Statements and all discovery documentation was not made available until after Sentencing as noted in the Sentencing Transcript (Exhibit K). |
| F.16 | Petitioner told Counsel he could not accurately evaluate the loss summaries at Sentencing. Later in an email to Counsel, Petitioner explained he would need actual utility bills to make any sort of analysis. |
| F.17 | The Court recommended Counsel file a motion to fix errors that occured at Sentencing. The Motion to Modify Restitution failed to address the multitude of issues related to restitution/loss. |
| F.18 | Petitioner told Counsel that the loss figures were unsubstantied and the loss figures looked very exagerated. Counsel failed to emphasize to the Court that the discrepencies did affect the Sentencing Guidelines. |
| F.19 | Lost profits refers to AEP's claim of $275,496. The rest of the victims claim losses, but not lost profit. |
| F.20 | Utility bills for all the victims except AEP, which requires various tupes of paperwork to substantiate their multitude of claims. Even this documentation may not be substantial enough, but it would allow some objective analysis. |
| F.21 | Specifically, Petitioner points to the plea, PSR, Sentencing Memorandum, Sentencing, and the Post-Sentencing Motion to Modify Restitution. Counsel's performance can be seen as below the reasonable standards established by the American Bar Association and relevant case law. |
| F.22 | Not all victims provided loss summaries, but the ones that did, provided no additional substantiation. AEP provided additional explanation, but evaded providing objective evidence. |
| F.23 | See Exhibit D for an additional NJ tax explanation and exhibits demonstrating the substantiation. |
| F.24 | Petitioner explained the inapplicability of Mark-to-market loss to Petitioner at Sentencing. Counsel did |

## FOOTNOTES- Con't

| FOOTNOTE | DESCRIPTION/INFORMATION |
|---|---|
| F.24(con't) | not understand, noted by his comment about selling energy in the Sentencing transcript (Exhibit K, page 9, ln 20-23).  Counsel fails to address this issue completely in the Motion to Modify Restitution, failing to investigate law related to the case. |
| F.25 | AEP Energy never proved the cancellation of contracts. |
| F.26 | See Exhibit A for additional explanation.  Mark-to-market represents 'open' trade positions and is therefore, at odds with the loss AEP Energy ambiguously refers to in their communications, which implies 'closing' the trade positions.  Closed trade positions could be demonstrated with market settlement reports from their exchange and were never provided. |
| F.27 | This rate is calculated by dividing the total cost by the quantity of Kwh to get $/Kwh. |
| F.28 | Note that Rastelli's did not understand that 'all-inclus-ive' rates do not include all applicable taxes.  See Exhibit D. |
| F.29 | 'All the contracts' does not include 'Valley Farm Market'; who received the exact rate and contract expected. |
| F.30 | 7% was the sales tax rate at the time of the contracts. |
| F.31 | AEP/Bluestar calls their 'all-inclusive' contract as 'consolidated', but the concept is the same. |
| F.32 | Counsel did not appear to be aware of PSR updates at Sentencing so Petitioner is assuming that Counsel had not reviewed the PSR. |
| F.33 | Valley Farm Market has been excluded from this list as it has been described in Exhibit B that their contract had no unexpected changes. |
| F.34 | Part of Petitioner's job history in the PSR. |
| F.35 | The victims referenced excludes : 1) Property Management, Inc. because they did not have a loss claim, 2) AEP Energy was the supplier, not the end user, and 3) Valley Farm Market never had an altered contract. |
| F.36 | 'Cost to Serve' was footnoted in AEP's victim loss state-ment (Exhibit O).  Exhibit A describes why 'cost to serve' is an inappropriate restitution/loss item.  There was no indication on AEP Energy's paperwork that suggested 70% |

FOOTNOTES - Con't

| FOOTNOTE | DESCRIPTION/INFORMATION |
|---|---|

F.36(con't)   of their 'lost profit' was 'cost to serve' as the
Government claims, and even so, does not separate
Petitioner's 'lost profit' claims from the entire
'lost profit' amount challenged.

F.37   Petitioner did not receive the Government's Response
to Motion to Modify Restitution until later in 2015
when he gathered documentation for this §2255 motion.

F.38   An attorney needs to be familiar with the law and facts
of a case in order to provide effective assistance
(United States v. Burton, 575 F. Supp 1320 (E.D. Texas
1983)).  Without a private meeting prior to the plea,
counsel could not advise his client.
"No such presumption [of reasonable professional conduct]
is warranted when a lawyer advises his client to plea
bargain to an offense, which the attorney has not invest-
igated.  Such conduct is always unreasonable" Id at 1029
Woodard v. Collins, 898 F. 2d 1027 (5th Cir. 1990)
Petitioner described his understanding of guilty was
associated to proximity to the case.  This qualifies as
ineffective assistance of counsel:
"Counsel's attempt to plead defendant guilty where it was
apparent that defendant felt that he was guilty because
he was present at the time the acts occured, constitutes
ineffective assistance and rendered guilty plea involunt-
ary"  Navarez-Dioz v. United States, 870 F. 2d 417 (7th
Cir. 1989)
§1343 requires an intent to defraud.  Similarly, in Ivy
v. Caspari, 173 F. 3d 1136 (8th Cir. 1999) and US v.
Bigma, 906 F. 2d 392 (9th Cir. 1990), both cases found
that Petitioner's were not represented by effective
assistance when Counsel failed to apprise of the 'intent'
aspect of a crime, rendering their pleas involuntary.
Counsel then failed to inform Petitioner of the impact
the Sentencing Guidelines would have related to §1343.
Petitioner did not plea with a real expectation of the
consequences.  In US v. Busse, 814 F. 2d 760 (E.D. Wis
1993), Counsel's failure to inform Petitioner of the im-
pact of the Sentencing Guidelines constituted ineffective
assistance of counsel.

F.39   The lack of extraordinary circumstances is important be-
cause Counsel should have challenged the Obstruction of
Justice charge.  "Counsel's failure to challenge the en-
hancement for obstruction of justice where the district
court failed to make proper factual findings on the re-
cord constituted ineffective assistance of counsel accord-
ing to US v. Phillips, 210 F.3d 1345 (5th Cir. 2000)

FOOTNOTES - Con't

| FOOTNOTE | DESCRIPTION/INFORMATION |
|---|---|
| F.39(con't) | Obstruction of Justice has an associated enhancement that Counsel did not mention.  Counsel is found in error with his advice about clear points of law and that advice led to the denial of right to effective Counsel.  Beasley v. United States, 491 F. 2d 687 (6th Cir. 1974) |
| F.40 | As US v. Phillips describes in F.39, the lack of findings and support of charges gave Counsel many opportunities to negotiate better terms if not move to dismiss the charges completely.  In US v. Mohammad, 999 F. Supp. 1198 (N.D. Ill. 1998), failing to explore the possibilities of the plea agreement which would have probably resulted in a different adjustment relative to the Petitioner's role constituted ineffective assistance of counsel. |
| F.41 | Petitioner demanded substantiation for charges. Instead, Counsel fought the applicability of charges such as internal costs and legal fees.  This departure was not properly discussed. |

EXHIBITS FOR §2255
PETITION

## EXHIBITS - ORDER OF REFERENCE

| EXHIBIT | DESCRIPTION |
|---|---|
| A | EXHIBIT AEP |
| B | EXHIBIT VALLEY FARM MARKET |
| C | EXHIBIT "ALL-INCLUSIVE" v. "ENERGY ONLY" |
| D | EXHIBIT NJ TAX |
| E | COUNSEL WALDRON'S WEBSITE INFORMATION |
| F | GOVERNMENT'S SENTENCING MEMORANDUM |
| G | DEFENDANT'S SENTENCING MEMORANDUM |
| H | MOTION TO MODIFY RESTITUTION |
| I | GOVERNMENT'S RESPONSE MOTION TO MODIFY RESTITUTION |
| J | PLEA AGREEMENT |
| K | SENTENCING TRANSCRIPT |
| L | WALDRON LETTER 1 |
| M | WALDRON LETTER 2 |
| N | WALDRON LETTER 3 |
| O | AEP VICTIM LOSS STATEMENT |
| P | AEP EMAIL FROM AEP'S COUNSEL |
| Q | AEP COMMISSION REPORT - MAY 2012 |
| R | AEP COMMISSION REPORT - JUNE 2012 |
| S | AEP/BLUESTAR EMAIL REGARDING MIP AND VALLEY FARM MARKET |
| T | AEP/BLUESTAR MIP CONTRACT |
| U | AEP/BLUESTAR VALLEY FARM MARKET CONTRACT |
| V | F.N.I. INTERVIEW - VALLEY FARM MARKET |
| W | SAMPLE LIBERTY POWER CONTRACT |
| X | RASTELLI'S 3RD PARTY ELECTRIC BILL SUMMARY FROM CONSTELLATION ENERGY |
| Y | NJ BILL - ATLANTIC STATES PIPE COMPANY - HESS |
| Z | ATLANTIC CITY ELECTRIC - NJ SUT REFERENCE |
| AA | F.B.I. INTERVIEW - RASTELLI BROTHERS INC. |

EXHIBIT A

EXHIBIT AEP

## EXHIBIT A - AEP ENERGY

The purpose of this exhibit is to demonstrate an overview of AEP Energy's claims, where the Government erred by relying on AEP's summary information, and Petitioner's response to each category. AEP's restitution claim is brought up in multiple areas of this filing including:

1. Section II(a)(2):   Mark-to-market, loss summaries
2. Section II(b)(2):   Sentencing Memorandum
3. Section II(b)(3):   Restitution Modification Motion

Communications received regarding AEP:

-- Victim Loss Statement  (Exhibit O)
-- E-Mail from AEP Counsel ( Exhibit P)
-- Assistant United States Attorney's statements in Government's Response to Motion to Modify Restitution   (Exhibit I))

Restitution Breakdown:

| | | | |
|---|---|---|---|
| 1) Prepaid Commissions | $ 80,017 | | |
| 2) Early Termination Fees | 365,733 | | |
|     a) Mark-to-market | | $ 90,237 | |
|     b) Gross Margin (*1) | | 275,496 | |
| 3) Attorney's Fees & Other Legal Costs | 31,490 | | |
| 4) Internal Costs and Expenses (*2) | 50,000 | | |
| TOTAL: | $527,240 (*2) | | |

Petitioner will identify, category by category, relevant information and how this entire amount is unsubstantiated.

---

(*1)  : Gross Margin later split into 'cost to serve' and 'lost profit' in the Government's response to Motion to Modify Restitution.

(*2)  : Internal Costs and Expenses lowered to $21,650 after Restitution Modification Motion with a corresponding decrease in the total to $790,533.

1

## (1) PREPAID COMMISSIONS

AEP Energy claims to have damages equal to $80,017 in prepaid commissions made to Coastal Energy ($49,067- Silvi Concrete and $30,950- Friedman Point Plaza). However, AEP Energy had outstanding commissions owed to Coastal Energy in the amount of $68,875.46.

AEP Energy withheld these commissions, presumably to offset any potential losses they incurred. Since these commissions were earned and owed to Coastal Energy, they offset the $80,017 in losses AEP Energy claims for Pre-paid Commissions on cancelled contracts.

Petitioner identified this fact with Counsel in his email dated 06/18/2014, attached the relevant commission statements, and was ignored by Counsel. AEP Energy never provided proof of cancellation related to Silvi Concrete or Friedman Point Plaza. Because there is no substantiation behind this statement, proof of cancellation would be needed to verify this statement, if even one month of a 12 month contract was serviced, the related $80,017 claim would need to be pro-rated according to the length of time the contract was serviced.

Any pro-rated month would have a two fold benefit to Petitioner:

1) Reduce the loss claim by 1/12 the victim related prepaid commission;
2) Increases the amount of owed commissions beyond the 'prepaid' amount by 1/12 the agreed fee to Petitioner.

This suggests that the victim was able to recover some of, if not all the value it originally lost; far outside the scope of the "MVRA."

"The MVRA demands that restitution be awarded only for the victim's actual, provable loss...This is necessarily a backward- looking inquiry that takes into account what actually happened, including whether the victim managed to recover some or all of the value it originally lost" United States v. Innarelli; 524 F. 3d 286, 294 (1st Cir. 2008)

## FUTURE COMMISSION CALCULATIONS

- -- Exhibit Q , includes a commission report from AEP Energy for May 2012.
- -- Exhibit R , includes a commission report from AEP Energy for June 2012.
- -- Exhibit S , includes an email from AEP Energy acknowledging they made a physical error and some commissions were missing from these reports (Also explained in Exhibit 'Valley Farm Market').

These commissions have been added here:

| CLIENT NAME | # OF CONTRACT YEARS | OWED RECURRING COMMISSIONS | FUTURE UP-FRONT COMMISS. |
|---|---|---|---|
| Brass Rail | 1 | $     432.60 | |
| Valley Foods, Inc. | 2 | 7.40 | 3,704.44 |
| James M. Coates | 2 | 811.48 | 795.56 |
| St. Charles Church | 3 | 377.08 | 6,703.68 |
| Figueras Market | 1 | 77.91 | - |
| Rastelli's Brothers | 1 | 9,244.25 | |
| McTish Kunkel | 1 | 1,216.09 | |
| Health Center | 1 | 197.27 | |
| Glendon Properties | 1 | 327.48 | |
| Creekside Senior | 1 | 802.05 | |
| First Commonwealth | 1 | 3,733.77 | |
| Subtotal: | | $   17,030.11 | $11,203.68 |
| June up-front commissions: | | $   17,708.74 | |
| Valley Farm Market* | 1 | 18,412.80 | |
| MIP* | 3 | 4,520.13 | |
| Subtotal: | | $   22,932.93 | |

GRAND TOTAL Recurring & Future Up-Front Commissions:   $68,875.46

\* Valley Farm Market & MIP had both recurring commissions owed and future up-front commissions.  Totals were unable to be segregated at this time.

None of these contracts were cancelled and AEP Energy owed these commissions.

## (2) EARLY TERMINATION FEES

AEP Energy claimed to have $365,733 of losses in Early Termination Fees (ETFs) split into two categories: a) Mark-to-market of $ 90,237 and

3

b) Gross Margin of $275,496.

a) MARK-TO-MARKET LOSSES

Mark-to-market losses are explained in detail in Section II(1)(b). Two primary concerns with Mark-to-market claims include:

1) Mark-to-Market claims are inadmissable as a loss claim
2) Mark-to-Market represents open positions, meaning AEP Energy is taking delivery

1) MARK-TO-MARKET CLAIMS ARE INADMISSABLE AS A LOSS CLAIM

As described in Section II(1)(b), Mark-to-market represents positions in the market and does not represent 'out-of-pocket' loss. The latest reading of Lama Holding, 88 N.Y. 2d 413, 668 N.E. 2d 1370, 1373, 646 N.Y.S. 2d 76 (N.Y. 1996) concludes that mark-to-market losses are not realized losses.

2) MARK-TO-MARKET REPRESENTS OPEN POSITIONS, MEANING AEP ENERGY IS TAKING DELIVERY

As described in N.Y. Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc., 497 F. 3d 109 (2006), Mark-to-market represents 'open' positions. If AEP Energy had open trade positions, logic would dictate that the positions be closed and liquidated to minimize future loss exposure. AEP Energy does not need these open positions because they supposedly cancelled contracts. AEP Energy never provided substantiation or proof of cancellation or partial delivery and fulfillment of contracts for as long as they remained active.

AEP Energy could produce settlement reports with their exchange showing the date and purchase amount, etc. for these energy contracts and their related closing. With an affidavit from the trading agent(s) who performed the task, these transactions can be accounted for with appropriate documentation.

4

Because AEP Energy failed to specify to specify such action, and the meaning of mark-to-market implies open positions, AEP Energy appears to be taking delivery of the contracts. If they are taking delivery of the contracts, that means they are selling the energy loads to other clients. This infers they are not suffering losses and if the 'cancelled contracts' were purchased at an opportune time, AEP Energy could in fact be making <u>more</u> profit with those customers than would be otherwise possible depending on market conditions at the time of those contracts.

> "In particular, if the wholesale price of electricity goes down between the time AEPE locks in the customer price and purchases the hedge and the time the contract is terminated, AEPE suffers a real loss because it is then forced to liquidate the more expensive electricity at the current, lower price." <u>Exhibit P</u>

What AEP Energy fails to explain is that the opposite is also true. If the wholesale price of electricity goes up, AEPE gains a real gain, which is what Petitioner is referring to with their ability to make 'more profit'. AEPE's statements here assume the contract is terminated as is the correlated trade position. Mark-to-market language indicates this is not the case and market settlement data from their exchange is the only way to settle such a dispute. AEP Energy provides figures in a summary, EXCEL format and does not provide purchase and sale data from an appropriate source to substantiate the data claimed.

In the email from AEP's Counsel (Exhibit P), he references some minor gains such as $3,709 for Friedman Point Plaza, potentially in an attempt to divert attention from their outrageous claims. Again, actual exchange data is the only way to resolve such a dispute.

b) GROSS MARGIN

AEP Energy fails to disclose what their marginal markup per account is to justify "lost margin." A margin would be calculated by demonstrating

5

direct costs related to the energy hedges, associated direct costs such as transaction fees, and an associated markup to calculate their retail price. This margin or markup requires disclosure of purchasing costs and related market data AEPE failed to produce in their Mark-to-market section so the markup can be demonstrated arithmetically. AEPE would also have to provide start and stop information related to the contracts they supposedly cancelled to prorate the loss calculation based on the remaining term of the contract left at the time of cancellation.

Without this data, the single-line loss summary has no substantiation. AEP Energy makes references to "costs to serve," which is an undefined term with no substantiation. Similar to victim in United States v. Randell Lee Rahal, LEXIS 148436:: Nov 1, 2015, such calculations give rise to a significant possibility of becoming punitive.

> "In addition to being unweidly, applying such calculations as hist-orical weighted averages and weighted average variable-costs of production and marketing expenses, in an attempt to calculate the actual loss suffered by [victim] as a result of the defendants' crimes of conviction, interjects supposition to such an extent that the risk that [victim] would be overcompensated for any loss would be far from insignificant. See Fair, 694 F. 3d at 512 ("Awarding restitution in excess of the victim's actual loss would be punitive in nature and thus Fall outside the scope of the MVRA")"

The margin built into a contract is the price, above variable costs, as described in any standard business textbook. Fixed costs are not attrib-utable in such as a case as they would not be direct or consequential to the allegations from AEP.

> "Presented with just the bare requests for these amounts, however, it is not clear from the record that the defendant's criminal con-duct was the cause of those particular loses[sic] in whole or in part, or if instead some or all of those costs were the result of normal operating procedures, business decisions, etc" United States v. Randell Lee Rahal, LEXIS 148436:: Nov 1, 2015

Therefore, "costs to serve" is inappropriate for restitution or loss calculations.

## (3) ATTORNEY FEES & OTHER LEGAL COSTS

Attorney Fees & Other Legal costs are relatively simple items to substantiate. Standard business practice for most attorneys involves billing for time spent with an hourly rate. Attorneys then send their clients billable hours summaries of information related to where the time was spent and on what subject. AEPE could produce such a receipt to verify this amount and substantiate where time was allocated, but failed to provide any substantiation.

> "It is the government that has the burden of making the case for restitution to the court, a burden it has not met with respect to the requests for legal fees...Specifically, the government has not shown by a preponderance of the evidence that the legal fees requested by any victim were reasonable foreseeable or resulted from [Petitioner's] criminal conduct. Waknine, 543 F. 3d at 558-59 ("Court may only award restitution of travel expenses and investigation costs, including attorney's fees, if the government provides sufficiently detailed evidence to demonstrate by a preponderance of the evidence" they were "necessarily incurred" and "reasonably necessary"). United States v. Vu:: 2015 US Dist LEXIS 102081:: August 3, 2015

## 4) INTERNAL COSTS AND EXPENSES

AEP never provides substantiation for their $50,000 internal costs and expenses (later reduced to $21,650 in the Government's response to Defendant's Motion to Modify Restitution). AEPE claimed 150-200 estimated hours spent internally, but again, has no evidence to support these figures. They do not list the employees involved, a record of their activities, or a record of their payroll figures to justify the internal costs. Competent management tracks allocation of resources, especially human resources. There is no excuse for a firm as large as AEPE not to substantiate those figures with an almost 60% swing from one estimate to another and no supporting documentation. Similar to the legal fees, and United States v. Vu:: 2105 US Dist LEXIS 102081:: August 3, 2015, substantiation for these fees was necessary.

7

AEP CONCLUSION

AEPE makes many unsubstantiated arguments regarding restitution and continually speaks vaguely with the Government, failing to use objective terms, descriptions and substantiation for their claims.  They claim to have 'mitigated' damages by reselling the energy:

"AEPE did in fact mitigate its damages, and did not let any electricity go to waste"  Exhibit P  and also claim to have closed their market positions:

"damages based on the cost to unwind and liquidate that future position"  AEP Victim Impact Statement- Exhibit O

AEP Energy provides Mark-to-market data and contradictory statements of whether they liquidated these positions or not, all unsubstantiated and unfit to be relief upon by a Court of law.

The profit margin built into AEP Energy's contracts (see  Exhibit O, Dauphin County, Part of Property Management Inc, calculated by $/kwh) is outrageously high.  The Dauphin County account comes to $0.01233/kwh or 3-4 times common amounts in the industry.

This questions whether 'victims' in this case were perceiving higher rates due to the Defendant's actions, or the largely inflated margins AEP Energy was building into contracts.

Ultimately, Petitioner claims that $0 of loss from AEP Energy was substantiated and restitution according to the MVRA was not possible.

"that multiple complex issues of fact related to the cause and amount of the victims' losses would complicate and prolong these already prolonged sentencing processes to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process"  United States v. Randell Lee Rahal, LEXIS 148436:: November 1, 2015

8

EXHIBIT B

EXHIBIT VALLEY FARM MARKET

## EXHIBIT B- 'VALLEY FARM MARKET'

'Valley Farm Market' was a victim Petitioner attempted to object to and was dismissed by the Government, Counsel, and the Probation Department. This exhibit explains the circumstances.

The Government describes the Defendants of changing contract terms from "all-inclusive" to "energy-only" (see Exhibit F). 'Valley Farm Market' and Samuel Puleo, co-defendant, of Coastal Energy Consultants came to an agreement to enter an energy contract. By entering a new energy contract, 'Valley Farm Market' would incur early termination fees with their existing provider for cancelling one or two months early, but 'Valley Farm Market' and Coastal Energy Consultants could still gain from the scenario in two ways:

1) 'Valley Farm Market' would decrease their energy rate, saving them a significant amount of money on their energy expenditure
2) Coastal Energy Consultants had an upfront payment arrangement with AEP Energy (formally Bluestar Energy) and could use the upfront payment to pay 'Valley Farm Market's' cancellation fee and obtain a new client.

A problem occured when AEP Energy reneged on their agreement with Coastal Energy Consultants and did not pay Coastal their respected commissions for 'Valley Farm Market': Coastal continuously attempted to resolve the issue, finally receiving a response on 06/21/2012 (Exhibit S) where AEP Energy admits they made a mistake:

"Valley Farm Market missing on the commission report.  They have noted it in the system and said it was a manual mistake and that it will show up on the next report" Exhibit S

This issue came at an admitted error from AEP Energy and not from an attempt to defraud.

Additionally, Valley Farm Market received an 'all-inclusive' rate ('consolidated' pricing- See Exhibit C and U).  The exact rate requested was procured, including energy, losses, capacity, transmission, and ancill-

aries and incurred no issues regarding contract changes as alleged by the Assistant United States Attorney in the Government's Sentencing Memoandum.    In the F.B.I. interview (Exhibit V), there is a similar description as described here, without Valley Farm Market knowing that AEP Energy defaulted on their contractual terms with Coastal Energy Consultants.

EXHIBIT C

EXHIBIT "ALL-INCLUSIVE" v. "ENERGY-ONLY"

## EXHIBIT C 'ALL-INCLUSIVE' v. 'ENERGY-ONLY'

This exhibit is used to help define the meaning of the term 'all-inclusive' and 'energy-only' as used by the Assistant United States Attorney and in contracts in the energy business.

The Assistant United States Attorney defines these terms as:

> "A 'Fixed All-inclusive' contract provides the customer with one rate for each kilowatt hour used. This single rate includes charges for transmission, capacity, and energy, the three common charges that make up a consumer's energy bill. Alternatively, an "Energy Only" contract provides the customer with a rate for each kilowatt hour, but this rate does not include the additional charges for transmission and capacity. As an energy broker Coastal could not negotiate the transmission and capacity charges." Exhibit F

An energy bill is divided into two main categories: (1) Distribution/ Utility charges and (2) Energy Supply charges. Distribution/Utility charges are set by state utility commissions and cannot be purchased through a 3rd party, but energy supply charges can. The Assistant United States Attorney uses a lot of terms, but lacks fundamental understanding.

Bluestar or AEP Energy does not have an "all inclusive" rate, rather they call a similar product "Consolidated Energy Cost." As seen in Exhibit V, Consolidated Energy Cost breaks up the 3rd party supply cost into subcategories: Energy, Losses, Capacity, Transmission, and Ancill- aries. Gross Receipt Taxes (GRT) are included, but Sales and Use Tax (SUT), competitive transition charges and reconciliation charges are not included. Therefore, a 'Consolidated Energy Cost' fixes many line item charges under the supply cost, but not all of them.

On the Liberty Power Contract (a 3rd party supplier competitor of AEP Energy) in Exhibit W, Liberty Power calls their 'all inclusive' rate, 'energy only' because it does not include one line item, the GRT.

> "For purposes of this Agreement, Rate means the energy price, includ- ing congestion, capacity, network transmission, ancillary services, losses, auction revenue rights ('ARR'), renewable portfolio standards ('RPS') compliance costs, generation and any other miscellaneous

1

charges (including, but not limited to ISO/RTO, or PUC fees).  The Price does not include taxes, regulated charges from the utility, including, but not limited to, utility delivery and distribution charges, customer account fees or other utility transition charges. The Liberty Power Energy only Rate does not include Pennsylvania Gross Receipts Tax."  (emphasis added)   Exhibit W, Rate

As seen, Liberty Power's "energy only" contract is very similar to AEP's "consolidated" rate, except for the GRT component.

Therefore, as shown by these exhibits, the terms "all-inclusive" and "energy-only" can be used in a variety of ways, often times as synonyms.

The Assistant United States Attorney claims "Coastal could not negotiate the transmission and capacity charges," (SM, page 2), but Coastal could in fact negotiate these terms as fixed or variable, saving financing costs from prepaying on the futures market through the 3rd party supplier.

In all of the cases, all the victims saved significant monies compared to their previous rates and are claiming losses based on improper calculations, like including sales taxes, Gross Receipts Taxes, and items inappropriate for these calculations.

In addition, the Government has not provided any documentation or calculation to prove that their claims of victim losses, making the objective analysis of losses and restitution complicated and possibly impossible for the Court to determine.

The terms "all-inclusive" and "energy-only" are not meaningful the way the Assistant United States Attorney uses them.  In all of the cases described, Coastal Energy Consultants locked in rates as fixed for at least an energy component of the contract, but not every component can be locked in as described by Bluestar/AEP's contract terms.

Finally, AEP Energy has not provided any proof that any of these other charges (charges not encompassed by the term "energy" in AEP's Consolidated Pricing Product) were accurately accounted for.  For example, a capacity charge could easily have a commission/profit margin added to

it and there would be no accountability for what the charge should have been or if AEP Energy tampered with these rates for ther own gain.

EXHIBIT D

EXHIBIT NJ TAX

## EXHIBIT D- NJ TAX

This exhibit demonstrates the application of sales and use tax (SUT) for the computation of electric bills in New Jersey and how it affects electric rates.

New Jersey and Pennsylvania have their own SUT respective to their state requirements. Where they differ, is how those taxes are presented to customers. In Pennsylvania, SUT is a separate line item on a bill. In New Jersey, sales tax is not separated and is instead added directly to line items on the bill (see Exhibit Y for sample bill for Atlantic States Pipe Co.) Atlantic States Pipe Company is paying a 7% Sales tax, but it is not separately identified, it is added and presented in the rates shown.

Exhibit Z is a page from a Board of Public Utilities filing from Atlantic City Electric where a directive is demonstrating that New Jersey Sales tax is built into their rates.

Example:

ABC Corp. gets an electric rate of $0.10/kwh
In a state like Pennsylvania, their sales tax would be a
separate line item:
Energy Cost = $0.10/kwh
SUT = $0.007/kwh*

In New Jersey, this would appear as:

Energy Cost: $0.107/kwh

When the victims claim overpayment, if they did not remove the 7% sales tax from their rate, their calculations would be incorrect as energy agreements do not include sales tax in the contracted rate, see Exhibits T, U, or W.

---

* - Pennsylvania Sales tax is <7%, but 7% is used for demonstrative purposes.

EXHIBIT E

COUNSEL WALDRON'S WEBSITE INFORMATION

http://www.huber-waldron.com/criminal-defense.html



# HUBER, WALDRON & WILLIAMS, LLP

FREE Consultation for Personal Injury Cases

 610-774-9790

Home        Attorney Profiles        Practice Areas        Newsletters        Map & Directions        Contact Us

James T. Huber

John J. Waldron

## Pennsylvania Criminal Defense Attorneys

### An experienced firm fighting for your rights

If you have been charged with a crime in Pennsylvania, you need an experienced criminal defense attorney on your side. Since 1981, the attorneys at Huber, Waldron & Williams, LLP have been fighting to defend the rights of their clients. We have built our reputation on getting results. We are intimately familiar with all facets of the Pennsylvania criminal justice system, and have the knowledge and skill to make sure you understand your legal options and to guide you through the legal process.

## Practice Areas

- Personal Injury
- Commercial Litigation
- Criminal Defense

Since 1981, Huber and Waldron now Huber, Waldron & Williams, LLP in Allentown has represented clients in state and federal courts on charges ranging from minor offenses to serious felonies, including:

- Traffic violations
- Assault and battery
- DWI/DUI/OWI
- Possession of drugs
- Theft and larceny
- Burglary

- Robbery
- Arson
- Rape
- Homicide — murder/manslaughter
- Domestic violence
- White collar crime
- And more

When you have charges on your record that you want eliminated, we can help you get those charges sealed or expunged, or represent you in appellate court.

No matter what obstacle has been placed in your way, rest assured that we strive diligently to help you overcome it, and work tenaciously to attain the best possible result for you.

## Going the extra mile to ensure your freedom

At Huber, Waldron & Williams, LLP, we go the extra mile to ensure that you get the justice you deserve. We have taken an oath to provide exemplary service, an oath that we are dedicated to honoring. Through meticulous preparation and a firm attention to detail, our efforts are always focused on achieving that goal. We personally speak with witnesses, comb through police records and thoroughly examine the alleged crime scene, if necessary. We also bring in experts who challenge the prosecution and help us prepare trial strategy.

Nothing is more important than your freedom. If you need a defense attorney who is dedicated to your case, contact Huber, Waldron & Williams, LLP today.

## Don't delay. Contact Huber, Waldron & Williams, LLP today.

When you have been charged with a crime, choose a criminal defense attorney with the experience and dedication to make a difference. Contact Attorney John J. Waldron or Attorney Michael M. Stitt, Hamilton Street Location, 610-435-9790 or contact us online to schedule an appointment. With two offices conveniently located in Allentown, Pennsylvania, we stand ready to represent you in your criminal matter.

## Office Locations

John J. Waldron, Esquire
Michael M. Stitt, Esquire
800 Hamilton Street
Suite 500
Allentown, Pennsylvania 18101
**Telephone:** 610-435-9790
**Fax:** 610-435-1238
jwaldron@huber-waldron.com
mstitt@huber-waldron.com

.........................................................

James T. Huber, Esquire
Steven T. Williams, Esquire
Omega Building
1150 South Cedar Crest Boulevard
Suite 201
Allentown, Pennsylvania 18103
**Telephone:** 610-774-9790
**Fax:** 610-774-0418
jhuber@huber-waldron.com
swilliams@huber-waldron.com

EXHIBIT F

GOVERNMENT'S SENTENCING MEMORANDUM

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :

      v.               :      CRIMINAL NO.   13-575-01

MICHAEL MATEJA           :

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, and David L. Axelrod, Assistant United States Attorney for the District, hereby files this sentencing memorandum in, and for the reasons herein respectfully requests that the Court impose a sentence at the bottom of the guideline range of 33 to 41 months' imprisonment, and order the defendant to pay full restitution.

## I.     BACKGROUND

### A.    Procedural Background

On October 22, 2013, The United States Attorney's Office for the Eastern District of Pennsylvania filed a two-count Information, charging defendant Michael Mateja with one count of wire fraud, and aiding and abetting wire fraud, in violation of 18 U.S.C. § 1343, and one count of obstruction of justice, in violation of 18 U.S.C. § 1505. On December 19, 2013, Mateja pled guilty pursuant to a plea agreement with the government.

### B.    Factual Background

Defendants Michael Mateja and Samuel Puleo held themselves out as co-owners of Coastal Energy, LLC ("Coastal"), a company that brokered energy contracts between commercial businesses and energy suppliers. Coastal operated as an energy broker, finding commercial

energy clients for energy suppliers.   Coastal was paid a commission by the energy supplier once

the customer entered into an agreement with the energy supplier.

In the middle of 2012, Mateja and Puleo decided to alter a number of contracts

signed by customers, and then send the altered contracts on to the energy suppliers.   As part of this

process, Mateja and Puleo had Coastal clients sign limited power of attorney agreements ("Coastal

POA") allowing Coastal's employees to negotiate directly with energy providers on the client's

behalf.   Each Coastal POA signed by a Coastal client stated the "Contract Type" or the price per

kilowatt hour that Coastal would negotiate.

The Coastal POA signed by Coastal clients stated that Coastal would negotiate a

"Fixed All-Inclusive" rate for the client.   A "Fixed All-Inclusive" contract provides the customer

with one rate for each kilowatt hour used.   This single rate includes charges for transmission,

capacity, and energy, the three common charges that make up a consumer's energy bill.

Alternatively, an "Energy Only" contract provides the customer with a rate for each kilowatt hour,

but this rate does not include the additional charges for transmission and capacity.   As an energy

broker Coastal could not negotiate the transmission and capacity charges.

Unbeknownst to their clients, Mateja and Puleo altered the signed Coastal POA by

changing the terms of the contract from "Fixed All-Inclusive" contracts to "Energy Only."   A

third person, co-defendant Matthew Morgan helped Mateja and Puleo alter the contracts.   After

defendants altered these contracts, they sent the altered contracts on to energy suppliers via

electronic mail.   These energy suppliers, located in Illinois, New Jersey, and other places,

assumed that the Coastal POA were valid and entered into energy supply agreements with

Coastal's clients.   In some cases, these energy suppliers also purchased energy and spent other

monies based on the expectation that they would be fulfilling their commitments to supply energy

on these contracts.

As a result of the actions of defendants Mateja, Puleo, and Morgan, Coastal earned commissions that it was not entitled to and its clients ended up paying much higher rates for energy than they contracted for.

The fraud scheme did not work well. Many of the customers immediately noticed their energy bills were much higher than what they believed they would be charged. Some customers received copies of their agreement from the energy supplier and saw that it was different than the version they had completed with Coastal.

With respect to Count One, a New Jersey company, R.B., signed a Coastal POA agreeing that Coastal could negotiate a "Fixed All-Inclusive" contract on its behalf where it agreed to pay a total price of $0.07069 per kilowatt hour. After R.B. executed the Coastal POA, Mateja and Puleo had Morgan alter the document to indicate that R.B. agreed to enter into a "Fixed Energy" contract with a price of $0.05590 per kilowatt hour for energy only. On R.B.'s behalf Coastal then negotiated a contract with an Illinois energy supplier whereby R.B. agreed to pay $0.05590 per kilowatt hour for energy only. As a result of this undisclosed alteration, R.B. ended up paying a much higher total rate per kilowatt hour than the $0.07069 it agreed to pay. Subsequently, Coastal emailed this altered contract from Pennsylvania to the energy supplier in Illinois.

With respect to Count Two, in 2012, Puleo and Mateja heard that Coastal was being investigated by the FBI for altering energy contracts as discussed above. In September 2012, Mateja had Morgan erase data from Coastal's computer servers and hard drives.

3

## II.   SENTENCING ANALYSIS

### A.   Statutory Maximum Sentence

The Court may impose the following statutory maximum sentences: Count One (wire fraud), 20 years imprisonment, a $250,000 fine, three years supervised release, and a $100 special assessment; Count Two (obstruction of justice), five years imprisonment, a $250,000 fine, three years supervised release, and a $100 special assessment.   The total maximum sentence defendant faces is: 25 years imprisonment, a $500,000 fine, three years supervised release, and a $200 special assessment.

### B.   Advisory Guidelines Calculation

The government concurs in the guidelines calculation that appears in the Presentence Report ("PSR") at ¶¶ 35-46, as summarized in the following chart:

| Base offense level | U.S.S.G. §2B1.1(a)(1) | 7 |
|---|---|---|
| Loss amount greater than $400,000 but less than $1,000,000 | U.S.S.G. §2B1.1(b)(1)(H) | +14 |
| Obstruction of justice | U.S.S.G. §3C1.1 | +2 |
| Adjustment for acceptance of responsibility | U.S.S.G. §3E1.1(a) | -2 |
| Adjustment for acceptance of responsibility | U.S.S.G. §3E1.1(b) | -1 |
| Total Offense Level | | 20 |

Because the defendant is in criminal history category I, the advisory guideline range is 33 to 41 months' imprisonment.

### C.   Consideration of the 3553(a) Factors

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a), indicates that a sentence of imprisonment at the bottom of the advisory guideline range is appropriate.   Those factors include: (1) the nature and circumstances of the offense and the

4

history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public

from further crimes of the defendant; (4) the need to provide the defendant with educational or

vocational training, medical care, or other correctional treatment in the most effective manner; (5)

the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.   18

U.S.C. § 3553(a).[1]    A review of the remaining 3553(a) factors illustrates the propriety of the

sentence recommended by the government.

> **1.    The nature and circumstances of the offense and the history and
> characteristics of the defendant**

The offense in this case was driven simply by greed.   Mateja and his co-defendants

sought to increase their company's sales and lied to succeed.

Mateja has no criminal history.   It appears from the information in the PSR that

Mateja came from a family where he was given substantial opportunities to succeed.   He then

went to a premier university.   It also appears that he has a consistent history of employment,

working both menial jobs and starting his own businesses.

---

[1]   Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a
sentence sufficient, but not greater than necessary, to comply with the purposes set forth in
paragraph (2) of this subsection."   The Third Circuit has held that "district judges are not required
by the parsimony provision to routinely state that the sentence imposed is the minimum sentence
necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the 'not
greater than necessary' language requires as a general matter that a judge, having explained why a
sentence has been chosen, also explain why some lighter sentence is inadequate.'"   United States
v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450
F.3d 54, 58 (1st Cir. 2006)).

2.    **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**

The crime in this case was serious.   Mateja and his co-defendants successfully persuaded small businesses located in Pennsylvania and New Jersey to hire Coastal to broker their energy contract.   Instead of receiving the benefits of lower prices, the customers were duped into entering contracts that provided just the opposite – higher prices.

The government is hopeful that after this process Mateja will have respect for the law.   Mateja appears to have taken positive steps.   He pled guilty to an information and met with the government to explain his crimes and help conclude the government's investigation.

3.    **The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant;**

General deterrence is significantly more important than specific deterrence. Mateja had no criminal record before he became involved in this scheme and there is little in his background and characteristics that suggest he poses a risk of recidivism.

General deterrence is more important.   Consumers and small businesses need to be protected from fraudsters who will attempt to replicate schemes like this.   AEP Energy, one of the victims in this case described the following non-economic injury it suffered: "AEP Energy suffered incalculable damage to its reputation due to the negative impact of Defendants' fraudulent conduct on customers who thought they were signing up for electricity service with AEP Energy."

4.    **The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

There is no need to adjust defendant's sentence based on the need for education or vocational training.

6

5.    **The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;**

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. The Third Circuit explained:

> Even under the current advisory system, district courts must "meaningfully consider" § 3553(a)(4), i.e., "the applicable category of offense . . . as set forth in the guidelines." The section of *Booker* that makes the Guidelines advisory explains that "the remaining system, while not the system Congress enacted, nonetheless continue[s] to move sentencing in Congress' preferred direction, *helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary.*" Booker, 543 U.S. at 264-65 (emphasis added). The Guidelines remain at the center of this effort to "avoid excessive sentencing disparities," and, as the *Booker* Court explained, the Sentencing Commission will continue "to promote uniformity in the sentencing process" through the Guidelines. Id. at 263. We have likewise observed that the "'Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.'" United States v. Cooper, 437 F.3d 324, 331 (3d Cir. 2006) (quoting United States v. Mykytiuk, 415 F.3d 606, 608 (7th Cir. 2005)).

United States v. Ricks, 494 F.3d 394, 400 (3d Cir. 2007) (emphasis in original).

In the present case, all of the relevant facts suggest the Court should impose a sentence at the bottom of the recommended guideline range.

## III.    RESTITUTION

The government respectfully asks the Court to order Mateja to pay full restitution to the victims of the Coastal fraud scheme. The government has submitted a restitution spreadsheet summarizing the restitution owed to each of Mateja's victims. The total restitution owed is

7

$818,903, split among six victims.

      Mateja has objected to the losses of three of the victims: Atlantic States Pipe Company, Property Management, Inc., and AEP Energy.   PSR, Objections.   First, Mateja objects to Atlantic States Pipe's loss, on the grounds that Coastal saved Atlantic States Pipe money in another way.   This explanation makes little sense, and without substantial evidence does not overcome Atlantic States Pipe's contention (and signed declaration) that it sustained losses of $141,399 because it was charged higher energy rates due to defendants' fraud.   PSR ¶ 24. Second, Mateja objects to the loss sustained by Property Management, Inc.   The summary restitution chart does not include a loss for this company.[2]   Third, Mateja objects to the loss sustained by AEP Energy on the grounds "that the company may have made money and had no losses."   The government has submitted a letter to the Court from AEP Energy which fully supports the losses this company sustained.

## IV.   CONCLUSION

      Accordingly, the government respectfully recommends the court impose a sentence of imprisonment at the bottom of the advisory guideline range of 33 to 41 months' imprisonment and order the defendant to pay full restitution.

          Respectfully submitted,

          ZANE DAVID MEMEGER
          United States Attorney

             /s/
          DAVID L. AXELROD
          Assistant United States Attorney

2 At the sentencing for co-defendant Puleo, the Court did not order any restitution to be paid to this company.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Government's sentencing memorandum has been served by electronic filing and/or first-class mail to:

John J. Waldron
Huber and Waldron
535 Hamilton Mall #301
Allentown, PA 18101


_____/s/_____
DAVID L. AXELROD
Assistant United States Attorney


DATED: June 6, 2014

EXHIBIT G

DEFENDANT'S SENTENCING MEMORANDUM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **Case No.: 0313 2:13CR00575-001** |
| | * | |
| **vs.** | * | |
| | * | |
| **MICHAEL MATEJA,** | * | |
| | * | |
| **Defendant** | * | |

## DEFENDANT'S SENTENCING MEMORANDUM

AND NOW, comes the Defendant, Michael Mateja, by and through his counsel, John J. Waldron, Esquire, and respectfully submits the following Sentencing Memorandum to this Honorable Court for his Sentencing Hearing to be held on June 16th, 2014 and would move that he receive a minimally sufficient sentence to achieve the goals of punishment pursuant to Section 3553(a) factors, and in support of this Sentencing Memorandum, the Defendant avers the following:

## I. INTRODUCTION

On October 22, 2013 a two-count Information charged Michael Mateja, Samuel Puleo, and Matthew Morgan with wire fraud and aiding and abetting in violation of 18 U.S.C. 1343, 1349, and 2 (Count 1). Michael Mateja and Matthew Morgan were also charged with obstruction of justice in violation of 18 U.S.C. § 1505 (Count 2).

On December 19, 2013, pursuant to a written plea agreement, Michael Mateja appeared before the Honorable Michael M. Baylson and pled guilty to all counts of the information (Counts 1 and 2). Pretrial services records indicate Mr. Mateja has complied with all Court ordered conditions of release.

## II.   FEDERAL SENTENCING GUIDELINES POST-BOOKER SENTENCING IN THE THIRD CIRCUIT

As revised by *United States v. Booker*, 543 U.S. 220, 245-6 (2005), the Sentencing

Reform Act "requires a sentencing court to consider [advisory] guidelines ranges, see 18 U.S.C.

§ 3553(a)(4), but it permits the court to tailor the sentence in light of other statutory concerns as,

well, see § 3553(a)." This means that a district court's primary obligation is to choose a sentence

in light of all the statutory sentencing factors (including the advisory guideline range) in the

context of a defendant's particular case, and that sentence may or may not be imposed with

regard to the guideline range. *See United States v. Coleman*, 451 F.3d 154, 158 (3d Cir.2006)

("the guidelines recommended range may be modified or disregarded by a district court upon

consideration of the other sentencing factors Congress has identified in § 3553(a)"). Essentially,

*Post-Booker* guidelines are merely advisory.

In the Third Circuit, district courts "follow a three-step sentencing process." *United

States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006):

(1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they

would have before *Booker* . . .

(2) In doing so, they must formally rule on the motions of both parties and state on the

record whether they are granting a departure and how that departure affects the

Guidelines calculation, and take into account our Circuit's pre-Booker case law,

which continues to have advisory force . . .

(3) Finally, they are required to exercise their discretion by considering the relevant §

3553(a) factors . . . in setting the sentence to impose regardless whether it varies from

the sentence calculated under the guidelines.

*Id.* Thus, in the critical third *Gunter* step, the district courts must apply their own independent judgment to the sentence to be imposed in light of the sentencing factors, whether or not that judgment results in a sentence within the advisory range. *See also United States v. Cooper,* 437 F.3d 324, 329-30 (3d Cir. 2006) (district court must give "meaningful consideration to the section 3553(a) factors" and impose a sentence for reasons that are logical and consistent with those factors, but rejecting a presumption that the sentence should be imposed within guideline range).

Moreover, as the Court explained in *Gunter*, section 3553(a) "begins with the broad mandate that sentencing courts shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing set out in the statute." 462 F.3d at 243 n.9. This broad mandate applies to the consideration of all of the section 3553(a) factors, and it necessarily takes precedence of the advisory guideline range and other individual factors.

A district court commits error if, in applying the third *Gunter* step, it believes that it is bound by any aspect of the sentencing guidelines. This aspect of post-*Booker* Third Circuit law was illustrated clearly in *Gunter*, 462 F.3d 237. There, the defendant's guideline range was based on his offense for possession with intent to distribute cocaine base ("crack" cocaine). At the time, the guidelines for crack cocaine were subject to the 100-to-1 crack versus powder cocaine differential, meaning that the defendant's advisory guideline range was significantly higher than it would have been had his offense involved powder cocaine. *Id.* at 238. At Sentencing, the defense asked the district court to consider the unwarranted nature of that differential in imposing sentence. The district court refused to do so, concluding that it was not at liberty to reconsider Congressional intent in establishing and maintaining the differential. *Id.* at 239. The Third Circuit remanded, because the district court's refusal to consider the differential merely as

3

advisory in the third step of the sentencing process amounted to treating the guidelines as

mandatory. *Id.* at 247-48; See also *Cooper*, 437 F.3d at 330-31 (rejecting notion that guideline

sentence if presumptively correct as "coming close to restoring the mandatory nature of the

guidelines").

Accordingly, district courts now have much greater discretion in sentencing than was

previously afforded, and the Third Circuit has spoken firmly in support of this discretion. The

courts should exercise their sentencing discretion to further the directives and purposes of 18

U.S.C. § 3553, which are set forth and applied to Mr. Mateja's case in the next sections.

## III.    THE DIRECTIVE AND FACTORS OF SECTION 3553(a)

The primary directive in section 3553(a), as noted above, is for sentencing courts to

"impose a sentence sufficient, but <u>not greater than necessary,</u> to comply with the purposes set

forth in paragraph 2," which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to
             provide just punishment for the offense;
    (B)    to afford adequate deterrence to criminal conduct;
    (C)    to protect the public from further crimes of the defendant;
             and
    (D)    to provide the defendant with needed educational or vocational training, medical
             care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In determining the minimally sufficient sentence, section 3553(a) further directs

sentencing courts to consider the following factors:

1)  the nature and circumstances of the offense and the history and characteristics of the
     defendant, § 3553(a)(1);
2)  the kinds of sentences available, the advisory guideline range and pertinent guideline
     policy statements, §3553(a)(3)-(5);
3)  the need to avoid unwarranted sentence disparities among defendants with similar
     records who have been found guilty of similar conduct, § 3553(a)(6); and
4)  the need to provide restitution to any victims of the offense, §3553(a)(7).

This is not an exhaustive list of the factors the Court can consider, as "no limitation shall be placed on the information concerning the background, character, and conduct of Mr. Mateja which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. §3661.

## IV.   **APPLICATION OF THE STATUTORY FACTORS TO THIS CASE**

### A.   **The History and Characteristics of the Offender and the Nature and Circumstances of the Offense.**

Michael Mateja was born on November 20, 1986 in Boston, Massachusetts. He is twenty-seven (27) years old. He is currently single and has never married. Mr. Mateja's father, Thaddeus Mateja (61), is an electrical engineer. His mother Lucyna Mateja (62) is a high school teacher. Mr. Mateja resides at 1607 Salem Street, North Andover, Massachusetts with his parents. He has one sibling, Melissa Ferrigno (32), who resides in Storrs, Connecticut employed by the University of Connecticut.

Mr. Mateja attended Lehigh University in Bethlehem, Pennsylvania. In 2011, he graduated with a bachelor of science in business and economics with a major of finance.   Mr. Mateja has an extensive work history since 2000 working at a variety of positions for several companies. These jobs included several salesman positions including Circuit City, Bose Corporation, and even some work in telemarketing. In 2010, Mr. Mateja co-owned and worked as a utility auditor at Coastal. Currently, Mr. Mateja has been working as a bartender at the Beehive in Boston, Massachusetts since February of this year. Mr. Mateja does not report any physical, mental, or emotional health concerns. A urinalysis administered by the United States Pretrial Services Office on December 19, 2013, provided negative results for drug use.

5

This offense arises in regards to a fraudulent business scheme under Coastal Energy LLC ("Coastal"). The business consisted of brokering energy contracts between commercial businesses and energy suppliers. Mr. Mateja and Mr. Puleo were co-owners of Coastal and Mr. Morgan was an employee. They solicited business in Pennsylvania and New Jersey with the representation of negotiating lowering energy prices from energy providers. The company would receive paid commissions by the energy suppliers once customers entered into agreements. From June 2011 to February 2013, the defendants altered a number of contracts changing the terms of the contract from "Fixed All-Inclusive" to "Energy Only". This effectively cost the customers higher rates for energy. Such a scheme did not work very well and many clients immediately noticed the higher bills.

**B.      The Need for the Sentence Imposed to Promote Certain Statutory Objectives:**

**(1) To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.**

Mr. Mateja has suffered the shame and humiliation of being charged in this matter and having entered a guilty plea to Wire Fraud. This Court will no doubt sentence Mr. Mateja in a fashion that reflects the seriousness of the offense, but at the same time, provide for just punishment. The negative stigma of being convicted of a fraudulent offense will also follow Mr. Mateja for the rest of his adult life. This stigma will magnify the punishment imposed by the Court as businesses will consider his conviction when considering whether to hire him in his chosen field.

**(2) To afford adequate deterrence to criminal conduct, to protect the public from further crimes, and to provide the defendant with needed medical or other correctional treatment in the most effective manner.**

Mr. Mateja faces a significant period of incarceration pursuant to the advisory guidelines. Mr. Mateja certainly recognizes the seriousness of his actions. The Government acknowledges that Mr. Mateja has taken positive steps. Mr. Mateja met with the government to explain his crimes and helped conclude the government's investigation.

**C.     The Kinds of Sentences Available.**

The guideline for violations of 18 U.S.C. § 1343 and 1349 offenses is found in U.S.S.G. §2B1.1. The base offense level is 7. Based upon the amounts charged in the information, the offense level is increased by 14 levels (21). Since the Defendnat obstructed justice the offense level is increased by 2 levels (23). Pursuant to Mr. Mateja's acceptance of responsibility and timely notification his offense is reduced by 3 levels (20).

Thus, Mr. Mateja faces a Total Adjusted Offense Level of 20. With no prior criminal history the guideline range of imprisonment is 33 to 41 months. Nevertheless, although the district court must give respectful consideration to the guidelines in determining a sufficient sentence, *Gall v. United States*, 128 S. Ct. at 594, it may not presume that the guideline sentence is the correct one, *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007). Mr. Mateja is statutorily eligible for not less than 1 year nor more than 5 years of probation with regard to each count. 18 U.S.C. 3561(c)(1).

7

## V.    RESTITUTION

The Court must also consider the issue of restitution. If the Court is imposing restitution

it must consider the financial resources of the defendant, the financial needs and earning ability

of the defendant, and the defendant's dependents, and other such factors as the court deems

appropriate. See 18 U.S.C. § 3663(a)(1)(B)(i)(II). As the Pre-Sentence Investigation Report

indicates, Mr. Mateja has significant negative net worth. See PSR ¶85. He has negative cash flow

values and is currently residing with this parents. *Id.*

Even with negative cash flow and negative net worth, Mr. Mateja has been working

diligently to make payments to several victims to the best of his financial ability. Mr. Mateja has

made payment arrangements with both Silvi Group and Friedmans. Mr. Mateja has paid over

$15,000.00 to Friedmans and over $6,000.00 to Silvi.

In regards to future payments and earning ability, Mr. Mateja would note that his

business does not have any guaranteed income of any sort. He has been fortunate to obtain some

ongoing auditing that he performs every month.  From that account he can attempt to generate

$6000-$10,000/month but it is not guaranteed and is a direct result of the savings Mr. Mateja can

show from audit changes.  This is highly dependent on tariff rates and related to first energy and

could change or disappear. In addition, his company has outstanding liabilities to the IRS in

excess of $50,000 and the Department of Unemployment for approximately $7,000.00 with

payments made directly from any gross revenue. This also doesn't account for the operating

costs of maintaining the business.

Mr. Mateja has kept his company operating, with little help from his co-defendants, and

is doing his best to pay all liabilities. These liabilities are being met due to Mateja's operation

8

and growth of the business.  If the business continues to grow, there is a possibility to pay back

full restitution in a short time frame. Counsel respectfully requests to address any additional

issues in regards to restitution at the sentencing hearing.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, the Defendant Michael Mateja respectfully submits that a

sentence which is substantially below the sentencing range recommended by the guidelines is an

appropriate sentence. Such sentence would adequately consider the enumerated factors and

fashion a sentence that is not greater than necessary to comply with the purpose of sentencing.

### RESPECTFULLY SUBMITTED:


/s/ John Waldron
John J. Waldron, Esquire
Attorney for Michael Mateja
535 Hamilton Mall Suite 301
Allentown, PA 18101
610-435-9790
I.D. #: 36853

9

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Defendant's Sentencing Memorandum filed through the ECF System will be electronically sent to the registered participants as identified on the Notice of Electronic Filing, including the following:

David Axelrod, Esquire
Assistant U.S. Attorney
David.Axelrod@usdoj.gov

Janice A. Lutz
Criminal Deputy to Honorable Michael M. Baylson
267-299-7528 (Fax)

Antonio Maiocco
Senior U.S. Probation Officer
Antonio_Maiocco@paep.uscourts.gov

/s/ John Waldron
John J. Waldron, Esquire
Attorney for Michael Mateja
535 Hamilton Mall Suite 301
Allentown, PA 18101
610-435-9790
I.D. #: 36853

Date: June 13, 2014

EXHIBIT H

MOTION TO MODIFY RESTITUTION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | No. 13-575-1 |
| vs. | * | |
| | * | |
| MICHAEL MATEJA, | * | |
| | * | |
| Defendant | * | |

## MOTION TO MODIFY RESTITUTION

Defendant Michael Mateja, by and through his attorney, John J. Waldron, Esquire, respectfully requests this Honorable Court grant a Motion to Modify Restitution, or, in the alternative, grant a restitution hearing. In support thereof, it is averred:

1. On June 16, 2014, Mr. Mateja was sentenced in the above-captioned matter.

2. At the time of sentencing the defense received several documents not previously provided regarding the issue of restitution.

3. This Honorable Court sentenced Defendant to make restitution in the sum of $818,903.00.

4. After a review of this documentation Defendant respectfully requests that this Honorable Court reconsider the issue of restitution.

5. Under the Mandatory Restitution Act the court shall order restitution. 18 U.S.C.A. § 3663A(a)(1).

6. The term "victim" means a person directly and proximately harmed as a result of the commission of an offense. 18 U.S.C.A. § 3663A(a)(2).

7. In the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense restitution is made through paying an amount equal to the greater of (I) the value of the property on the date of the damage, loss, or destruction; or (II) the

value of the property on the date of sentencing, less the value (as of the date the property

is returned) of any part of the property that is returned. 18 U.S.C.A. § 3663A(b).

8.      Restitution may also allow for reimbursing the victim for lost income and necessary child

care, transportation, and other expenses incurred during participation in the investigation

or prosecution of the offense or attendance at proceedings related to the offense. 18

U.S.C.A. § 3663A(b)(4).

9.      Any dispute as to the proper amount or type of restitution shall be resolved by the court

by the preponderance of the evidence. The burden of demonstrating the amount of the

loss sustained by a victim as a result of the offense shall be on the attorney for the

Government. 18 U.S.C.A. § 3664(e).

10.     Defendant contends that the restitution alleged to be owed to AEP Energy is

unreasonably high and unjust in light of the purpose of the restitution statute.

11.     AEP claims restitution based on (4) categories:

(1) Pre-paid commission to Defendants for fraudulent contracts that AEP had to

cancel due to Defendant's conduct ($80,017);

(2) Early termination fees associated with the contracts that AEP Energy had to

terminate due to Defendant's conduct ($365,733);

(3)Outside legal fees ($31,490); and

(4) Internal costs and expenses ($50,000).

12.     Internal costs and expenses ($50,000) was defined by AEP as work investigating the

scheme, working with affected customers, reporting to authorities, and internal audit

committees.

13.     150 hours for $50,000 in internal costs and expenses is approximately $333.00 an hour.

14.   Defendant contends that no information was provided to substantiate such internal costs and amounts.

15.   Attorneys' fees ($31,490) appear to be consequential damages, and are, therefore, not recoverable under the restitution statute. The Third Circuit has interpreted the restitution act as not authorizing consequential damages. See *U.S. v. Quillen,* 335 F.3d at 222 (citing *U.S. v. Simmonds,* 235 F.3d at 833).

16.   In *United States v. Amato*, 540 F.3d 153, 159–60 (2d Cir.2008), the Second Circuit held that, "necessary ... other expenses" contemplated by Section 3663A(b)(4) <u>may</u> include attorneys' fees, provided that the court finds, by a preponderance of the evidence, that: (1) such expenses were necessary; (2) they were incurred while participating in the investigation, prosecution, or attendance at proceedings regarding the offense; (3) they were incurred by a victim as defined by the MVRA; and (4) they do not require unduly complicated determinations of fact.

17.   The Third Circuit has also applied this test in determining whether it is proper to award attorney's fees. See *U.S. v. Dodd*, 978 F.Supp.2d 404 (M.D.Pa., 2013).

18.   Defendant contends AEP's attorney fees and internal costs and expenses are consequential damages and were not incurred while participating in the investigation, prosecution, or attendance at proceedings regarding the offense.

19.   In addition, attorney fees and internal costs were not used in determining loss. See Pre-Sentence Report at ¶20.

20.   AEP also requests $365,733 for terminating contracts due to Defendant's conduct referenced as early termination fees.

21.   Early termination fees should represent the fees associated with having to cancel the

contracts with AEPs customers due to Defendant's fraudulent activity.

22.   AEP's early termination fees were listed as follows:

(a) PMI property Management      $149,710.00   ($81,808 in lost margin)

(b) Silvi Concrete                $101,971.00   ($69,200 in lost margin)

(c) Friedman Point Plaza[negative]  $-3,709.00    ($16,773 in lost margin)

(d) Dauphin County  [negative]    $-6,727.00    ($107,715 in lost margin)

23.   As indicated above, AEP's early termination fees not only represent fees associated with

canceling contracts but would also like the Defendant to pay for any lost profit associated

with the canceled contracts referenced as lost margin.

24.   Defendant contends the purpose of the restitution statute is to make a victim whole

and to restore victims to their "original" state of well-being. See *U.S. v. Quillen,* 335 F.3d

219, 222 (C.A.3 (Pa.),2003)

25.   Defendant contends AEP is attempting to gain more from the restitution statute than

permissible.

26.   Consider that AEP is requesting restitution for $80,000 for pre-paid commissions

(Defendant returns the commissions received due to unfulfilled contracts) while

simultaneously requesting that the Court consider the contracts fulfilled in order to

reimburse for alleged future profit.

27.   If the court determines that AEP is entitled to future profit then Defendant asks the court

to consider a reasonable profit of $0.003/kWh of annual usage to be a more accurate

restitution for profit:

Silvi:                $25,226.31   (8,408,771 kWh *$0.003/kWh)

Friedmans:        $23,212.48     (7,737,493 kWh * 0.003 kWh)

PMI:              $9,057.72      (3,019,240 kWh * 0.003/kWh)

Dauphin County:   $25,672.24     (8557414kWh*0.003kWh)

28. The Court does not have to order restitution when determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. 18 U.S.C.A. § 3663A(c)(3)(B).

29. Defendant recognizes the need to make restitution, and in this case, the Defendant intends on making full restitution.

30. Nevertheless, Defendant should not be liable for unreliable, unjustified, and arbitrary amounts.

WHEREFORE, Defendant respectfully requests that this Honorable Court consider a Restitution Hearing to determine the appropriate amount of restitution.

**RESPECTFULLY SUBMITTED:**

/s/ John Waldron
John J. Waldron, Esquire
Attorney for Michael Mateja
535 Hamilton Mall Suite 301
Allentown, PA 18101
610-435-9790
I.D. #: 36853

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Defendant's Motion to Modify

Restitution filed through the ECF System will be electronically sent to the registered participants

as identified on the Notice of Electronic Filing, including the following:

David Axelrod, Esquire
Assistant U.S. Attorney
David.Axelrod@usdoj.gov

Janice A. Lutz
Criminal Deputy to Honorable Michael M. Baylson
267-299-7528 (Fax)

Antonio Maiocco
Senior U.S. Probation Officer
Antonio_Maiocco@paep.uscourts.gov

/s/ John Waldron
John J. Waldron, Esquire
Attorney for Michael Mateja
535 Hamilton Mall Suite 301
Allentown, PA 18101
610-435-9790
I.D. #: 36853

Date: July 2, 2014

EXHIBIT I

GOVERNMENT'S RESPONSE MOTION TO MODIFY RESTITUTION

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA**          :

    **v.**                     :     **CRIMINAL NO. 13-575-01**

**MICHAEL MATEJA**             :

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO MODIFY RESITUTION

Defendant Michael Mateja was sentenced on June 16, 2014 and ordered to pay

restitution of $818,903. Following the sentencing Mateja filed a motion to modify the amount of

restitution owed. For the reasons herein, the government respectfully requests that the Court

grant Mateja's motion, in part, and order him to pay restitution in the amount of $790,553.

## I.    PROCEDURAL BACKGROUND

On October 22, 2013, The United States Attorney's Office for the Eastern District

of Pennsylvania filed a two-count Information, charging defendant Michael Mateja with one

count of wire fraud, and aiding and abetting wire fraud, in violation of 18 U.S.C. § 1343, and one

count of obstruction of justice, in violation of 18 U.S.C. § 1505. On December 19, 2013, Mateja

pled guilty pursuant to a plea agreement with the government. On June 16, 2014, Mateja was

sentenced by the Court and ordered to pay restitution of $818,903.

Prior to the sentencing hearing, the United States Probation Office and the

government contacted victims of Mateja's scheme and ascertained their losses as a result of the

criminal conduct. The probation office and the government recommended that the Court impose

restitution of $818,903 based on this information. *See* PSR ¶ 110. The Court ordered Mateja to

pay restitution in accordance with this schedule:

| Victim | Amount |
|---|---|
| Rastelli Brothers | $46,687 |
| Atlantic States Pipe | $141,399 |
| Silvi Concrete | $46,129 |
| Friedman's Fresh Market | $6,020 |
| Valley Farmer's Market | $51,428 |
| AEP Energy | $527,240 |
| Total | $818,903 |

However, the Court granted Mateja time to challenge the amount of restitution.

## II.  APPLICABLE LAW

Under the Mandatory Victims Restitution Act of 1996 (MVRA), 18 U.S.C.

3663A, when a defendant is convicted of certain offenses, including wire fraud, the court must

order the defendant to pay restitution "in the full amount of each victim's losses." 18 U.S.C. §

3664(f)(1)(A). In *Hughey v. United States* the Supreme Court held that restitution may be

awarded only for the victim's losses resulting from the specific conduct for which the defendant

was convicted. 495 U.S. 411, 421-22 (1990).

## III.  THE RESITUTION AMOUNT SHOULD BE REDUCED BY $28,350

Mateja's motion solely challenges the $527,240 in restitution owed to victim AEP

Energy ("AEPE"). Mateja argues that this amount should be reduced because: (1) AEPE's

internal costs of $50,000, spent investigating the scheme and working with affected customers is

too high, Mateja Mot. ¶ 12; (2) AEPE's attorneys' fees of $31,490 are "consequential" damages

and thus not recoverable under the restitution statute, Mateja Mot. ¶ 15; and (3) AEPE is not

2

entitled to restitution of the "lost profit" because of Mateja's fraud, Mateja Mot. ¶¶ 23-25. The

government addresses each of these arguments separately.

A.      **Restitution for "Internal Costs" Should be Reduced to $21,650.**

Prior to sentencing AEPE informed the government that it spent approximately

$50,000 on "internal costs" in "investigating the scheme, working with affected customers,

reporting to authorities and internal audit committees and otherwise attempting to minimize the

scheme's impact, internally and externally." AEPE Victim Impact Statement at 2, attached as

Ex. A. Mateja does not argue that AEPE cannot be reimbursed for these internal costs; he only

argues that the amount claimed is too high.

After Mateja filed the instant motion the government contacted AEPE regarding

Mateja's claims. AEPE responded that taking a conservative approach, the "internal cost" figure

should be reduced to $21,650, thereby reducing the total restitution amount by $28,350.

B.      **AEPE's Attorneys' Fees of $31,490 are Properly Included in Restitution.**

AEPE incurred attorneys' fees of $31,490 in "investigating the scheme, reporting

to authorities, and attempting to recoup its losses through civil litigation and enforcement."

Mateja does not object to the amount of AEPE's attorneys' fee but argues that this amount

should be excepted from restitution because it is "consequential" and not authorized as

restitution. Mateja Mot. ¶ 15 (citing *United States v. Quillen*, 335 F.3d 219 (3d Cir. 2003).

The Third Circuit has interpreted the MVRA as not authorizing consequential

damages. *Quillen*, 335 F.3d at 222 (citing *United States v. Simmonds*, 235 F.3d 826, 833 (3d Cir.

2000)). Mateja cites these cases for the proposition that attorneys' fees are consequential

damages, and are, therefore, not recoverable under the MVRA. Mateja's argument assumes the

existence of a bright-line rule prohibiting restitution for attorneys' fees that does not exist.
*United States v. Dodd*, 978 F. Supp. 2d 404, 422 (M.D. Pa. 2013).

The proper question is not whether attorneys' fees can be included in restitution,
but whether the attorneys' fees incurred were a loss directly resulting from the offense, or a
consequential loss. *See Dodd*, 978 F. Supp. 2d at 422-23. Indeed, the MVRA does not exclude
attorneys' fee but instead states generally that the order of restitution shall: "reimburse the victim
for . . . expenses incurred during participation in the investigation or prosecution of the offense . .
. ." 18 U.S.C. § 3663A(b)(4).

In *United States v. Amato*, 540 F.3d 153, 159–60 (2d Cir.2008), the Second
Circuit held that, "necessary . . . other expenses" contemplated by Section 3663A(b)(4) may
include attorneys' fees, provided that the court finds, by a preponderance of the evidence, that:
(1) such expenses were necessary; (2) they were incurred while participating in the investigation,
prosecution, or attendance at proceedings regarding the offense; (3) they were incurred by a
victim as defined by the MVRA; and (4) they do not require unduly complicated determinations
of fact. *See also United States v. Gupta*, 925 F.Supp.2d 581, 584 (S.D.N.Y. 2013) (citing
Amato, 540 F.3d at 160); *Dodd*, 978 F. Supp. 2d at 423 (adopting the *Amato* test). In *Amato*, the
Second Circuit affirmed restitution of $3,000,000 in attorneys' stating:

> Defendants perpetrated a complicated fraud against a large corporation and a number of its
> clients, as well as the states to which those clients were required to turn over escheated funds.
> That this fraud would force the corporation to expend large sums of money on its own
> internal investigation as well as its participation in the government's investigation and
> prosecution of defendants' offenses is not surprising. There is no doubt that EDS's attorney
> fees and auditing costs were a direct and foreseeable result of defendants' offenses.

540 F.3d at 162.

Applying the *Amato* test to this case, the Court should include AEPE's attorneys'
fees in the restitution amount. Mateja and his co-conspirators perpetrated a complicated fraud

4

against AEPE and its customers, which directly caused AEPE to spend significant amounts of money investigating the fraud, attempting to collect funds from Mateja and his co-conspirators, and participating in the government's investigation. Accordingly, AEPE's attorneys' fees are properly included in the restitution total.

### C. AEPE's Lost Profits are Appropriated Included in Restitution.

AEPE lost $365,733 of early termination fees associated with the contracts that AEPE was forced to cancel due to Mateja and his co-conspirators' conduct. These early termination fees are composed of two elements: (1) the difference between the wholesale cost to purchase electricity to service the lost contracts and the price at which AEPE could sell that electricity after the contracts were cancelled (AEPE refers to this as the "mark to market loss"); and (2) the lost retail margin that includes the (a) cost to serve the contracts and (b) the lost profit.

AEPE suffered a mark-to-market loss of $90,187. Mateja does not contest this portion of restitution.

AEPE suffered lost retail margin of $275,546. Mateja does not contest the "cost to serve" portion of this amount but does argue that AEPE is not entitled to the lost profit associated with the cancelled contracts. AEPE estimates that based on its business operations in 2012 and 2013 that approximately 70% of the "lost margin" is attributable to the "cost to serve" component and 30% is lost profit. This means that the "cost to serve" component, which Mateja does not challenge, is $192,882, and the "lost profit" component equals approximately $82,663.[1]

Mateja's contention that AEPE is not entitled to its lost profit on these contracts is not supported by the law. There is nothing in the restitution statute, 18 U.S.C. §§ 3663, 3663A,

---

[1] Mateja contends that if the Court does conclude that AEPE is entitled to the "lost profit" from these contracts, the profit should be limited to $83,168.75. Mateja Mot. ¶ 27.

5

Accordingly, it found that the bank should be reimbursed for $200,000 in profit that was usurped by the defendant.

AEPE is in the same position as the bank in *Rodrigues*. AEPE expected and had a direct interest in profit of approximately $82,679. The only reason this profit was lost was because of the defendants' criminal activities. This amount should be included in the restitution.

## IV. CONCLUSION

The following chart reflects the contested and uncontested items regarding the

restitution owed to AEPE:

| Restitution Component | Amount | Contested/Uncontested |
|---|---|---|
| Attorneys' Fees | $31,490 | Contested |
| Internal Costs | $21,650 | Contested |
| Prepaid Commissions | $80,017 | Uncontested |
| Market-to-Market Loss | $90,187 | Uncontested |
| Cost to Serve Loss | $192,882 | Uncontested |
| Lost Profit | $82,663 | Contested |

For the reasons discussed in this memorandum, the government respectfully asks

the court to grant Mateja's motion, in part, and order him to pay AEPE restitution of $498,890,

and total restitution of $790,553.[3]

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

DAVID L. AXELROD
Assistant United States Attorney

Dated: August 4, 2014

---

[3] The government also asks the Court to modify the judgment and conviction for co-defendant Samuel Puleo to reflect these changes.

8

## CERTIFICATE OF SERVICE

The foregoing filing has been served electronically through the electronic case

filing system upon:

John J. Waldron
535 Hamilton Mall, Suite 301
Allentown, PA 18101

DAVID L. AXELROD
Assistant United States Attorney

Dated: August 4, 2014

9

# Exhibit A

GOVERNMENT
EXHIBIT
A

United States v. Michael Mateja, Sam Puleo Jr., Matthew Morgan

**Criminal Case Number:**    13 CR 575 (E.D. Pa.)

**Names of Victims:**    AEP Energy, Inc. (f/k/a BlueStar Energy Services, Inc.)

**Scheduled Date of Sentencing:**    April 10, 2014 (Mateja); May 12, 2014 (Puleo, Morgan)

## VICTIM IMPACT STATEMENT (FINANCIAL CRIME)

I.    Background

AEP Energy, Inc. is an alternative retail electricity supplier headquartered in Chicago, Illinois. AEP Energy sells electricity to its customers and bills them for it; other utility companies generate the electricity and deliver it from the point of generation and along transmission lines to the customers.

A contract between AEP Energy and a customer can be "all inclusive" or it can be for "electricity only." Under an all-inclusive contract, the price the customer paid would include charges that can comprise an electricity bill, such as transmissions fees and other incidental charges. On the other hand, a contract between AEP Energy and a customer for "electricity only" would cover only the energy purchased by the customer. The customer would still be billed by the utility for other costs related to that electricity, including transmission and other incidental costs.

In order to secure additional customers, AEP Energy sometimes utilizes third parties to act as approved brokers. Those brokers solicit new customers for AEP Energy and, when successful, facilitate the execution of a contract between AEP Energy and the customer. Sometimes, a broker will sign a contract on behalf of a new AEP Energy customer pursuant to a power of attorney executed by that customer. Brokers are paid a commission when they secure a new customer for AEP Energy.

Defendants Sam Puleo, Jr., Michael Mateja, and Matthew Morgan were owners and/or employees of one such electricity broker, Coastal Energy Consultants LLC. As outlined in the Information filed in the above-referenced action, Defendants (through Coastal) engaged in a fraudulent scheme whereby they informed certain customers that they were being signed up with an electricity provider for an "all inclusive" contract at a fixed price while actually entering into "energy only" contracts with the provider. In order to accomplish this scheme, Defendants forged and altered contracts, powers of attorney and several other documents.

AEP Energy was a victim of Defendants' scheme in at least four instances. In each of those cases, AEP Energy was forced to release the customer from its contract, and thereby incurred substantial losses as a result. In addition, in two of these instances, AEP Energy had paid Defendants pre-paid commissions on the contracts that had to be terminated due to Defendants' fraudulent conduct.

II.    Amount of Financial Loss

*As a result of Defendants' fraudulent activities, AEP Energy incurred a total of $527,240 in financial losses.* The losses fall into four categories: (1) pre-paid commission to Defendants for fraudulent contracts that AEP Energy had to cancel due to Defendants' conduct; (2) early termination fees associated with fraudulent contracts that AEP Energy had to terminate due to Defendants' conduct; (3) outside legal fees; and (4) internal costs and expenses. (A breakdown of these costs was previously provided to the U.S. Attorney's Office by outside counsel for AEP Energy.)

*First,* AEP Energy pre-paid Defendants' commission on two of the fraudulent contracts. However, AEP Energy was forced to release these customers and terminate the contract without earning the revenue upon which Defendants' commission was based. The amount of such pre-paid commissions totals $80,017 ($49,067 for Silvi Concrete; $30,950 for Friedman Point Plaza).

*Second,* AEP Energy incurred early termination fee damages with respect to the four fraudulent contracts in the amount of $365,733 (PMI Property Management $149,710; Silvi Concrete $101,971; Dauphin County $100,988; Friedman Point Plaza $13,064). The early termination fee is the amount that the four customers would have been contractually obligated to pay AEP Energy had they decided to terminate the contracts (absent Defendants' fraudulent conduct).

The early termination fee includes several components that represent losses to AEP Energy in the event of an early termination. Most notably, because AEP Energy provided a fixed price for electricity, AEP Energy must pre-purchase electricity or purchase an electricity hedge in the energy wholesale market. If a customer breaches its contract with AEP Energy, AEP Energy is still obligated to purchase the electricity required to service that customer. Put another way, in the event a customer breaches its obligation to purchase electricity from AEP for the term of its contract, AEP Energy incurs damages based on the electricity or hedges it purchased in order to service that customer, as well as additional damages based on the cost to unwind and liquidate that future position. The early termination fee also includes certain of the costs that AEP Energy incurred to service the contract, as well as compensation for its lost profit.

*Third,* AEP Energy incurred attorneys' fees and other legal cost damages in investigating the scheme, reporting to authorities, and attempting to recoup its losses through civil litigation and enforcement. These costs totaled $31,490.

*Fourth,* AEP Energy incurred internal cost and expense damages in investigating the scheme, working with affected customers, reporting to authorities and internal audit committees and otherwise attempting to minimize the scheme's impact, internally and externally. Based on 150 to 200 hours of employee time, AEP Energy estimates these costs to be $50,000.

Finally, in addition to the calculable financial loss, AEP Energy suffered incalculable damage to its reputation due to the negative impact of Defendants' fraudulent conduct on customers who thought they were signing up for electricity service with AEP Energy.

## VICTIM IMPACT STATEMENT/FINANCIAL CRIME      PAGE 3

### III.    Recovery

AEP Energy filed a civil suit against Costal Energy Consultants LLC and Puleo in the Circuit Court of Cook County, and obtained a default judgment in the amount of $445,750. AEP Energy also undertook efforts to enforce that judgment in Pennsylvania. However, to date, AEP Energy has not been successful in its efforts to collect on the Illinois default judgment.

After his arrest, in November 2013, Puleo mailed a money order to AEP Energy in the amount of $300. In accompanying correspondence, Puleo claimed that the payment was "the beginning of a complete pay-back of your losses in dealing with Coastal Energy." To date, AEP Energy has not received any additional funds from Puleo or the other Defendants.

### IV.    Additional Information

To the extent you have additional questions concerning AEP Energy's losses or require additional documentation of those losses, please do not hesitate to contact the undersigned.

Report Submitted by: Peter Kolch, Associate General Counsel, on behalf of AEP Energy, Inc., f/k/a BlueStar Energy Services, Inc.

Signature:

Phone: (312) 628-0787

email: pkolch@aepenergy.com

Date: February 28, 2014

EXHIBIT J

PLEA AGREEMENT

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :

     v.                    :      CRIMINAL NO.

MICHAEL MATEJA             :

### GUILTY PLEA AGREEMENT

Under Rule 11 of the Federal Rules of Criminal Procedure, the government, the defendant, and the defendant's counsel enter into the following guilty plea agreement. Any reference to the United States or the government in this agreement shall mean the Office of the United States Attorney for the Eastern District of Pennsylvania.

1.    The defendant agrees to plead guilty to Counts One and Two of an indictment or information, waiving prosecution by indictment, charging him with wire fraud, in violation of 18 U.S.C. § 1343, and obstruction of justice, in violation of 18 U.S.C. § 1505, and not to contest forfeiture as set forth in the notice of forfeiture charging criminal forfeiture under 18 U.S.C. § 981, all arising from his involvement in a scheme to defraud clients of Coastal Energy LLC. The defendant further acknowledges his waiver of rights, as set forth in the attachment to this agreement.

2.    At the time of sentencing, the government will:

a.    Make whatever sentencing recommendation as to imprisonment, fines, forfeiture, restitution, and other matters which the government deems appropriate.

b.      Comment on the evidence and circumstances of the case; bring to the Court's attention all facts relevant to sentencing including evidence relating to dismissed counts, if any, and to the character and any criminal conduct of the defendant; address the Court regarding the nature and seriousness of the offense; respond factually to questions raised by the Court; correct factual inaccuracies in the presentence report or sentencing record; and rebut any statement of facts made by or on behalf of the defendant at sentencing.

c.      Nothing in this agreement shall limit the government in its comments in, and responses to, any post-sentencing matters.

3.      The defendant understands, agrees, and has had explained to him by counsel that the Court may impose the following statutory maximum sentences: Count One (wire fraud), twenty years' imprisonment, a three year period of supervised release, a $250,000 fine, and a $100 special assessment; and Count Two (obstruction of justice), five years, imprisonment, a three year period of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum Sentence is: 25 years' imprisonment, a three year period of supervised release, $500,000 fine, and a $200 special assessment. Full restitution shall be ordered. Forfeiture of all proceeds from the offense also may be ordered.

The defendant further understands that supervised release may be revoked if its terms and conditions are violated. When supervised release is revoked, the original term of imprisonment may be increased by up to two years per count. Thus, a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant will have to serve the original sentence, plus a substantial additional period, without credit for time already spent on supervised release.

2

4.      The defendant agrees to pay a fine and to make restitution as directed by the court. The defendant further agrees that forfeiture, restitution, fine, assessment, tax, interest, or other payments in this case do not constitute extraordinary acceptance of responsibility or provide any basis to seek a downward departure or variance from the applicable Sentencing Guideline range.

5.      In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees fully to disclose all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party. Accordingly:

a.      The defendant will promptly submit a completed financial statement to the U.S. Attorney's Office, in a form it provides and as it directs. The defendant promises that his financial statement and disclosures will be complete, accurate, and truthful.

b.      The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on him in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.      The defendant agrees to pay the special victims/witness assessment in the amount of $200 before the time of sentencing and shall provide a receipt from the Clerk to the government before sentencing as proof of this payment.

7.      The defendant may not withdraw his plea because the Court declines to follow any recommendation, motion, or stipulation by the parties to this agreement. No one has promised or guaranteed to the defendant what sentence the Court will impose.

3

8.      Pursuant to USSG § 6B1.4, the parties enter into the following stipulations under the Sentencing Guidelines Manual. It is understood and agreed that: (1) the parties are free to argue the applicability of any other provision of the Sentencing Guidelines, including offense conduct, offense characteristics, criminal history, adjustments, and departures; (2) these stipulations are not binding upon either the Probation Office or the Court; and (3) the Court may make factual and legal determinations that differ from these stipulations and that may result in an increase or decrease in the Sentencing Guidelines range and the sentence that may be imposed:

a.      The parties agree and stipulate that, as of the date of this agreement, the defendant has demonstrated acceptance of responsibility for his offense, making the defendant eligible for a 2-level downward adjustment under USSG § 3E1.1(a).

b.      The parties agree and stipulate that, as of the date of this agreement, the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying the government of his intent to plead guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, resulting in a 1-level downward adjustment under USSG § 3E1.1(b).

9.      In exchange for the promises made by the government in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.

4

a.      Notwithstanding the waiver provision above, if the government appeals from the sentence, then the defendant may file a direct appeal of his sentence.

b.      If the government does not appeal, then notwithstanding the waiver provision set forth in this paragraph, the defendant may file a direct appeal but may raise only a claim:

(1)     that the defendant's sentence on any count of conviction exceeds the statutory maximum for that count as set forth in paragraph 3 above;

(2)     challenging a decision by the sentencing judge to impose an "upward departure" pursuant to the Sentencing Guidelines; and/or

(3)     challenging a decision by the sentencing judge to impose an "upward variance" above the final Sentencing Guideline range determined by the Court. If the defendant does appeal pursuant to this subparagraph, no issue may be presented by the defendant on direct appeal other than those described in this subparagraph.

c.      Notwithstanding the waiver provision set forth in this paragraph, the defendant may file a petition for collateral relief under 28 U.S.C. § 2255, but may only raise a claim that the attorney who represented the defendant at the time of the execution of this agreement and the entry of the defendant's guilty plea provided constitutionally ineffective assistance during any part of the representation.

10.     The defendant waives any claim under the Hyde Amendment, 18 U.S.C. § 3006A (Statutory Note), for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

5

11.    The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

12.    The defendant is satisfied with the legal representation provided by the defendant's lawyer; the defendant and this lawyer have fully discussed this plea agreement; and the defendant is agreeing to plead guilty because the defendant admits that he is guilty.

6

13.     It is agreed that the parties' guilty plea agreement contains no additional promises, agreements, or understandings other than those set forth in this written guilty plea agreement, and that no additional promises, agreements, or understandings will be entered into unless in writing and signed by all parties.

ZANE DAVID MEMEGER
United States Attorney

_____
MICHAEL MATEJA
Defendant

_____
PETER F. SCHENCK
Chief, Criminal Division
Assistant United States Attorney

_____
JOHN WALDRON, ESQ.
Counsel for Defendant

_____
DAVID L. AXELROD
Assistant United States Attorney

Date: _9/20/2013_____

7

Attachment

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

        v.          :          CRIMINAL NO.

MICHAEL MATEJA          :

## ACKNOWLEDGMENT OF RIGHTS

I hereby acknowledge that I have certain rights that I will be giving up by pleading guilty.

1.     I understand that I do not have to plead guilty.

2.     I may plead not guilty and insist upon a trial.

3.     At that trial, I understand

     a.     that I would have the right to be tried by a jury that would be selected from the Eastern District of Pennsylvania and that along with my attorney, I would have the right to participate in the selection of that jury;

     b.     that the jury could only convict me if all 12 jurors agreed that they were convinced of my guilt beyond a reasonable doubt;

     c.     that the government would have the burden of proving my guilt beyond a reasonable doubt and that I would not have to prove anything;

     d.     that I would be presumed innocent unless and until such time as the jury was convinced beyond a reasonable doubt that the government had proven that I was guilty;

     e.     that I would have the right to be represented by a lawyer at this trial and at any appeal following the trial, and that if I could not afford to hire a lawyer, the court would appoint one for me free of charge;

     f.     that through my lawyer I would have the right to confront and cross-examine the witnesses against me;

     g.     that I could testify in my own defense if I wanted to and I could subpoena witnesses to testify in my defense if I wanted to; and

h.      that I would not have to testify or otherwise present any defense if I did not want to and that if I did not present any evidence, the jury could not hold that against me.

4.      I understand that if I plead guilty, there will be no trial and I would be giving up all of the rights listed above.

5.      I understand that if I decide to enter a plea of guilty, the judge will ask me questions under oath and that if I lie in answering those questions, I could be prosecuted for the crime of perjury, that is, for lying under oath.

6.      I understand that if I plead guilty, I have given up my right to appeal, except as set forth in the appellate waiver provisions of my plea agreement.

7.      Understanding that I have all these rights and that by pleading guilty I am giving them up, I still wish to plead guilty.

8.      I acknowledge that no one has promised me what sentence the Court will impose. I am aware and have discussed with my attorney that, at sentencing, the Court will calculate the Sentencing Guidelines range (including whether any departures apply), and then, in determining my sentence, will consider the Guideline range and all relevant policy statements in the Sentencing Guidelines, along with other sentencing factors set forth in 18 U.S.C. § 3553(a), including

(1) the nature and circumstances of the offense and my personal history and characteristics;

(2) the need for the sentence imposed-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

2

(5) the need to provide restitution to any victims of the offense.

_____
MICHAEL MATEJA
Defendant


_____
JOHN WALDRON, ESQ.
Counsel for the Defendant

Dated:   9/20/2013

3

EXHIBIT K

SENTENCING TRANSCRIPT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,      )     13-CR-575
                               )
                               )
      vs.                      )
                               )
                               )
MICHAEL ANDREW MATEJA,         )
                               )     Philadelphia, PA
                               )     June 16, 2014
            Defendant.         )     2:18 p.m.


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE MICHAEL M. BAYLSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:      DAVID L. AXELROD, ESQUIRE
                         ASSISTANT UNITED STATES ATTORNEY
                         UNITED STATES ATTORNEY'S OFFICE
                         615 Chestnut Street
                         Suite 1250
                         Philadelphia, PA   19106-4476


For the Defendant,       JOHN J. WALDRON, ESQUIRE
Michael Mateja:          HUBER AND WALDRON
                         535 Hamilton Mall
                         Suite 301
                         Allentown, PA 18101


Also Present:            ANTONIO MAIOCCO, PROBATION OFFICER

Audio Operator:          JANICE LUTZ


Transcribed by:          DIANA DOMAN TRANSCRIBING
                         P.O. Box 129
                         Gibbsboro, New Jersey  08026-0129
                         Office:  (856) 435-7172
                         Fax:     (856) 435-7124
                         Email:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

I N D E X

RESTITUTION ARGUMENT:                              PAGE NUMBER

    By Mr. Waldron                                      6

    By Mr. Axelrod                                      8

    By Mr. Waldron                                      9

    By Mr. Axelrod                                     10

Decision of the Court

    By Judge Baylson                                   12

STATEMENT AS TO SENTENCING:

    By Mr. Axelrod                                     18

    By Mr. Waldron                                     19

STATEMENT OF DEFENDANT:

    By Mr. Mateja                                      21

SENTENCE OF THE COURT:

    By Judge Baylson on Restitution                    22

    By Judge Baylson on Surrender Date                 24

    By Judge Baylson on Sentence                       25

Colloquy                                                3

1    (The following was heard in open court at 2:18 p.m.)

2           THE COURT:  All right.  Please be seated.  All

3    right.  Counsel, are you ready to proceed?

4           MR. WALDRON:  Judge, I just got a document from the

5    Government that my client is reviewing on a restitution issue.

6           THE COURT:  What is that -- oh?   What is this, Mr.

7    Axelrod?

8           MR. AXELROD:  Judge, it's actually a letter that

9    you've seen before.

10          THE COURT:  Oh, all right.

11          MR. AXELROD:  It relates to the money owed to AEP

12   Energy.

13          THE COURT:  Right.

14          MR. AXELROD:  It's a portion of the restitution.

15          THE COURT:  Right.

16          MR. AXELROD:  And as you may recall, with the Puleo

17   sentencing, that they contested this portion, at first, and

18   then they withdrew it once they received this letter?

19          THE COURT:  Right.

20          MR. AXELROD:  I had thought that I had forwarded it

21   to defense counsel for this defendant, as well.

22          THE COURT:  All right.

23          MR. AXELROD:  It turns out, I had not.  So, I,

24   actually, just gave this to him now.

25          THE COURT:  All right.  Well, do you want more time

Colloquy                                    4

1    to review it?

2                MR. WALDRON:  Could I just have about ten minutes,

3    Judge?  Is that okay?

4                THE COURT:  Yes, sure.  All right.  Well, I'll come

5    back in about ten minutes.

6                MR. WALDRON:  Thank you.

7                MR. AXELROD:  Thank you, Your Honor.

8                THE COURT:  All right.  Thank you.

9         (Recess.)

10               THE COURT:  Okay.  All right.  We're ready to

11   proceed?  Okay.  Present, Mr. Axelrod is here for the United

12   States in the United States versus Mateja, M-A-T-E-J-A,

13   criminal 13-575.  And Mr. Waldron is here for the defendant,

14   and the defendant is here.  Mr. Maiocco is here from the

15   Probation Department.

16               All right.  Let's swear the defendant, please?

17               MICHAEL ANDREW MATEJA, DEFENDANT, SWORN

18               COURTROOM DEPUTY:  Thank you.  Please state your

19   full name and spell your last name for the record?

20               THE DEFENDANT:  Michael Andrew Mateja, —A-T-E-J-A.

21               THE COURT:  All right.  Mr. Mateja, you may have a

22   seat.  Well, just before you sit down, pull the microphone

23   closer to you and keep your voice up.

24               THE DEFENDANT:  Sure.

25               THE COURT:  All right.  You understand that this is

Colloquy                                    5

1    the date and time set for your understanding?

2              THE DEFENDANT:  Yes, I understand.

3              THE COURT:  All right.  And did you receive a copy

4    of the presentence report through your attorney?

5              THE DEFENDANT:  Yes, I did.

6              THE COURT:  And have you had a chance to read it and

7    review it?

8              THE DEFENDANT:  Yes, I did.

9              THE COURT:  All right.  And are you prepared to

10   proceed at this time?

11             THE DEFENDANT:  Yes.

12             THE COURT:  All right.  And are you satisfied with

13   Mr. Waldron's representation of you?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Okay.  You may have a seat.

16             All right.  And, now, in terms of the presentence

17   report, I saw that the defendant made several comments.  I'm

18   not sure I would call them, precisely, objections, but are you

19   satisfied, Mr. Waldron, that the revisions made by Mr. Maiocco

20   address your concerns?

21             MR. WALDRON:  Yes, Judge, and at this point, the

22   only issues we have are regarding one victim, regarding

23   restitution, Judge.

24             THE COURT:  Well, what is that issue?

25             MR. WALDRON:  Judge, I think you might have received

1    a victim impact statement from AEP, Your Honor.

2              THE COURT:  Well, I'm not sure I have.

3              MR. WALDRON:  Okay.  And also an e-mail --

4              THE COURT:  Is that -- Mr. Axelrod, is that

5    something --

6              MR. AXELROD:  Your Honor, it's, actually, what Ms.

7    Lutz just, I think, gave you a copy before you went back --

8              THE COURT:  Oh, okay.

9              MR. AXELROD:  -- to chambers.

10             THE COURT:  All right.  All right.

11             MR. AXELROD:  It's an e-mail that I forwarded to Ms.

12   Lutz, and she was nice enough to print it out for me.

13             THE COURT:  Is that from Peter Kolch, K-O-L-C-H?

14             MR. AXELROD:  Correct, and he is the -- I think, the

15   vice-president for AEP.

16             THE COURT:  Okay.

17             MR. WALDRON:  And he breaks down, Judge, the losses,

18   financial loss, for AEP into four different -- like, four

19   different steps, I guess.

20             THE COURT:  This ADT, the alarm company?

21             MR. WALDRON:  AEP.

22             THE COURT:  Oh, AEP?  What's that stand for?

23             MR. WALDRON:  AEP Energy, Judge.

24             THE COURT:  All right.

25             MR. WALDRON:  And the amount they're claiming is a

1   total of $527,240. And there's two of the steps that we had

2   an issue with. The second step is an early termination fee

3   damage, and the fourth step is, they incurred internal costs

4   and expenses that they estimated to be $50,000, Your Honor.

5           And the e-mail that you just got, I just got, also,

6   and you gave us -- you were kind enough to give us some time

7   to review that, Judge. They're the issues, restitutionwise

8   that we --

9           THE COURT: Well, what's the issue -- what do you

10  think the restitution should be?

11          MR. WALDRON: Well, let me just explain, you know,

12  restitution has to be reasonable, Judge. For example, in --

13          THE COURT: Well, it has to be accurate, first of

14  all.

15          MR. WALDRON: Well, the --

16          THE COURT: Reasonable is a very subjective

17  viewpoint.

18          MR. WALDRON: Right. And you have to make that --

19          THE COURT: But the victim is entitled to be

20  reimbursed for its losses.

21          MR. WALDRON: AEP, Judge, for example, where they

22  say, they incurred internal costs and expense damages of

23  $50,000 based on 150 to 200 hours of employee time, where they

24  investigated the scheme, worked with customers, reported to

25  authorities.

Case 2:13-cr-00575-MMB   Document 75   Filed 04/07/16   Page 173 of 238

Axelrod - Restitution Argument                    8

1    So, if you look at 150 to 200 hours, and they're

2  estimating it at $50,000, 150 hours would be $333 an hour or

3  200 hours would be $250 an hour.  I think that's pretty

4  exorbitant, Judge.

5         THE COURT:  All right.  Mr. Axelrod?

6         MR. AXELROD:  Your Honor, I, quite frankly, the only

7  information I had about the defendant's objection to the

8  restitution was in the PSR, which didn't touch on that $50,000

9  number, so, I, quite frankly, am not prepared to address that.

10        I have not reached out and spoke to AEP about that

11 $50,000 number, because I didn't know that I was going to have

12 to defend it.

13        THE COURT:  All right.  Mr. Maiocco, did you know

14 anything about this?

15        MR. MAIOCCO:  Not as an objection, no, Your Honor.

16        MR. AXELROD:  So, Your Honor, if you are prepared to

17 ignore that $50,000, even though AEP claims it is a cost, what

18 I would ask you to do is either continue this hearing or

19 complete the hearing, but just leaving the restitution issue

20 open, and I will, either, ascertain more information from the

21 company and submit it to the Court or I will bring a witness

22 from the company to testify for Your Honor.

23        THE COURT:  Well, you know, the -- I wouldn't say

24 the issue is moot, but it's not a practical barrier to

25 proceeding, because the defendant doesn't have any money

1    anyway.  I mean, whatever restitution he's going to be able to

2    make is from his current or future earnings.

3              MR. AXELROD:  Correct.

4              THE COURT:  And that was the same thing, true with

5    the codefendant, Mr. Puleo.

6              MR. AXELROD:  Correct.

7              THE COURT:  So, what about the early termination

8    fee?  What's the value of that dispute?

9              MR. WALDRON:  Well, here's what I had gotten, Judge,

10   I had gotten, previously, this victim impact statement

11   regarding financial crime from AEP, and the early termination

12   fee damages amount to $365,000.  So, my question was, well,

13   did AEP resell their energy.  And, because, in this impact

14   statement it didn't indicate if they did or they didn't.

15             So, then, I got this e-mail today, and they try to

16   explain that they did resell the energy units with four

17   victims.

18             THE COURT:  What do you think the amount should be,

19   if not $365,000?

20             MR. WALDRON:  Well, I think it should be this,

21   Judge.  It should be the $365,000.  They're asking for

22   profits.  They did resell the energy, and there was a loss

23   that we should pay of 67, with one victim -- thousand;

24   $32,000, we should pay that.  Two of the victims, they made a

25   profit.  But they're asking for lost profits on each of the

1    four victims.

2           One, they're asking for $81,000 in a lost profit.
3    Another is $69,000 lost profit.  Another is $16,000, and then
4    another, $107,000 in lost profits.

5           My client informs me -- and he just read this,
6    himself, just now -- he says, that that's quite high.  It
7    should be, either, zero or it should be what the market
8    normally pays in profit, and that that's exorbitantly high for
9    profit in selling this energy.

10          THE COURT:  Okay.  Mr. Axelrod?

11          MR. AXELROD:  Well, let's be very clear what we're
12   talking about.  Because of the defendant's fraud, AEP entered
13   into a contract with the company, where they expected to make,
14   say, $100,000, based on that contract.

15          THE COURT:  Right.

16          MR. AXELROD:  When it came to light that these
17   contracts were fraudulent, that was now income that the
18   company didn't earn.

19          THE COURT:  Right.

20          MR. AXELROD:  Okay.  That's -- I think that's the
21   issue, and that's what Waldron --

22          THE COURT:  That's what's called expectation
23   damages.

24          MR. AXELROD:  Correct.  That's what Mr. Waldron is
25   contesting is not part of what should be owed in restitution.

1   I don't think -- well, I guess he's contesting the underlying

2   facts, too, though -- so, that's a different issue.  I think

3   he's contesting whether they should even -- whether his client

4   should have to pay that as restitution and whether the numbers

5   are, in fact, accurate.

6            I am not in a position, if the Court is disinclined

7   to take the statement of AEP in this e-mail as what their

8   testimony would be, to -- to debate this any further today,

9   then I would have to bring in a witness from the company, who

10  could -- who could --

11           THE COURT:  Well, we might do that, but we're not

12  going to postpone the sentencing.

13           MR. AXELROD:  Okay.

14           THE COURT:  I can tell you that, because the -- two

15  things.  And, Mr. Waldron, you're -- you're -- I mean, you're

16  doing your very best to represent your client, and I

17  appreciate that, and I will give you that opportunity.  But --

18  and this is true in a number of cases that I have had, and

19  other Judges, as well.  As a matter of fact, it is frequently

20  true that defendants who are found guilty of fraud or plead

21  guilty to fraud, very seldom have the money to pay back.

22           And the law requires that the Judge impose

23  restitution, and there are a lot of cases about restitution,

24  and the Supreme Court has a couple of them, itself, and the --

25  there are limits to what the judge is supposed to -- or what

1    the judge can legitimately charge to restitution.

2              And it has to have some foundation in fact.  I agree

3    with you.  I don't -- I think reasonableness is an overly

4    broad term to describe the concept.  I think accuracy is more

5    accurate.

6              So, but, as I said, it's really a moot point.  You

7    know, I have to impose restitution, and I'm going to do it.

8    But, the defendant doesn't have any money.  I mean, he -- and

9    I read in the presentence report that he's made some minor

10   amounts of restitution to some of the victims already, which I

11   think is very good for him, and I assume he'll be able to make

12   others.

13             But, you know, he's going to be spending some time

14   in prison, and he doesn't have the capacity to earn money

15   while he is in prison, and the restitution requirement will

16   only be while he is on supervised release, for which the

17   maximum term is three years, and so, we had the same situation

18   with Mr. Puleo.

19             So, you know, if I impose -- the total amount of

20   restitution, here, is about $800,000, right, Mr. Maiocco?

21                 MR. MAIOCCO:  Yes, Your Honor.

22             THE COURT:  $818,903.  That's the same amount Mr.

23   Puleo got.  So, and the restitution has to be joint and

24   several.  So, we're really disputing something that has very

25   little chance in reality.  Now, when his supervised release is

1    over, then, the amount of restitution becomes a civil judgment

2    that is enforceable by the victims or by the Government and

3    will be a lien on any property that Mr. Mateja acquires in the

4    future.  So, this is something that is going to hang over his

5    head.

6          Now, whether he owes AEP $527,000 as set forth in

7    paragraph 100 of the presentence report or, perhaps, only half

8    of that, of $250,000, the prospects of his making any of those

9    repayments, along with the other victims, is remote, if not,

10   unlikely.  Do you understand what I'm saying?

11         So, my view in these cases is that, I don't delay

12   the imposition of sentence to worry about the fine points of

13   restitution for the defendant who doesn't have any money,

14   because it doesn't make any sense.

15         MR. WALDRON:  But, Judge, I just got some discovery

16   today on another victim, also, and the amount of restitution

17   drives the Guidelines --

18         THE COURT:  No, no.  That's not right.

19         MR. WALDRON:  -- from -- from $400,000 --

20         THE COURT:  The amount of fraud represents.  Well,

21   that should have been an objection.

22         MR. WALDRON:  -- to a million.  Excuse me?

23         THE COURT:  That should have been an objection.  If

24   you have -- if you object to the amount of a loss, that's

25   grounds to object.

1      MR. WALDRON: I'm just getting discovery today, Your

2   Honor.

3           THE COURT: Oh. Why -- why is that?

4           MR. WALDRON: I don't know.

5           THE COURT: Mr. Axelrod?

6           MR. AXELROD: Your Honor, there is no objection to

7   the loss in the PSR. If there were -- Mr. Waldron didn't make

8   an objection to the loss. If there was, I would have defended

9   the loss number.

10          MR. WALDRON: I'm just getting handed an --

11          MR. AXELROD: Well, that's a very different --

12   restitution and loss amounts are different, as you know, Your

13   Honor.

14          THE COURT: Of course.

15          MR. WALDRON: But I'm just getting today, an e-mail.

16   I'm just getting another FBI document. And then, I'm getting

17   another loss document from Atlantic State Pipe today, Your

18   Honor.

19          THE COURT: All right. All right. Let's remember

20   something else. This is not the first time that this has come

21   up. Okay. The paragraph 19, "The estimated loss was within

22   the range of $400,000 to one million." Okay.

23          So, the Guideline range would not have changed,

24   unless the loss was less than $400,000, is that right, Mr.

25   Maiocco?

1        MR. MAIOCCO:  That's right, Your Honor.

2        THE COURT:  Okay.

3        MR. WALDRON:  And I don't -- I don't believe it's

4   below $400,000, Judge, so, I think the Guidelines are probably

5   correct.

6        THE COURT:  Well, so, you didn't have any grounds to

7   object.  So, it's not affecting the Guideline range.

8        MR. WALDRON:  It probably isn't, but I don't -- I

9   just want to be thorough, and I want to represent my client to

10  the best --

11       THE COURT:  I appreciate that.  You're doing a good

12  job of representing him.

13       MR. WALDRON:  But getting documents, in a case like

14  this, I'm not an energy expert, so, when I'm getting this

15  e-mail, and I'm looking at certain things for the first time,

16  I have to ask the Judge for ten minutes to review it, that's

17  not, in my world, being as thorough as I can be.

18       And then, when I'm getting another document about

19  another victim, Atlantic State Pipe, I don't like practicing

20  that way, Judge, but you're running the courtroom, so, I have

21  to defer to whatever you want to do.

22       THE COURT:  Well -- well, just let's wait, Mr.

23  Waldron.  All right.  You had the PSR.  Before that, you had

24  opportunities for discovery.  I assume that one of the things

25  that you, either got from the Government or could have gotten,

Colloquy                           16

1    if you had requested it, would have estimates of the amount of

2    loss by the victims.

3              Your client pled guilty, and acknowledging his

4    guilt, over three months ago, and you've had three months to

5    get additional information from Mr. Axelrod or from the

6    Probation Department and so forth.  Now, I'm not being

7    critical, because as you, yourself, admit, this debate isn't

8    going to change the Guideline range.

9              MR. WALDRON:  I don't think it is, Your Honor.

10             THE COURT:  All right.  So, we're really -- it's

11   like a paper tiger.  That's, really, all it is.  And it's not

12   the first time I have had this dialogue with a defense

13   attorney in a fraud case.

14             Now, if your client had millions of dollars, then,

15   it would be something, really, to talk about, because, then,

16   he would have -- he would have a real interest in minimizing

17   the amount he had to pay in restitution.

18             But, here, your client doesn't have any assets at

19   all, and he has a negative net worth, as you point out.

20             MR. WALDRON:  I saw that in the PSR, Your Honor.

21             MR. AXELROD:  Your Honor, let me put this on the

22   record.

23             THE COURT:  Yes?

24             MR. AXELROD:  Under the -- under the statute, which

25   is 18 U.S.C. 36:64A -- I'm sorry, 18 U.S.C. 36:63A, the

Colloquy                                17

1    Government has the burden to establish restitution, --

2              THE COURT:  Right.

3              MR. AXELROD:  -- by a preponderance of the evidence.

4    To that end, I am submitting to the Court, the breakdown of

5    AEP's losses.

6              THE COURT:  All right.

7              MR. AXELROD:  Now, I believe that this satisfies my

8    burden by a preponderance of the evidence.

9              THE COURT:  Right.  This is what's in the memo you

10   handed up?

11             MR. AXELROD:  Correct.  This is in this e-mail,

12   which breaks down, thoroughly, --

13             THE COURT:  Right.

14             MR. AXELROD:  -- AEP's losses.  Now, Mr. Waldron can

15   certainly contest that with evidence or something, but at this

16   point, he's done nothing except have conjecture that this

17   isn't accurate.  And I would say that that doesn't surpass the

18   Government's evidence, at least by preponderance of the

19   evidence.

20             THE COURT:  Okay.  All right.  So, we're going to

21   proceed.  I'm going to use the numbers in the presence report

22   for reasons that I have already indicated, concerning what's

23   been happening in this case, and the fact that it's agreed

24   between counsel that reducing the amount of restitution would

25   not change the Guideline level.

Axelrod - Statement as to Sentencing                18

1          Now, Mr. Waldron, and your client wants you to do

2     it, you are free to file a motion to adjust the amount of

3     restitution.  And I will have a hearing.  I will make the

4     victims come in, if necessary, but I don't think they have to

5     come in.  I think they can -- you can get affidavits or we can

6     have them on the telephone, and I'll have some kind of

7     hearing, you know, in September.  And you'll have lots of time

8     to get me to change the amount of restitution.  Okay?

9          MR. WALDRON:  Yes, Your Honor.

10          THE COURT:  All right.  So, we are going to proceed.

11          Now, does either side want to call any witnesses?

12          MR. AXELROD:  No, Your Honor, not at this time.

13          MR. WALDRON:  My client will testify, Judge.

14          THE COURT:  Well, after --

15          MR. WALDRON:  Yes.

16          THE COURT:  Do you have any other witnesses?

17          MR. WALDRON:  No, Your Honor.

18          THE COURT:  Okay.  All right.  I will hear, now,

19     from Mr. Axelrod.  Then, I will hear from Mr. Waldron.  Then,

20     I will hear from the defendant, and, I'll impose sentence.

21     And I have read both of your sentencing memorandums, so,

22     please don't repeat what's in there.

23          And, Mr. Axelrod, you can go first.

24          MR. AXELROD:  Your Honor, I will be brief, because I

25     know you have read the sentencing memo.  This was a very

Axelrod/Waldron - Statement as to Sentencing          19

1    simple and very stupid crime the defendant committed.  What

2    they did was alter contracts, that there was no way they

3    weren't going to get caught.  It was greedy, and it was short-

4    sighted.

5            That said, you know, the defendant did come in and

6    met with myself and Agent Nissen (phonetic) and helped put

7    this case to rest without further investigation, and that's

8    why I've asked the Court to impose a bottom of the Guideline

9    sentence of 33 months.

10           I think that is a fair result, a just result, will

11   show -- will punish the defendant for his crimes, and will

12   provide a general deterrence and specific deterrence to make

13   sure that this defendant doesn't end up back in front of the

14   Court like this again.

15           THE COURT:  All right.  Thank you.

16           Mr. Waldron?

17           MR. WALDRON:  Thank you, Judge.  Judge, as you know,

18   my client is 27.  He's single.  No prior record.  And he has

19   an extensive work history, Judge.  He started when he was 13.

20   He worked through high school, worked through college, during

21   the week, weekends and in the summers.

22           At present, he's a bartender, and he is also getting

23   his energy business up and running again.  He's made

24   restitution payments, as Your Honor knows, to Friedmans

25   (phonetic) to the tune of $15,000 from August of 2013 and to

1   Silby Concrete (phonetic), Your Honor, in excess of $6,000

2   from August of 2013.

3           Last year was, somewhat, of a successful year in his

4   energy business, Your Honor, and he is slowly growing his

5   company in order to make that, ultimately, a career, and to

6   pay as much restitution back, as he can.  I know what Your

7   Honor's point is about that amount of restitution, and

8   whatever it is, it's going to be a large sum, needless to say.

9           He did meet with the Government, explained his

10  involvement, helped with their investigation.  On the

11  downside, at this young age, he is going to be a convicted

12  felon and have significant debt.

13          So, Your Honor, I ask this, he wants to get back

14  into the work force as quickly as possible.  He's always been

15  a good worker.  He wants to make as much restitution as he

16  possibly can for as long as he can, and he wants to

17  reestablish his career as quickly as he can, Your Honor.

18          So, this case isn't complex.  You see it for what it

19  is.  So, I would just ask that you sentence him to, hopefully,

20  allow him to achieve those objectives.

21          THE COURT:  Thank you.  Thank you very much.

22          All right.  Mr. Mateja, I am happy, now, to hear

23  whatever you would like to say on your own behalf before I

24  impose sentence.

25          THE DEFENDANT:  Your Honor, first, I just want to

1   apologize for what occurred.  I know it wasn't correct, and

2   it's not part of my moral code.  Since then, I've learned a

3   significant amount about the legal process and about what my

4   responsibility is to my community.  And it was stupid, as Mr.

5   Axelrod said, and it was futile, and there, really, was no

6   good purpose behind it.

7           As young entrepreneurs, we just, really, wanted to

8   succeed, and we succumbed to the financial pressures that you

9   have running a large company.  Since then, we've lost over 200

10  sales agents, 400 clients and almost $150,000 a month in

11  revenue that we were incurring at the time.

12          Since then, in the past 24 months -- or 22 months, I

13  believe, since Sam Puleo has walked away from the company,

14  I've been building the company on my own, trying to rebuild

15  the revenue, and to date, I've built it up to about $10,000 a

16  month in revenue, and just in the past eight weeks, I've

17  increased the revenue another $2,000.  And I believe those

18  restitution amounts will be able to be met.

19          But I'm working 14 hours a day, doing everything I

20  can in order to, you know, meet those requirements.  However,

21  our growth numbers have been impressive, and I'm doing

22  everything in my power to make those clients whole.  There's

23  no part or me or no intention to leave anyone financially

24  unwhole.

25          And so, I appreciate you taking the time to listen

1    to me, and I hope you consider this in sentencing.   Thank you.

2            THE COURT:  All right.  Thank you.  All right.

3    Well, first, I am going to impose the restitution.   For

4    reasons that I have indicated, I believe that the presentence

5    report is, arguably, the correct number, in paragraph 110, and

6    I will impose the same amount of restitution, $818,903 that I

7    did for Mr. Puleo, jointly and severally.

8            The victims are indicated in paragraph 110, and I

9    will require that -- well, the defendant may participate in

10   the Bureau of Prisons Inmate Financial Responsibility Program

11   and make payments towards restitution in the amount of $25 per

12   quarter towards restitution, and in the amounts of at least

13   $200 per month after release from confinement.

14           But, the restitution will be due within the period

15   of supervised release, as I indicated before.  In addition,

16   the defendant has to pay a special assessment of $200, which

17   is due immediately.

18           MR. AXELROD:  Thank you, Your Honor.  Judge, can I

19   add one thing to the record?

20           THE COURT:  Yes.

21           MR. AXELROD:  I just wanted to say that the

22   Government did not intend to not provide Mr. Waldron or his

23   client incomplete information regarding the restitution.

24           THE COURT:  Right.

25           MR. AXELROD:  And I want to extend that since this

1   -- since Mr. Waldron and his client will have a chance to

2   relitigate the restitution issue, if they choose, my files are

3   open, and I will provide the defendant with any document --

4          THE COURT:  Right.

5          MR. AXELROD:  -- he so requires, regarding the

6   restitution that he requests.

7          THE COURT:  Right.  Well, I would suggest, Mr.

8   Waldron, that you get together, if you want, with the lawyers

9   for the other two defendants, and maybe you can have some kind

10  of joint effort, and maybe you can make a proposal to Mr.

11  Axelrod that he would find acceptable or he could communicate

12  to the victims to see if they can all agree on some lesser

13  amount of restitution.

14         MR. WALDRON:  I'll get together with them, Judge.  I

15  appreciate that.

16         THE COURT:  All right.  And then --

17         MR. WALDRON:  And if you'll allow me to file a

18  motion, maybe a hearing, in September, as you indicated, --

19         THE COURT:  Okay.

20         MR. WALDRON:  -- if we can't stipulate to anything.

21         THE COURT:  That's fine.  All right.

22         All right.  Now, all right, what do you -- I am

23  willing to have Mr. Mateja surrender, rather than -- do you

24  want to suggest a surrender date?

25         MR. WALDRON:  I appreciate that, Judge.  I don't

1    know how long you're --

2             THE COURT:  Well, I'll come to that, but --

3             MR. WALDRON:  Okay.  Yes, I would appreciate that,

4    Judge.

5             THE COURT:  -- when did -- you want 30 days?

6             MR. WALDRON:  Excuse me?

7             THE COURT:  Do you want 30 days?

8             MR. WALDRON:  Yes, that's -- that's fine, Your

9    Honor.

10            THE COURT:  All right.  So, I will fix the surrender

11   date for July 16th, which is a Wednesday.

12            All right.  In considering the sentence that I am

13   going to impose in this case, the prison aspect of the

14   sentence -- I am not going to impose a fine, in view of the

15   large amount of restitution -- I, first, have to consider the

16   Guideline range.

17            And there has not been an objection to the Guideline

18   range of level 20.  The defendant is in Criminal History

19   Category I.  And I find that that is the correct range, since

20   there is no dispute.  The loss amount is between $400,000 and

21   one million dollars.

22            Now, then, I have to consider whether to stay with

23   the Guideline range or sentence under a variance, and in doing

24   that, I have to consider the sentencing factors.  In this

25   case, I don't think the defendant is violent or dangerous to

1    the public, as we have in some cases, where people have

2    committed violent offenses or drug dealers, things like that.

3              But, this is a serious fraud case.  The defendant

4    does not have a criminal record, but this fraud continued over

5    a period of time.  I mean, it was a very sophisticated fraud,

6    took some ingenuity, some knowledge of a very specialized line

7    of commerce.

8              The defendant knew how the industry worked and was

9    able to carry this out without detection for a period of time.

10   The amount of the fraud is very large, even if it's not fully

11   at $818,000, and in my view, from what I have heard today and

12   in the other cases, it's at least a half a million dollars, if

13   not more.

14             And that is a very serious fraud.  There are a

15   number of victims.  And the defendant did it, as he said, with

16   intention to make money for himself, at the prejudice of his

17   victims.

18             The other thing, which is an aggravating factor

19   here, for which the defendant received a two level increase

20   for obstruction of justice is that the defendant attempted to

21   cover up his scheme when he first learned that it was being

22   investigated by the FBI.  And to me, that shows a particular

23   kind of mens rea of criminal intent that is very serious, and

24   I think, is a factor which warrants the imposition of a

25   Guideline sentence.

1           So, for those reasons, and also -- I, also, want to

2    mention deterrence, that we have to have a scheme of

3    deterrence, as far as sentencing for fraud defendants, because

4    very often, they don't have any criminal background; they have

5    a good education; they come from nice families, and they've

6    just been overtaken with a sense of greed, without care for

7    the consequences or the fact that others are going to suffer.

8           So, for all of these factors, Mr. Mateja, I think

9    the appropriate sentence in this case is as follows.  Pursuant

10   to the Sentencing Reform Act of 1984, it is the judgment of

11   the Court that the defendant, Michael Mateja, is committed to

12   the custody of the Bureau of the Prisons, to be imprisoned for

13   a term of 33 months, on each of Counts 1 and 2, to be served

14   concurrently.

15          Upon release from imprisonment, the defendant is

16   placed on supervised release for a term of three years, to run

17   concurrently, on each Counts 1 and 2.  While on supervised

18   release, the defendant shall not commit another Federal, state

19   or local crime, is prohibited from possessing a firearm or

20   other dangerous device, shall not possess an illegal,

21   controlled substance, and shall comply with the other standard

22   conditions that have been adopted by this Court.

23          The judgment and commitment order will have other

24   terms, concerning drug testing, providing full disclosure of

25   financial records, prohibiting from incurring new credit

 1       charges and cooperation in the collection of DNA.

 2              I have already imposed restitution and the amount of

 3       the assessment.

 4              Do you want me to make a recommendation as to the

 5       place of confinement?

 6              MR. WALDRON:  I was going to ask, Your Honor, if you

 7       would consider Allenwood, but it's up to the Bureau of

 8       Prisons.  All right.

 9              MR. WALDRON:  Thank you, Your Honor.

10              THE COURT:  That's the sentence.  Thank you very

11       much.  All right.  You understand, Mr. Mateja, that, until you

12       surrender, 30 days from now, you have to comply, completely,

13       with all the terms and conditions of pretrial release, do you

14       understand that?

15              THE DEFENDANT:  I understand.

16              THE COURT:  All right.  Thank you.  Court is

17       adjourned.

18              MR. AXELROD:  Your Honor, before we adjourn --

19              THE COURT:  Yes?

20              MR. AXELROD:  -- would you notify the defendant of

21       his right to appeal the sentence?

22              THE COURT:  Yes, thank you.  All right.  So, Mr.

23       Mateja, even though you pled guilty, you still have a right to

24       appeal.  Now, in the plea agreement, you waived your right to

25       appeal, unless the Government appeals or I impose an illegal

1   sentence, so I just want to remind you about that.

2           But, if you want to appeal, you have to file the

3   appeal within 14 days, and if you can't afford counsel, the

4   Court will appoint counsel for you, free of change, do you

5   understand that?

6           THE DEFENDANT:   I understand.

7           THE COURT:   All right.   Thank you.

8           MR. AXELROD:   Thank you, Your Honor.

9           THE COURT:   Thank you.

10           (Proceedings concluded at 2:38 p.m.)

11                       * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3

4

5          I, Jacqueline M. Mullica, court approved

6    transcriber, certify that the foregoing is a correct

7    transcript from the official electronic sound recording

8    of the proceedings in the above-entitled matter.

9

10

11

12   Jacqueline        Digitally signed by Jacqueline
                       Mullica
                       DN: cn=Jacqueline Mullica, o, ou,
13   Mullica           email=jacki6670@comcast.net, c=US        June 27, 2014
                       Date: 2014.06.27 13:30:57 -04'00'

14   JACQUELINE M. MULLICA

15   DIANA DOMAN TRANSCRIBING

16

17

18

19

20

21

22

23

24

25

EXHIBIT L

WALDRON LETTER 1

# HUBER AND WALDRON
## Attorneys at Law

James T. Huber

The Omega Professional Building
Suite 201
1150 South Cedar Crest Boulevard
Allentown, Pennsylvania 18103
Telephone (610) 774-9790
Facsimile (610) 774-0418
Email: jhuber@huber-waldron.com

John J. Waldron
Michael Manus Stitt

The Capri Building
Suite 301
535 Hamilton Mall
Allentown, Pennsylvania 18101
Telephone (610) 435-9790
Facsimile (610) 435-1238
Email: jwaldron@huber-waldron.com
mstitt@huber-waldron.com

August 4, 2014

Candace Marz, Contractor
Legal Assistant
Financial Litigation Unit
United States Attorney Office
Eastern District of Pennsylvania

RE:   United States v. Michael Mateja
      13-CR-575-01

Dear Contractor Marz:

I am in receipt of your July 23, 2014 correspondence in regards to the collection of debt in United States v. Michael Mateja.

In accordance with your request please be advised that Mr. Mateja has a post-sentence matter regarding a motion to modify restitution that is currently outstanding with the Honorable Michael M. Baylson. I believe this motion will be addressed in September.

I will not be representing Mr. Mateja with regard to collection of his debt. I am also unaware of any other post-sentence matter.

If you have any questions or concerns please do not hesitate to contact my office.

Very truly yours,

John J. Waldron

JJW:nlk

EXHIBIT M

WALDRON LETTER 2

# HUBER AND WALDRON

### Attorneys at Law

James T. Huber

The Omega Professional Building
Suite 201
1150 South Cedar Crest Boulevard
Allentown, Pennsylvania 18103
Telephone (610) 774-9790
Facsimile (610) 774-0418
Email: jhuber@huber-waldron.com

John J. Waldron
Michael Manus Stitt

The Capri Building
Suite 301
535 Hamilton Mall
Allentown, Pennsylvania 18101
Telephone (610) 435-9790
Facsimile (610) 435-1238
Email: jwaldron@huber-waldron.com
mstitt@huber-waldron.com

August 11, 2014

Michael Mateja
71081066
FMC Devens
P.O. Box 879
Ayer, MA 01432

#### RE:    Court Documents

Dear Mike:

Enclosed please find a copy of the Judgment in your criminal case that you requested.

I also enclose correspondence from Charles Peruto with regard to Samuel Puleo's interest in your company and correspondence I received from the Financial Litigation Unit. I would advise you to seek out a corporate Attorney for the Puleo matter.

I will be present for any upcoming hearing for the modification of restitution. Please be advised that I am not retained to represent you with regard to any collection proceedings involving the repayment of any restitution ordered.

If you have any questions or concerns, please feel free to contact me.

Very truly yours,

John J.  Waldron

JJW:lcm
Enclosures

EXHIBIT N

WALDRON LETTER 3

# HUBER AND WALDRON
## Attorneys at Law

James T. Huber

The Omega Professional Building
Suite 201
1150 South Cedar Crest Boulevard
Allentown, Pennsylvania 18103
Telephone (610) 774-9790
Facsimile (610) 774-0418
Email: jhuber@huber-waldron.com

August 14, 2014

John J. Waldron
Michael Manus Stitt

The Capri Building
Suite 301
535 Hamilton Mall
Allentown, Pennsylvania 18101
Telephone (610) 435-9790
Facsimile (610) 435-1238
Email: jwaldron@huber-waldron.com
mstitt@huber-waldron.com

Michael Mateja
71081066
FMC Devens
P.O. Box 879
Ayer, MA 01432

    **RE:**   **Restitution**

Dear Mike:

    Enclosed please find a copy of the Judge's order in regards to our motion to modify restitution.

    The Judge agreed that the internal costs were too high and reduced the restitution by $21,650 but denied further relief from the lost profits and attorney's fees.

    I do not believe an appeal is of merit. Your guilty plea agreement expressly waives your right to appeal your sentence (which includes restitution). In addition, restitution is governed by the Mandatory Restitution Act, 18 U.S.C.A. § 3663A, which gives the Judge broad discretion for restitution. The statute expressly permits reimbursement for lost income and other expenses incurred during participation in the investigation or prosecution of the offense.

    Nevertheless, if you wish to proceed with an appeal, the deadline to file the notice of appeal is August 20, 2014. If you wish to retain my services for the appeal, you must notify my office prior to the appeal deadline. My fee to address this appeal is $10,000.00.

    If you have any questions or concerns, please do not hesitate to contact my office.

            Very truly yours,

            John J. Waldron

JJW:lcm
Enclosure

EXHIBIT O

AEP VICTIM LOSS STATEMENT

United States v. Michael Mateja, Sam Puleo Jr., Matthew Morgan

Criminal Case Number:    13 CR 575 (E.D. Pa.)

Names of Victims:    AEP Energy, Inc. (f/k/a BlueStar Energy Services, Inc.)

Scheduled Date of Sentencing:    April 10, 2014 (Mateja); May 12, 2014 (Puleo, Morgan)

### VICTIM IMPACT STATEMENT (FINANCIAL CRIME)

I.    Background

AEP Energy, Inc. is an alternative retail electricity supplier headquartered in Chicago, Illinois.  AEP Energy sells electricity to its customers and bills them for it; other utility companies generate the electricity and deliver it from the point of generation and along transmission lines to the customers.

A contract between AEP Energy and a customer can be "all inclusive" or it can be for "electricity only."  Under an all-inclusive contract, the price the customer paid would include charges that can comprise an electricity bill, such as transmissions fees and other incidental charges.  On the other hand, a contract between AEP Energy and a customer for "electricity only" would cover only the energy purchased by the customer.  The customer would still be billed by the utility for other costs related to that electricity, including transmission and other incidental costs.

In order to secure additional customers, AEP Energy sometimes utilizes third parties to act as approved brokers.  Those brokers solicit new customers for AEP Energy and, when successful, facilitate the execution of a contract between AEP Energy and the customer.  Sometimes, a broker will sign a contract on behalf of a new AEP Energy customer pursuant to a power of attorney executed by that customer.  Brokers are paid a commission when they secure a new customer for AEP Energy.

Defendants Sam Puleo, Jr., Michael Mateja, and Matthew Morgan were owners and/or employees of one such electricity broker, Coastal Energy Consultants LLC.  As outlined in the Information filed in the above-referenced action, Defendants (through Coastal) engaged in a fraudulent scheme whereby they informed certain customers that they were being signed up with an electricity provider for an "all inclusive" contract at a fixed price while actually entering into "energy only" contracts with the provider.  In order to accomplish this scheme, Defendants forged and altered contracts, powers of attorney and several other documents.

AEP Energy was a victim of Defendants' scheme in at least four instances.  In each of those cases, AEP Energy was forced to release the customer from its contract, and thereby incurred substantial losses as a result.  In addition, in two of these instances, AEP Energy had paid Defendants pre-paid commissions on the contracts that had to be terminated due to Defendants' fraudulent conduct.

**VICTIM IMPACT STATEMENT/FINANCIAL CRIME          PAGE 2**

II.     Amount of Financial Loss

*As a result of Defendants' fraudulent activities, AEP Energy incurred a total of $527,240 in financial losses.* The losses fall into four categories: (1) pre-paid commission to Defendants for fraudulent contracts that AEP Energy had to cancel due to Defendants' conduct; (2) early termination fees associated with fraudulent contracts that AEP Energy had to terminate due to Defendants' conduct; (3) outside legal fees; and (4) internal costs and expenses. (A breakdown of these costs was previously provided to the U.S. Attorney's Office by outside counsel for AEP Energy.)

*First,* AEP Energy pre-paid Defendants' commission on two of the fraudulent contracts. However, AEP Energy was forced to release these customers and terminate the contract without earning the revenue upon which Defendants' commission was based. The amount of such pre-paid commissions totals $80,017 ($49,067 for Silvi Concrete; $30,950 for Friedman Point Plaza).

*Second*, AEP Energy incurred early termination fee damages with respect to the four fraudulent contracts in the amount of $365,733 (PMI Property Management $149,710; Silvi Concrete $101,971; Dauphin County $100,988; Friedman Point Plaza $13,064). The early termination fee is the amount that the four customers would have been contractually obligated to pay AEP Energy had they decided to terminate the contracts (absent Defendants' fraudulent conduct).

The early termination fee includes several components that represent losses to AEP Energy in the event of an early termination. Most notably, because AEP Energy provided a fixed price for electricity, AEP Energy must pre-purchase electricity or purchase an electricity hedge in the energy wholesale market. If a customer breaches its contract with AEP Energy, AEP Energy is still obligated to purchase the electricity required to service that customer. Put another way, in the event a customer breaches its obligation to purchase electricity from AEP for the term of its contract, AEP Energy incurs damages based on the electricity or hedges it purchased in order to service that customer, as well as additional damages based on the cost to unwind and liquidate that future position. The early termination fee also includes certain of the costs that AEP Energy incurred to service the contract, as well as compensation for its lost profit.

*Third,* AEP Energy incurred attorneys' fees and other legal cost damages in investigating the scheme, reporting to authorities, and attempting to recoup its losses through civil litigation and enforcement. These costs totaled $31,490.

*Fourth,* AEP Energy incurred internal cost and expense damages in investigating the scheme, working with affected customers, reporting to authorities and internal audit committees and otherwise attempting to minimize the scheme's impact, internally and externally. Based on 150 to 200 hours of employee time, AEP Energy estimates these costs to be $50,000.

Finally, in addition to the calculable financial loss, AEP Energy suffered incalculable damage to its reputation due to the negative impact of Defendants' fraudulent conduct on customers who thought they were signing up for electricity service with AEP Energy.

VICTIM IMPACT STATEMENT/FINANCIAL CRIME          PAGE 3

III.    Recovery

AEP Energy filed a civil suit against Costal Energy Consultants LLC and Puleo in the Circuit Court of Cook County, and obtained a default judgment in the amount of $445,750. AEP Energy also undertook efforts to enforce that judgment in Pennsylvania. However, to date, AEP Energy has not been successful in its efforts to collect on the Illinois default judgment.

After his arrest, in November 2013, Puleo mailed a money order to AEP Energy in the amount of $300. In accompanying correspondence, Puleo claimed that the payment was "the beginning of a complete pay-back of your losses in dealing with Coastal Energy." To date, AEP Energy has not received any additional funds from Puleo or the other Defendants.

IV.    Additional Information

To the extent you have additional questions concerning AEP Energy's losses or require additional documentation of those losses, please do not hesitate to contact the undersigned.

Report Submitted by:  Peter Kolch, Associate General Counsel, on behalf of AEP Energy, Inc., f/k/a BlueStar Energy Services, Inc.

Signature:

Phone:  (312) 628-0787

email:  pkolch@aepenergy.com

Date:   February 28, 2014

| AEP Energy, Inc. Damages Related to United States of America v. Michael Meteja, Sam Puleo and Matthew Morgan | |
| --- | --- |
| | |
| **Pre-Paid Commissions[1]** | |
| Silvi Concrete | $49,067 |
| Friedman Point Plaza | $30,950 |
| **Total** | **$80,017** |
| | |
| **Early Termination Fees[2]** | |
| PMI Property Management | $149,710 |
| Silvi Concrete | $101,971 |
| Dauphin County | $100,988 |
| Friedman Point Plaza | $13,064 |
| **Total** | **$365,733** |
| | |
| **Attorneys' Fees and Other Legal Costs[3]** | |
| Scandaglia & Ryan | $21975 |
| Rosenn Jenkins and Greenwald | $9,515 |
| **Total** | **$31,490** |
| | |
| **Internal Costs and Expenses[4]** | |
| AEP Energy (estimated at 150-200 hours) | $50,000 |
| **Total** | **$50,000** |
| | |
| Total | **$527,240** |

[1] AEP Energy incurred pre-paid commission damages made to Coastal Energy on contracts that were voided upon discovery of the scheme.

[2] AEP Energy incurred early termination fee damages (mark-to-market losses on the underlying wholesale hedge contracts, incurred costs to serve, etc.) on contracts that were voided upon discovery of the scheme.

[3] AEP Energy incurred attorneys' fee and other legal cost damages in investigating the scheme, reporting to authorities and otherwise attempting to recoup its damages.

[4] AEP Energy incurred internal cost and expense damages in investigating the scheme, working with affected customers, reporting to authorities and internal audit committees and otherwise attempting to minimize the scheme's impact, internally and externally.

**Coastal Energy ETF Detail**

| Customer | Distribution Area | Account Numbers | Volume Remaining on Contract (kWh) | Lost Margin | Loss on Market Value (MTM Loss) | Total ETF | Contract Price ($/kWh) | Total Remaining Contract Value |
|---|---|---|---|---|---|---|---|---|
| Silvi Concrete | JCP&L - NJ | 08007787350000153044<br>08010229660000712878 | 447,840 | $ 2,893 | $ 1,782 | $ 4,675 | $ 0.06816 | $ 30,525 |
| | Atlantic City - NJ | 327736999993<br>332447999977<br>332447999969 | 3,167,046 | $ 24,070 | $ 13,998 | $ 38,068 | $ 0.06814 | $ 215,803 |
| | PSE&G - NJ | PE000009791801575403<br>PE000010996143315582<br>PE000010996144115582 | 2,733,956 | $ 20,778 | $ 12,275 | $ 33,054 | $ 0.07669 | $ 209,667 |
| | PECO - PA | 2122201702<br>4899101508<br>6762059018<br>7990801603<br>8918300501<br>8938500204<br>9503300804<br>9763001003 | 2,823,583 | $ 21,459 | $ 4,715 | $ 26,175 | $ 0.06243 | $ 176,276 |
| | Total | | 9,172,425 | $ 69,200 | $ 32,772 | $ 101,971 | $ 0.06893 | $ 632,271 |

| Customer | Distribution Area | Account Numbers | Volume Remaining on Contract (kWh) | Lost Margin | Loss on Market Value (MTM Loss) | Total ETF | Contract Price ($/kWh) | Total Remaining Contract Value |
|---|---|---|---|---|---|---|---|---|
| Friedman's | WPP - PA | 08051820970007313718<br>08052515530006812390<br>08052587580007003539<br>08054050850006836902<br>08054867220006602798<br>08054867560006602865<br>08055231620006891808<br>08055846290006813108<br>08057968360007317866 | 4,121,210 | $ 16,773 | $ (3,709) | $ 13,064 | $ 0.04719 | $ 194,480 |

| Customer | Distribution Area | Account Numbers | Volume Remaining on Contract (kWh) | Lost Margin | Loss on Market Value (MTM Loss) | Total ETF | Contract Price ($/kWh) | Total Remaining Contract Value |
|---|---|---|---|---|---|---|---|---|
| Dauphin County | PPL - PA | 6108070002 | 8,736,000 | $ 107,715 | $ (6,727) | $ 100,988 | $ 0.06414 | $ 560,327 |
| PMI | PPL - PA | 0181120016<br>0223599004<br>0227063005<br>0243184009<br>0274855006<br>0358072009<br>0378072005<br>0513103001<br>0551016007<br>0724310276<br>0744079016 | 16,361,699 | $ 81,808 | $ 67,901 | $ 149,710 | $ 0.06620 | $ 1,083,144 |

| |
|---|
| 0779091002 |
| 0799091008 |
| 0807076017 |
| 0827063007 |
| 0866074026 |
| 0878072005 |
| 0953076036 |
| 0991016007 |
| 1119093007 |
| 1219093027 |
| 1358072000 |
| 1367063000 |
| 1409044007 |
| 1484079013 |
| 1509044009 |
| 1516092006 |
| 1536092011 |
| 1578072000 |
| 1579093003 |
| 1579297001 |
| 1599941000 |
| 1756092002 |
| 1793076026 |
| 1868072003 |
| 1879084000 |
| 1979093001 |
| 2058072005 |
| 2081129500 |
| 2084080019 |
| 2096092001 |
| 2126135002 |
| 2213076014 |
| 2287063005 |
| 2419521003 |
| 2440126485 |
| 2503072019 |
| 2509044000 |
| 2538072009 |
| 2559093008 |
| 2588442122 |
| 2659091006 |
| 2667063007 |
| 2767063009 |
| 2769044002 |
| 2805447332 |
| 2824080017 |
| 2891057017 |
| 2998072005 |
| 3031057023 |
| 3039091009 |
| 3047063000 |
| 3067063006 |
| 3163505014 |

| |
|---|
| 3164080016 |
| 3239091003 |
| 3264080054 |
| 3289044009 |
| 3307063004 |
| 3399093007 |
| 3421075008 |
| 3536092004 |
| 3541109007 |
| 3547064007 |
| 3561109003 |
| 3584080010 |
| 3676092008 |
| 3741109001 |
| 3756092004 |
| 3772558472 |
| 3879093001 |
| 3881075004 |
| 3883109003 |
| 3886070009 |
| 3901075002 |
| 3948072001 |
| 3967064001 |
| 3982102002 |
| 3995816462 |
| 4023301004 |
| 4081109000 |
| 4102037001 |
| 4122037007 |
| 4181121017 |
| 4207064000 |
| 4227064006 |
| 4399093008 |
| 4507064006 |
| 4537374006 |
| 4699093004 |
| 4747064002 |
| 4753537007 |
| 4759093004 |
| 4786070008 |
| 4843109002 |
| 4987064008 |
| 5168073000 |
| 5199093005 |
| 5227064007 |
| 5231087027 |
| 5317070004 |
| 5437869009 |
| 5439093003 |
| 5467064003 |
| 5491064026 |
| 5511064024 |
| 5531065027 |

| |
|---|
| 5571065065 |
| 5611065023 |
| 5631065038 |
| 5651065025 |
| 5727064007 |
| 6079089022 |
| 6099089000 |
| 6107064000 |
| 6142085001 |
| 6207064002 |
| 6211072003 |
| 6211490010 |
| 6243999015 |
| 6359093008 |
| 6407064006 |
| 6427830015 |
| 6539093006 |
| 6651088001 |
| 6717308002 |
| 6719093004 |
| 6721759008 |
| 6747064004 |
| 6771062014 |
| 6786070000 |
| 6787902001 |
| 6867063005 |
| 6871062016 |
| 6903285009 |
| 6911062038 |
| 6927064002 |
| 6948073001 |
| 6971062018 |
| 6987063049 |
| 7027063008 |
| 7085759009 |
| 7207063006 |
| 7248073008 |
| 7318066015 |
| 7318718005 |
| 7427064003 |
| 7467063008 |
| 7573303006 |
| 7583718000 |
| 7769441042 |
| 7770230019 |
| 7877061005 |
| 7880115003 |
| 7887063002 |
| 7907076043 |
| 7919078002 |
| 7979078000 |
| 7997077001 |
| 8053737016 |

| |
|---|
| 8181121011 |
| 8247451009 |
| 8268069065 |
| 8276085019 |
| 8340126489 |
| 8360115017 |
| 8380115013 |
| 8467063009 |
| 8552190000 |
| 8628073001 |
| 8727063003 |
| 8770120297 |
| 8971129501 |
| 9067063002 |
| 9292624026 |
| 9295068002 |
| 9327063006 |
| 9334058006 |
| 9378072004 |
| 9436085003 |
| 9613103002 |
| 9667063004 |
| 9727711005 |
| 9745834001 |
| 9810135006 |
| 9878072004 |
| 9884214009 |
| 9974601001 |

EXHIBIT P

AEP EMAIL FROM AEP'S COUNSEL

Philadelphia, Pennsylvania 19106

Phone: (215) 861-8462

Fax: (215) 861-8618

**From:** Mike Stitt [mailto:mstitt@huber-waldron.com]
**Sent:** Tuesday, June 17, 2014 12:47 PM
**To:** Axelrod, David (USAPAE)
**Subject:** Mateja

Attorney Axelrod:

Attorney Waldron wants me to review the restitution amounts for each victim.

When you have a moment could we have the documentation in regards to this issue?

We have the chart you provided earlier.

Thank you for your attention to this matter.

Michael Stitt, Esquire

Huber and Waldron

610-435-9790

———— Forwarded message ————
From: "Nicgorski, Alan W." <Anicgorski@scandagliaryan.com>
To: "Axelrod, David (USAPAE)" <DAxelrod@usa.doj.gov>
Cc: "Shapiro, Michael S." <mshapiro@scandagliaryan.com>, <pkolch@aepenergy.com>, "Waters, Denise E."
<DWaters@scandagliaryan.com>
Date: Tue, 12 Nov 2013 19:28:54 -0400
Subject: AEP Energy Damages Related to United States of America v Mateja Puleo and Morgan

Dave:

Thank you for your assistance with this matter. Please find attached AEP Energy's estimate of loss relating to

the activities of Coastal Energy and its principals.

I realize this computation of loss if more in the nature of what we would prepare in civil litigation, and that the standards for criminal restitution may be different – but wanted to provide you with all potentially applicable information.

Please let us know if you have any questions.

Alan



**Alan W. Nicgorski**
Scandaglia & Ryan
55 E. Monroe Street, Suite 3440 ◼ Chicago, IL 60603
tel (312) 580-2035 ◼ fax (312) 782-3806

SCANDAGLIA & RYAN

**website | bio | vCard | map | email**

The information contained in this communication is confidential, may be attorney-client privileged, and is intended only for the use of the addressee. It is the property of Scandaglia & Ryan. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail and destroy this communication and all copies thereof, including all attachments.

———— Forwarded message ————
From: "Peter Kolch" <pkolch@aepenergy.com>
To: "Axelrod, David (USAPAE)" <DAxelrod@usa.doj.gov>
Cc: "Alan Nicgorski" <anicgorski@hrdclaw.com>
Date: Thu, 1 May 2014 07:51:16 -0400
Subject: U.S. Department of Justice - VNS - Investigative Case 196D-PH-2522846 - Court Case 13-CR-00575

David:

Thank you for forwarding to us Defendants' objections to AEP Energy, Inc.'s ("AEPE") calculation of its loss due to the criminal scheme perpetrated by Defendants Puleo, Mateja and Morgan. As set forth below, Defendants' contention that the "early termination fee" damages associated with the contracts AEPE was forced to cancel as a result of Defendants' criminal conduct do not represent a real loss to AEPE is simply wrong.

## Background

As you know, and as set forth in greater detail in our victim impact statement submitted on February 28, 2014,

the Defendants – through their company Coastal Energy Consultants – acted as brokers for AEPE and other electricity suppliers. Defendants (through Coastal) engaged in a fraudulent scheme whereby they informed certain customers that they were being signed up with an electricity provider for an "all inclusive" contract (meaning that it covered both energy and other related delivery and transmission costs) at a fixed price while actually signing the customers up for "energy only" contracts with the provider. In order to accomplish this scheme, Defendants forged and altered contracts, powers of attorney and several other documents.

AEPE was a victim of Defendants' scheme in at least four instances. In each of those cases, AEPE was forced to release the customer from its contract, and thereby incurred substantial losses as a result. In addition, in two of these instances, AEPE had paid Defendants pre-paid commissions on the contracts that had to be terminated due to Defendants' fraudulent conduct.

*As a result of Defendants' fraudulent activities, AEPE incurred a total of $527,240 in financial losses.* The losses fall into four categories:

- Pre-paid commission to Defendants for fraudulent contracts that AEPE had to cancel due to Defendants' conduct ($80,017);

- Early termination fees ("ETFs") associated with the contracts that AEPE had to terminate due to Defendants' fraudulent conduct ($365,733);

- Outside legal fees ($31,490); and

- Internal costs and expenses ($50,000).

Defendants do not appear to be challenging three of the four categories of damages set forth above – the pre-paid commissions, outside legal fees, and internal costs and expenses. These damages total $161,507. Instead, Defendants focus on the ETF-component of AEPE's damages and claim that the ETFs on the four contracts AEPE was forced to cancel due to Defendant's criminal scheme do not represent real losses. Defendants are wrong.

## The ETF's on the Four Cancelled Contracts Are Actual Losses.

In order to understand AEPE's ETFs and why they represent real losses, it is important to start with some background on AEPE's business. AEPE offers businesses in deregulated electric supply states in the U.S. (including Pennsylvania) an alternative way to purchase their retail electricity supply. A customer contracts to exclusively purchase and receive from AEPE all of its electric generation requirements, and the electricity is then delivered through the wires of the "traditional utility." AEPE's contracts with its customers are for a set term of months and, in many cases, fix the price of the electricity over the life of the contract. Such deals are advantageous for customers that prefer to budget their electricity supply costs for the life of the contract so that they may be immunized against sharp wholesale market increases in the cost of energy during that period. To protect its now-obligated position and to guard against such energy price increases, AEPE hedges the electricity it needs to provide each customer. This hedging of fixed electric supply obligations by retail electric suppliers such as AEPE with underlying wholesale electric purchases from wholesale market participants is a fundamental concept in the retail electric supply industry. Once a fixed rate electricity contract is signed, AEPE takes all price risk on the underlying commodity and, once hedged, takes the risk that a customer defaults while it must still perform under the hedge. In particular, if the wholesale price of electricity goes down between the

time AEPE locks in the customer price and purchases the hedge and the time the contract is terminated, AEPE suffers a real loss because it is then forced to liquidate the more expensive electricity at the current, lower price.

Because of the price risk it takes on behalf of its customers, AEPE's contracts allow it to recoup its losses from a defaulting customer in the form of the ETF. In this case, the ETFs at issue are comprised of two elements of the financial loss suffered by AEPE: (1) the difference (if any) between the wholesale cost to purchase electricity to service the agreements with the customers and the wholesale price at which AEPE could sell that electricity when it was forced to release the customers at issue due to Defendants' criminal scheme (we refer to this component as the "mark-to-market loss"); and (2) retail margin, meaning, in gross terms, the cost to serve the contracts plus the lost profit on the contracts (we refer to this component as the "lost margin").

Here, as set forth in AEPE's Victim Impact Statement, AEPE incurred early termination fee damages with respect to the four contracts in the amount of $365,733 (PMI Property Management – $149,710; Silvi Concrete – $101,971; Dauphin County – $100,988; Friedman Point Plaza – $13,064). Notably, the financial loss to AEPE represented by these ETFs is just as real even though the contracts had be terminated due Defendants' criminal conduct as opposed to being terminated by the customers themselves.

In order to better explain the calculation underlying each of the four ETFs at issue, we have provided a spreadsheet along with this correspondence which provides the detailed calculation of each of the ETFs:

- **PMI Property Management**: There was a total ETF of $149,710 for the cancelled contract associated with this customer comprised of (1) $67,901 in mark-to-market loss; and (2) $81,808 in lost margin.

- **Silvi Concrete**: There was a total ETF of $101,971 for the cancelled contract associated with this customer comprised of (1) $32,772 in mark-to-market loss; and (2) $69,200 in lost margin.

- **Friedman Point Plaza:** There was a total ETF of $13,064 for the cancelled contract associated with this customer comprised of (1) -3,709 due to a mark-to-market gain; and (2) $16,773 in lost margin. Notably, in this instance, because the price of electricity went up during the time between contracting and termination, AEPE realized a small gain in unwinding the hedge. However, as shown and contrary to the Defendants' argument, AEPE's ETF calculation takes account of this gain.

- **Dauphin County:** There was a total ETF of $100,988 for the cancelled contract associated with this customer comprised of (1) -$6,727 due to a mark-to-market gain; and (2) $107,715 in lost margin. Again, because the price of electricity went up during the time between contracting and termination, AEPE realized a small gain in unwinding the hedge. However, as shown and contrary to the Defendants' argument, AEPE's ETF calculation takes account of this gain.

Defendants appear to make arguments in support of its claim that AEPE's ETFs on the cancelled do not represent real losses.

*First,* with respect to the mark-to-market component of the loss, Defendants appear to be arguing that there is no loss because, if the price of electricity went up in the relevant time period, AEPE may have actually realized a mark-to-market gain. This is true. However, in those instances, such as Friedman Point Plaza and Dauphin County, AEPE takes account of any mark-to-market gain in calculating the ETF. In other words, AEPE is not claiming a loss, where there is actually a gain as Defendants seem to imply. Importantly, in the case of the

other two contracts (Silvi and PMh), AEPE suffered a mark-to-market loss due to having to cancel the contracts due to Defendants' criminal scheme. Defendants do not contest that there is a real loss in those instances.

*Second*, with respect to the lost margin component, Defendants appear to argue that, to the extent AEPE is able to sell the electricity that it would have sold to the four customers at issue to others, then such sales effectively replace the lost margin on the sales that would have been made to the four customers at issue, and thus there is no lost margin. Here, Defendants are completely wrong. This is so because, but for Defendants' criminal conduct, AEPE would have sold electricity to the four customers *in addition to* the electricity it did sell to other customers. Put another way, AEPE's subsequent sales after it was forced to terminate the contracts at issue did not replace the lost sales, because AEPE would have made those sales anyway. Thus, the lost margin AEPE suffered on the four terminated contracts as reflected in the ETF calculation is very real.

Finally, it should be noted that contrary to Defendants' implication, AEPE is not attempting through the ETF calculations to claim as a loss the entire amount of the remaining contract price. Indeed, as you can see in the far right-hand columns of the spreadsheet accompanying this email, the ETF is much smaller that the full remaining contract price. This reflects the fact that AEPE did in fact mitigate its damages, and did not let any electricity go to waste.

In sum, the ETFs for each of the four terminated contracts represent real losses to AEPE as a result of Defendants' crime, and should be included in the mandatory award of full restitution to AEPE pursuant to the of the Crime Victims' Rights Act, 18 U.S.C. § 3771.

We would be happy to schedule a teleconference with you at your convenience to further explain the issues discussed herein. Thank you very much for assistance with this matter; and please do not hesitate to contact us with any questions or comments.

Peter

**Peter M. Kolch**

Associate General Counsel

**AEP Energy**

225 West Wacker Drive

Suite 700

Chicago, IL 60606

AEPenergy.com

Direct 312-628-0787

Fax 312-628-0788

EXHIBIT Q

AEP COMMISSION REPORT
MAY 2012

**2012 Commission Statement**
**Coastal Energy Consultants**

| | May-12 | | May-12 | | Notes: |
|---|---|---|---|---|---|
| One Time Commission Payment | 40,220.11 | | $ | 139,350.97 | |
| Recurring Commission Payment | - | | $ | - | |
| Account Cancellation Reversals | - | | $ | - | |
| Total Commission Payment | 40,220.11 | | $ | 139,350.97 | |

Spiff Bonus: $    1,000.00

Commission Total: $    140,350.97

* Please reference One Time Payment and Recurring Payment tabs for account breakdowns

Up Front Commission Statement
Coastal Energy Consultants

| Account Number | Account Name | Accepted Date | Contract Start Date | Contract End Date | Est Annual MWh | Agent Fee | One Time Payment Fee | Term | Payment Cycle Month | Payment Cycle Year | May-12 | May-12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08028708305000067142 | Jasar Recycling, Inc | 4/11/2012 | 5/22/2012 | 5/22/2012 | 140.32 | $ 2.50 | $ 2.50 | 12 | 4 | 2012 | 140.32 | $350.79 |
| 08028783000001169196 | Jasar Recycling, Inc 5 | 4/11/2012 | 5/22/2012 | 5/22/2012 | 113.70 | $ 2.50 | $ 2.50 | 12 | 4 | 2012 | 113.70 | $284.26 |
| 08028343000001492170 | Jasar Recycling, Inc 3 | 4/11/2012 | 5/22/2012 | 5/22/2012 | 6.67 | $ 2.50 | $ 2.50 | 12 | 4 | 2012 | 6.67 | $16.67 |
| 08028343000001169189 | Jasar Recycling, Inc 1 | 4/11/2012 | 5/22/2012 | 5/22/2012 | 641.64 | $ 2.50 | $ 2.50 | 12 | 4 | 2012 | 641.64 | $1,604.11 |
| 08057968360007317866 | HAROLD FRIEDMAN INC 3 | 4/16/2012 | 5/23/2012 | 5/23/2013 | 1,415.17 | $ 4.00 | $ 4.00 | 12 | 4 | 2012 | 1,415.17 | $5,660.69 |
| 08051820970007313718 | FRIEDMANS GREAT BTR MRT | 4/16/2012 | 5/29/2012 | 5/29/2013 | 1,648.50 | $ 4.00 | $ 4.00 | 12 | 4 | 2012 | 1,648.50 | $6,593.99 |
| 08052515530006812390 | HAROLD FRIEDMAN INC 2 | 4/16/2012 | 5/11/2012 | 5/11/2013 | 54.14 | $ 4.00 | $ 4.00 | 12 | 4 | 2012 | 54.14 | $216.54 |
| 08052587580007003539 | BUTLER BI LO FOODS | 4/16/2012 | 5/7/2012 | 5/7/2013 | 1,845.04 | $ 4.00 | $ 4.00 | 12 | 4 | 2012 | 1,845.04 | $7,380.15 |
| 08054050850006836902 | FMT FOODS INC | 4/16/2012 | 5/15/2012 | 5/15/2013 | 864.43 | $ 4.00 | $ 4.00 | 12 | 4 | 2012 | 864.43 | $3,457.73 |
| 08054867220006602798 | FRIEDMANS HAROLD INC 1 | 4/16/2012 | 5/22/2012 | 5/22/2013 | 54.86 | $ 4.00 | $ 4.00 | 12 | 4 | 2012 | 54.86 | $219.45 |
| 08054867560006602865 | FRIEDMANS HAROLD INC | 4/16/2012 | 5/22/2012 | 5/22/2013 | 0.00 | $ 4.00 | $ 4.00 | 12 | 4 | 2012 | 0.00 | $0.01 |
| 08055231620006891808 | FRIEDMANS CHICORA | 4/16/2012 | 5/24/2012 | 5/24/2013 | 875.13 | $ 4.00 | $ 4.00 | 12 | 4 | 2012 | 875.13 | $3,500.51 |
| 08055846290006813108 | FRIEDMANS WEST BRADY ST | 4/16/2012 | 6/1/2012 | 6/1/2013 | 980.22 | $ 4.00 | $ 4.00 | 12 | 4 | 2012 | 980.22 | $3,920.90 |
| 4395002001 | EAST SIDE FAMILY BEV | 4/19/2012 | 5/21/2012 | 5/21/2013 | 58.59 | $ 1.18 | $ 1.18 | 12 | 4 | 2012 | 58.59 | $69.13 |
| 4455002001 | AIRPORT ROAD MOTOR INN | 4/19/2012 | 5/21/2012 | 5/21/2013 | 114.80 | $ 2.18 | $ 2.18 | 12 | 4 | 2012 | 114.80 | $250.27 |
| 4435002005 | CHARLES NOTI | 4/19/2012 | 5/21/2012 | 5/21/2013 | 9.14 | $ 2.18 | $ 2.18 | 12 | 4 | 2012 | 9.14 | $19.92 |
| 3289700704 | SMG KULPSVILLE MOTOR INN | 4/23/2012 | 6/1/2012 | 6/1/2013 | 1,496.77 | $ 1.00 | $ 1.00 | 12 | 4 | 2012 | 1,496.77 | $1,496.77 |
| 08037662760000643772 | The Brass Rail Inc | 4/27/2012 | 7/18/2012 | 7/18/2013 | 116.29 | $ 7.72 | $ 4.00 | 12 | 4 | 2012 | 116.29 | $465.16 |
| 08006644015000334994 | Cardinal Mooney High School 4 | 4/30/2012 | 6/14/2012 | 6/14/2014 | 8.30 | $ 3.88 | $ 3.88 | 24 | 4 | 2012 | 8.30 | $32.20 |
| 08006644010001501379 | Cardinal Mooney High School 5 | 4/30/2012 | 6/14/2012 | 6/14/2014 | 2.32 | $ 3.88 | $ 3.88 | 24 | 4 | 2012 | 2.32 | $9.02 |
| 08006644010000990671 | Cardinal Mooney High School | 4/30/2012 | 6/14/2012 | 6/14/2014 | 521.07 | $ 3.88 | $ 3.88 | 24 | 4 | 2012 | 521.07 | $2,021.75 |
| 08025695440001021426 | Valley Foods Inc | 5/7/2012 | 6/15/2012 | 6/15/2014 | 926.11 | $ 4.04 | $ 4.00 | 24 | 5 | 2012 | 926.11 | $3,704.44 |
| 08027762410001508201 | James M Coates | 5/7/2012 | 6/29/2012 | 6/29/2014 | 198.89 | $ 6.04 | $ 4.00 | 24 | 5 | 2012 | 198.89 | $795.56 |
| 08027255460001054540 | Saint Charles Church 7 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.82 | $ 4.15 | $ 4.00 | 36 | 5 | 2012 | 0.82 | $3.27 |
| 08027255460001054541 | Saint Charles Church 8 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $ 4.15 | $ 4.00 | 36 | 5 | 2012 | 3.08 | $12.33 |
| 08027255460001054542 | Saint Charles Church 5 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.75 | $ 4.15 | $ 4.00 | 36 | 5 | 2012 | 0.75 | $2.99 |
| 08027255460001054543 | Saint Charles Church 6 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $ 4.15 | $ 4.00 | 36 | 5 | 2012 | 3.08 | $12.33 |
| 08027255460001054927 | Saint Charles Church 9 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 373.03 | $ 4.15 | $ 4.00 | 36 | 5 | 2012 | 373.03 | $1,492.11 |
| 08027255460001056059 | Saint Charles Church | 5/8/2012 | 6/5/2012 | 6/5/2015 | 219.44 | $ 4.15 | $ 4.00 | 36 | 5 | 2012 | 219.44 | $877.77 |
| 08027255460001422621 | Saint Charles Church 10 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.00 | $ 4.15 | $ 4.00 | 36 | 5 | 2012 | 1.00 | $4.00 |
| 08027255465000028377 | Saint Charles Church 11 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.24 | $ 4.15 | $ 4.00 | 36 | 5 | 2012 | 1.24 | $4.96 |
| 08027255465000028399 | Saint Charles Church 2 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 235.52 | $ 4.15 | $ 4.00 | 36 | 5 | 2012 | 235.52 | $942.09 |
| 3661300405 | LEHIGH FUELS INC | 5/9/2012 | 6/21/2012 | 6/21/2013 | 171.33 | $ 4.00 | $ 4.00 | 12 | 5 | 2012 | 171.33 | $685.33 |
| 4241200709 | LEHIGH FUELS INC 2 | 5/9/2012 | 6/1/2012 | 6/1/2013 | 178.63 | $ 4.00 | $ 4.00 | 12 | 5 | 2012 | 178.63 | $714.51 |
| 08007818820002461495 | TOP STAR INC 13 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 4.69 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 4.69 | $14.06 |
| 08019659740005492129 | TOP STAR INC 4 | 5/9/2012 | 6/25/2012 | 6/25/2013 | 16.64 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 16.64 | $49.91 |
| 08019659740005456242 | TOP STAR INC 5 | 5/9/2012 | 6/25/2012 | 6/25/2013 | 274.02 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 274.02 | $822.07 |
| 08019659740003230914 | TOP STAR INC 9 | 5/9/2012 | 5/31/2012 | 5/31/2013 | 326.95 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 326.95 | $980.85 |
| 08019659740002461707 | TOP STAR INC 2 | 5/9/2012 | 6/18/2012 | 6/18/2013 | 85.83 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 85.83 | $257.50 |
| 08019659740002461514 | TOP STAR INC 10 | 5/9/2012 | 6/14/2012 | 6/14/2013 | 101.70 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 101.70 | $305.10 |
| 08019659740002461494 | TOP STAR INC 7 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 70.75 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 70.75 | $212.26 |
| 08019659740002461493 | TOP STAR INC 8 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 319.05 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 319.05 | $957.15 |
| 08019659740002445429 | TOP STAR INC 14 | 5/9/2012 | 5/31/2012 | 5/31/2013 | 240.45 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 240.45 | $721.34 |
| 08019659740002319810 | TOP STAR INC 12 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 117.83 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 117.83 | $353.50 |
| 08019659740002209123 | TOP STAR INC 3 | 5/9/2012 | 6/8/2012 | 6/8/2013 | 89.25 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 89.25 | $267.75 |
| 08019659740002075425 | TOP STAR INC | 5/9/2012 | 6/15/2012 | 6/15/2013 | 95.80 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 95.80 | $287.39 |
| 08019659740002008449 | TOP STAR INC 11 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 443.18 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 443.18 | $1,329.55 |
| 08019659740006033127 | TOP STAR INC 6 | 5/9/2012 | 6/8/2012 | 6/8/2013 | 1.50 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 1.50 | $4.51 |
| 7948001006 | TOP STAR INC 16 | 5/11/2012 | 6/11/2012 | 6/11/2013 | 279.31 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 279.31 | $837.92 |
| 0753051017 | TOP STAR INC 20 | 5/11/2012 | 6/18/2012 | 6/18/2013 | 250.23 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 250.23 | $750.68 |
| 5377015010 | TOP STAR INC 5 | 5/11/2012 | 6/22/2012 | 6/22/2013 | 45.37 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 45.37 | $136.10 |
| 7026038010 | Top Star, Inc. 5 | 5/11/2012 | 6/7/2012 | 6/7/2013 | 219.47 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 219.47 | $658.40 |
| 7141090018 | Top Star, Inc. | 5/11/2012 | 6/29/2012 | 6/29/2013 | 134.69 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 134.69 | $404.08 |
| 7600030016 | TOP STAR INC 11 | 5/11/2012 | 6/28/2012 | 6/28/2013 | 154.44 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 154.44 | $463.31 |
| 7629079015 | Top Star, Inc. 6 | 5/11/2012 | 6/12/2012 | 6/12/2013 | 135.66 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 135.66 | $406.98 |
| 8266009025 | TOP STAR INC 3 | 5/11/2012 | 6/7/2012 | 6/7/2013 | 96.94 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 96.94 | $290.82 |
| 8286009021 | TOP STAR INC 4 | 5/11/2012 | 6/7/2012 | 6/7/2013 | 11.42 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 11.42 | $34.27 |
| 8611079011 | Top Star, Inc. 2 | 5/11/2012 | 6/14/2012 | 6/14/2013 | 157.86 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 157.86 | $473.57 |
| 9073017007 | TOP STAR INC 2 | 5/11/2012 | 6/18/2012 | 6/18/2013 | 303.74 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 303.74 | $911.21 |
| 9143013011 | TOP STAR INC 13 | 5/11/2012 | 6/4/2012 | 6/4/2013 | 191.35 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 191.35 | $574.06 |
| 9163013017 | TOP STAR INC 22 | 5/11/2012 | 6/4/2012 | 6/4/2013 | 116.19 | $ 3.00 | $ 3.00 | 12 | 5 | 2012 | 116.19 | $348.57 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5258018008 | TOP STAR INC 12 | 5/11/2012 | 6/25/2012 | 6/25/2013 | 64.37 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 64.37 | $193.11 |
| 5257812011 | TOP STAR INC 6 | 5/11/2012 | 6/28/2012 | 6/28/2013 | 81.77 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 81.77 | $245.30 |
| 4644108023 | TOP STAR INC 21 | 5/11/2012 | 6/5/2012 | 6/5/2013 | 221.64 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 221.64 | $664.91 |
| 0778018018 | TOP STAR INC 24 | 5/11/2012 | 6/25/2012 | 6/25/2013 | 143.19 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 143.19 | $429.58 |
| 0899028016 | TOP STAR INC 15 | 5/11/2012 | 6/26/2012 | 6/26/2013 | 307.94 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 307.94 | $923.82 |
| 1123012010 | TOP STAR INC 9 | 5/11/2012 | 6/4/2012 | 6/4/2013 | 13.18 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 13.18 | $39.53 |
| 1258027012 | TOP STAR INC 7 | 5/11/2012 | 6/25/2012 | 6/25/2013 | 211.42 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 211.42 | $634.26 |
| 1397054019 | TOP STAR INC 19 | 5/11/2012 | 6/22/2012 | 6/22/2013 | 262.65 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 262.65 | $787.95 |
| 1820087019 | TOP STAR INC 17 | 5/11/2012 | 6/28/2012 | 6/28/2013 | 199.46 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 199.46 | $598.38 |
| 2529035016 | Top Star, Inc. 7 | 5/11/2012 | 6/12/2012 | 6/12/2013 | 128.00 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 128.00 | $383.99 |
| 2677080010 | Top Star, Inc. 4 | 5/11/2012 | 6/22/2012 | 6/22/2013 | 190.36 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 190.36 | $571.09 |
| 3143026012 | TOP STAR INC 14 | 5/11/2012 | 6/4/2012 | 6/4/2013 | 339.06 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 339.06 | $1,017.18 |
| 3939821005 | TOP STAR INC 23 | 5/11/2012 | 6/26/2012 | 6/26/2013 | 246.63 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 246.63 | $739.88 |
| 7711003018 | TOP STAR INC 8 | 5/11/2012 | 6/14/2012 | 6/14/2013 | 76.25 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 76.25 | $228.75 |
| 7731003014 | TOP STAR INC 18 | 5/11/2012 | 6/14/2012 | 6/14/2013 | 155.07 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 155.07 | $465.22 |
| 9282005028 | TOP STAR INC 26 | 5/11/2012 | 7/2/2012 | 7/2/2013 | 228.29 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 228.29 | $684.86 |
| 4581089012 | Top Star, Inc 3 | 5/11/2012 | 6/29/2012 | 6/29/2013 | 202.15 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 202.15 | $606.45 |
| 4035230056 | TOP STAR INC | 5/11/2012 | 6/21/2012 | 6/21/2013 | 92.03 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 92.03 | $276.10 |
| 4076012009 | TOP STAR INC 25 | 5/11/2012 | 6/21/2012 | 6/21/2013 | 202.04 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 202.04 | $606.13 |
| 4579016009 | TOP STAR INC 10 | 5/11/2012 | 6/26/2012 | 6/26/2013 | 342.65 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 342.65 | $1,027.95 |
| 7931016006 | AUSTIN AUTO SERVICE | 5/21/2012 | 6/14/2012 | 6/14/2014 | 21.25 | $ | 3.84 | $ | 3.84 | 24 | 5 | 2012 | 21.25 | -$81.60 |
| PE000009791801575403 | Gibraltar Rock, Inc | 5/21/2012 | 6/26/2012 | 6/26/2013 | 3,279.88 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 3,279.88 | $13,119.50 |
| PE000010996143315582 | Sil Concrete Inc | 5/21/2012 | 6/25/2012 | 6/25/2013 | 11.16 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 11.16 | $44.65 |
| PE000010996144115582 | Sil Concrete Inc 2 | 5/21/2012 | 6/25/2012 | 6/25/2013 | 306.02 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 306.02 | $1,224.08 |
| 0800778350000153044 | Sil Kemp Concrete | 5/21/2012 | 7/10/2012 | 7/10/2013 | 437.47 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 437.47 | $1,749.89 |
| 0801022966000712878 | Silvi Concrete Corp | 5/21/2012 | 6/25/2012 | 6/25/2013 | 150.65 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 150.65 | $602.61 |
| 327736999993 | Sahara Sand Eagles Lake Reserve | 5/21/2012 | 6/27/2012 | 6/27/2013 | 2,225.31 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 2,225.31 | $8,901.23 |
| 332447999969 | Sahara Sand Plant 2 | 5/21/2012 | 6/27/2012 | 6/27/2013 | 1,458.15 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 1,458.15 | $5,832.60 |
| 332447999977 | Sahara Sand Plant | 5/21/2012 | 6/12/2012 | 6/12/2013 | 737.77 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 737.77 | $2,951.07 |
| 2122201702 | RIVERSIDE CONSTRUCTION 5 | 5/21/2012 | 7/3/2012 | 7/3/2013 | 384.84 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 384.84 | $1,539.38 |
| 4899101508 | RIVERSIDE CONST MATERIA | 5/21/2012 | 7/3/2012 | 7/3/2013 | 982.65 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 982.65 | $3,930.59 |
| 6762059018 | RIVERSIDE CONSTRUCTION | 5/21/2012 | 7/3/2012 | 7/3/2013 | 455.65 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 455.65 | $1,822.61 |
| 7990801603 | RIVERSIDE IND COMPLEX 1 | 5/21/2012 | 7/3/2012 | 7/3/2013 | 55.24 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 55.24 | $220.95 |
| 8918300501 | RIVERSIDE IND COMPLEX | 5/21/2012 | 7/3/2012 | 7/3/2013 | 130.64 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 130.64 | $522.56 |
| 8938500204 | SILVI CONCRETE PROD INC 1 | 5/21/2012 | 7/3/2012 | 7/3/2013 | 1,050.02 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 1,050.02 | $4,200.08 |
| 9503300804 | SILVI CONCRETE PROD INC | 5/21/2012 | 6/26/2012 | 6/26/2013 | 232.79 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 232.79 | $931.17 |
| 9763001003 | SILVI CONCRETE | 5/21/2012 | 6/26/2012 | 6/26/2013 | 368.62 | $ | 7.00 | $ | 4.00 | 12 | 5 | 2012 | 368.62 | $1,474.48 |
| 3758021012 | FIGUEROAS MARKET | 5/24/2012 | 6/25/2012 | 6/25/2013 | 76.38 | $ | 5.02 | $ | 4.00 | 12 | 5 | 2012 | 76.38 | $305.51 |
| 8466109006 | TRACI'S PARDISE INC | 5/29/2012 | 7/9/2012 | 7/9/2013 | 152.21 | $ | 4.00 | $ | 4.00 | 12 | 5 | 2012 | 152.21 | $608.85 |
| 326216999989 | Rastellis Foods 3 | 5/29/2012 | 6/27/2012 | 6/27/2013 | 2,951.00 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 2,951.00 | $8,853.01 |
| 137070199989 | Rastellis Foods 1 | 5/29/2012 | 7/12/2012 | 7/12/2013 | 630.31 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 630.31 | $1,890.94 |
| 101054999988 | Rastellis Foods 2 | 5/29/2012 | 6/28/2012 | 6/28/2013 | 2,297.81 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 2,297.81 | $6,893.44 |
| 101054999970 | Rastellis Foods | 5/29/2012 | 6/20/2012 | 6/20/2013 | 283.71 | $ | 3.00 | $ | 3.00 | 12 | 5 | 2012 | 283.71 | $851.12 |
| 4526017009 | KOGELMAN DIST CO | 5/30/2012 | 7/9/2012 | 7/9/2013 | 228.66 | $ | - | $ | - | 12 | 5 | 2012 | 228.66 | $0.00 |
| 4506017003 | TOMMY BURKE PROVISIONS | 5/30/2012 | 7/9/2012 | 7/9/2013 | 39.43 | $ | - | $ | - | 12 | 5 | 2012 | 39.43 | $0.00 |
| TOTAL | | | | | | | | | | | | | 40,220.11 | $139,350.97 |

Recurring Commission Statement
Coastal Energy Consultants

| Account Number | Account Name | Accepted Date | Contract Start Date | Contract End Date | Est Annual MWh | Agent Fee | One Time Payment Fee | Recurring Payment Fee | May-12 | May-12 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0802870830500006714 2 | Jasar Recycling, Inc | 4/11/2012 | 5/22/2012 | 5/22/2013 | 140.32 | $  2.50 | $  2.50 | $  - | | $  - | Billing has not started |
| 0802870830000116936 6 | Jasar Recycling, Inc 5 | 4/11/2012 | 5/22/2012 | 5/22/2013 | 113.70 | $  2.50 | $  2.50 | $  - | | $  - | Billing has not started |
| 0802834300000114921 70 | Jasar Recycling, Inc 3 | 4/11/2012 | 5/22/2012 | 5/22/2013 | 6.67 | $  2.50 | $  2.50 | $  - | | $  - | Billing has not started |
| 0802834300000116918 9 | Jasar Recycling, Inc 1 | 4/11/2012 | 5/22/2012 | 5/22/2013 | 641.66 | $  2.50 | $  2.50 | $  - | | $  - | Billing has not started |
| 0805796836000073178 66 | HAROLD FRIEDMAN INC 3 | 4/16/2012 | 5/23/2012 | 5/23/2013 | 1,415.17 | $  4.00 | $  4.00 | $  - | | $  - | Billing has not started |
| 0805182097000731371 8 | FRIEDMANS GREAT BTR MRT | 4/16/2012 | 5/29/2012 | 5/29/2013 | 1,648.50 | $  4.00 | $  4.00 | $  - | | $  - | Billing has not started |
| 0805251553000068123 90 | HAROLD FRIEDMAN INC 2 | 4/16/2012 | 5/11/2012 | 5/11/2013 | 54.14 | $  4.00 | $  4.00 | $  - | | $  - | Billing has not started |
| 0805258758000700353 9 | BUTLER BI LO FOODS | 4/16/2012 | 5/7/2012 | 5/7/2013 | 1,845.04 | $  4.00 | $  4.00 | $  - | | $  - | Billing has not started |
| 0805405085000683690 2 | FMT FOODS INC | 4/16/2012 | 5/15/2012 | 5/15/2013 | 864.43 | $  4.00 | $  4.00 | $  - | | $  - | Billing has not started |
| 0805486723200066027 98 | FRIEDMANS HAROLD INC 1 | 4/16/2012 | 5/22/2012 | 5/22/2013 | 54.86 | $  4.00 | $  4.00 | $  - | | $  - | Billing has not started |
| 0805486756000660286 5 | FRIEDMANS HAROLD INC | 4/16/2012 | 5/22/2012 | 5/22/2013 | 0.00 | $  4.00 | $  4.00 | $  - | | $  - | Billing has not started |
| 0805523162000689180 8 | FRIEDMANS CHICORA | 4/16/2012 | 5/24/2012 | 5/24/2013 | 875.13 | $  4.00 | $  4.00 | $  - | | $  - | Billing has not started |
| 0805584629000681310 8 | FRIEDMANS WEST BRADY ST | 4/16/2012 | 6/1/2012 | 6/1/2013 | 980.22 | $  4.00 | $  4.00 | $  - | | $  - | Billing has not started |
| 4395002001 | EAST SIDE FAMILY BEV | 4/19/2012 | 5/21/2012 | 5/21/2013 | 58.59 | $  1.18 | $  1.18 | $  - | | $  - | Billing has not started |
| 4455002001 | AIRPORT ROAD MOTOR INN | 4/19/2012 | 5/21/2012 | 5/21/2013 | 114.80 | $  2.18 | $  2.18 | $  - | | $  - | Billing has not started |
| 4435002005 | CHARLES NOTI | 4/19/2012 | 5/21/2012 | 5/21/2013 | 9.14 | $  2.18 | $  2.18 | $  - | | $  - | Billing has not started |
| 3289700704 | SMG KULPSVILLE MOTOR INN | 4/23/2012 | 6/1/2012 | 6/1/2013 | 1,496.77 | $  1.00 | $  1.00 | $  - | | $  - | Billing has not started |
| 0803766276000064377 2 | The Brass Rail Inc | 4/27/2012 | 7/18/2012 | 7/18/2013 | 116.29 | $  7.72 | $  4.00 | $  3.72 | | $  - | Billing has not started |
| 0800664401500033499 4 | Cardinal Mooney High School 4 | 4/30/2012 | 6/14/2012 | 6/14/2014 | 8.30 | $  3.88 | $  3.88 | $  - | | $  - | Billing has not started |
| 0800664401000150137 9 | Cardinal Mooney High School 5 | 4/30/2012 | 6/14/2012 | 6/14/2014 | 2.32 | $  3.88 | $  3.88 | $  - | | $  - | Billing has not started |
| 0800664401000990657 1 | Cardinal Mooney High School | 4/30/2012 | 6/14/2012 | 6/14/2014 | 521.07 | $  3.88 | $  3.88 | $  - | | $  - | Billing has not started |
| 0802569544000102142 6 | Valley Foods Inc. | 5/7/2012 | 6/15/2012 | 6/15/2014 | 926.11 | $  4.04 | $  4.00 | $  0.04 | | $  - | Billing has not started |
| 0802776241000150820 1 | James M Coates | 5/7/2012 | 6/29/2012 | 6/29/2014 | 198.89 | $  6.04 | $  4.00 | $  2.04 | | $  - | Billing has not started |
| 0802725546000105454 0 | Saint Charles Church 7 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.82 | $  4.15 | $  4.00 | $  0.15 | | $  - | Billing has not started |
| 0802725546000105454 1 | Saint Charles Church 8 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $  4.15 | $  4.00 | $  0.15 | | $  - | Billing has not started |
| 0802725546000105454 2 | Saint Charles Church 5 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.75 | $  4.15 | $  4.00 | $  0.15 | | $  - | Billing has not started |
| 0802725546000105454 3 | Saint Charles Church 6 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $  4.15 | $  4.00 | $  0.15 | | $  - | Billing has not started |
| 0802725546000105492 7 | Saint Charles Church 9 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 373.03 | $  4.15 | $  4.00 | $  0.15 | | $  - | Billing has not started |
| 0802725546000105605 9 | Saint Charles Church | 5/8/2012 | 6/5/2012 | 6/5/2015 | 219.44 | $  4.15 | $  4.00 | $  0.15 | | $  - | Billing has not started |
| 0802725546000142262 1 | Saint Charles Church 10 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.00 | $  4.15 | $  4.00 | $  0.15 | | $  - | Billing has not started |
| 0802725546500002837 7 | Saint Charles Church 11 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.24 | $  4.15 | $  4.00 | $  0.15 | | $  - | Billing has not started |
| 0802725546500000283 99 | Saint Charles Church 2 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 235.52 | $  4.15 | $  4.00 | $  0.15 | | $  - | Billing has not started |
| 3661300405 | LEHIGH FUELS INC | 5/9/2012 | 6/21/2012 | 6/21/2013 | 171.33 | $  4.00 | $  4.00 | $  - | | $  - | Billing has not started |
| 4241200709 | LEHIGH FUELS INC 2 | 5/9/2012 | 6/1/2012 | 6/1/2013 | 178.63 | $  4.00 | $  4.00 | $  - | | $  - | Billing has not started |
| 0800781882000246149 5 | TOP STAR INC 13 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 4.69 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000549212 9 | TOP STAR INC 4 | 5/9/2012 | 6/25/2012 | 6/25/2013 | 16.64 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000545624 2 | TOP STAR INC 5 | 5/9/2012 | 6/25/2012 | 6/25/2013 | 274.02 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000323091 4 | TOP STAR INC 9 | 5/9/2012 | 5/31/2012 | 5/31/2013 | 326.95 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000246170 7 | TOP STAR INC 2 | 5/9/2012 | 6/18/2012 | 6/18/2013 | 85.83 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000246151 4 | TOP STAR INC 10 | 5/9/2012 | 6/14/2012 | 6/14/2013 | 101.70 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000246149 4 | TOP STAR INC 7 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 70.75 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000246149 3 | TOP STAR INC 8 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 319.05 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000244542 9 | TOP STAR INC 14 | 5/9/2012 | 5/31/2012 | 5/31/2013 | 240.45 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000231981 0 | TOP STAR INC 12 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 117.83 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000220912 3 | TOP STAR INC 3 | 5/9/2012 | 6/8/2012 | 6/8/2013 | 89.25 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000207942 5 | TOP STAR INC 1 | 5/9/2012 | 6/15/2012 | 6/15/2013 | 95.80 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000200844 9 | TOP STAR INC 11 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 443.18 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0801965974000603312 7 | TOP STAR INC 6 | 5/9/2012 | 6/8/2012 | 6/8/2013 | 1.50 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 7948001006 | TOP STAR INC 16 | 5/11/2012 | 6/11/2012 | 6/11/2013 | 279.31 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 0753051017 | TOP STAR INC 20 | 5/11/2012 | 6/18/2012 | 6/18/2013 | 250.23 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 5377015010 | TOP STAR INC 5 | 5/11/2012 | 6/22/2012 | 6/22/2013 | 45.37 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 7026038010 | Top Star, Inc. 5 | 5/11/2012 | 6/7/2012 | 6/7/2013 | 219.47 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 7141090018 | Top Star, Inc. | 5/11/2012 | 6/29/2012 | 6/29/2013 | 134.69 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 7600030016 | TOP STAR INC 11 | 5/11/2012 | 6/28/2012 | 6/28/2013 | 154.44 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 7629079015 | Top Star, Inc. 6 | 5/11/2012 | 6/12/2012 | 6/12/2013 | 135.66 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 8266009025 | TOP STAR INC 3 | 5/11/2012 | 6/7/2012 | 6/7/2013 | 96.94 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 8286009021 | TOP STAR INC 4 | 5/11/2012 | 6/7/2012 | 6/7/2013 | 11.42 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 8611079011 | Top Star, Inc. 2 | 5/11/2012 | 6/14/2012 | 6/14/2013 | 157.86 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 9079017007 | TOP STAR INC 2 | 5/11/2012 | 6/18/2012 | 6/18/2013 | 303.74 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 9143013011 | TOP STAR INC 13 | 5/11/2012 | 6/4/2012 | 6/4/2013 | 191.35 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |
| 9163013017 | TOP STAR INC 22 | 5/11/2012 | 6/4/2012 | 6/4/2013 | 116.19 | $  3.00 | $  3.00 | $  - | | $  - | Billing has not started |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 5258018008 | TOP STAR INC 12 | 5/11/2012 | 6/25/2012 | 6/25/2013 | 64.37 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 5257812011 | TOP STAR INC 6 | 5/11/2012 | 6/28/2012 | 6/28/2013 | 81.77 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 4644108023 | TOP STAR INC 21 | 5/11/2012 | 6/5/2012 | 6/5/2013 | 221.64 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 0778018018 | TOP STAR INC 24 | 5/11/2012 | 6/25/2012 | 6/25/2013 | 143.19 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 0899028016 | TOP STAR INC 15 | 5/11/2012 | 6/26/2012 | 6/26/2013 | 307.94 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 1123012010 | TOP STAR INC 9 | 5/11/2012 | 6/4/2012 | 6/4/2013 | 13.18 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 1258027012 | TOP STAR INC 7 | 5/11/2012 | 6/25/2012 | 6/25/2013 | 211.42 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 1397054019 | TOP STAR INC 19 | 5/11/2012 | 6/22/2012 | 6/22/2013 | 262.65 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 1820087019 | TOP STAR INC 17 | 5/11/2012 | 6/28/2012 | 6/28/2013 | 199.46 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 2529035016 | Top Star, Inc. 7 | 5/11/2012 | 6/12/2012 | 6/12/2013 | 128.00 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 2677080010 | Top Star, Inc. 4 | 5/11/2012 | 6/22/2012 | 6/22/2013 | 190.36 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 3143026012 | TOP STAR INC 14 | 5/11/2012 | 6/4/2012 | 6/4/2013 | 339.06 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 3939821005 | TOP STAR INC 23 | 5/11/2012 | 6/26/2012 | 6/26/2013 | 246.63 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 7711003018 | TOP STAR INC 8 | 5/11/2012 | 6/14/2012 | 6/14/2013 | 76.25 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 7731003014 | TOP STAR INC 18 | 5/11/2012 | 6/14/2012 | 6/14/2013 | 155.07 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 9282005028 | TOP STAR INC 26 | 5/11/2012 | 7/2/2012 | 7/2/2013 | 228.29 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 4581089012 | Top Star, Inc. 3 | 5/11/2012 | 6/29/2012 | 6/29/2013 | 202.15 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 4035230056 | TOP STAR INC | 5/11/2012 | 6/21/2012 | 6/21/2013 | 92.03 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 4076012009 | TOP STAR INC 25 | 5/11/2012 | 6/21/2012 | 6/21/2013 | 202.04 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 4579016009 | TOP STAR INC 10 | 5/11/2012 | 6/26/2012 | 6/26/2013 | 342.65 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 7931016006 | AUSTIN AUTO SERVICE | 5/21/2012 | 6/14/2012 | 6/14/2014 | 21.25 | $ 3.84 | $ 3.84 | $ - | $ - | Billing has not started |
| PE000009791801575403 | Gibraltar Rock, Inc | 5/21/2012 | 6/26/2012 | 6/26/2013 | 3,279.88 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| PE000010996143315582 | Sil Concrete Inc | 5/21/2012 | 6/25/2012 | 6/25/2013 | 11.16 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| PE000010996144115582 | Sil Concrete Inc 2 | 5/21/2012 | 6/25/2012 | 6/25/2013 | 306.02 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 08007787350000153044 | Sil Kemp Concrete | 5/21/2012 | 7/10/2012 | 7/10/2013 | 437.47 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 08010229660000712878 | Silvi Concrete Corp | 5/21/2012 | 6/25/2012 | 6/25/2013 | 150.65 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 327736999993 | Sahara Sand Eagles Lake Reserve | 5/21/2012 | 6/27/2012 | 6/27/2013 | 2,225.31 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 332447999969 | Sahara Sand Plant 2 | 5/21/2012 | 6/27/2012 | 6/27/2013 | 1,458.15 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 332447999977 | Sahara Sand Plant | 5/21/2012 | 6/12/2012 | 6/12/2013 | 737.77 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 2122201702 | RIVERSIDE CONSTRUCTION 5 | 5/21/2012 | 7/3/2012 | 7/3/2013 | 384.84 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 4899101508 | RIVERSIDE CONST MATERIA | 5/21/2012 | 7/3/2012 | 7/3/2013 | 982.65 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 6762059018 | RIVERSIDE CONSTRUCTION | 5/21/2012 | 7/3/2012 | 7/3/2013 | 455.65 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 7990801603 | RIVERSIDE IND COMPLEX 1 | 5/21/2012 | 7/3/2012 | 7/3/2013 | 55.24 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 8918300501 | RIVERSIDE IND COMPLEX | 5/21/2012 | 7/3/2012 | 7/3/2013 | 130.64 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 8938500204 | SILVI CONCRETE PROD INC 1 | 5/21/2012 | 7/3/2012 | 7/3/2013 | 1,050.02 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 9503300804 | SILVI CONCRETE PROD INC | 5/21/2012 | 6/26/2012 | 6/26/2013 | 232.79 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 9763001003 | SILVI CONCRETE | 5/21/2012 | 6/26/2012 | 6/26/2013 | 368.62 | $ 7.00 | $ 4.00 | $ 3.00 | $ - | Billing has not started |
| 3758021012 | FIGUEROAS MARKET | 5/24/2012 | 6/25/2012 | 6/25/2013 | 76.38 | $ 5.02 | $ 4.00 | $ 1.02 | $ - | Billing has not started |
| 8466109006 | TRACI'S PARIDISE INC | 5/29/2012 | 7/9/2012 | 7/9/2013 | 152.21 | $ 4.00 | $ 4.00 | $ - | $ - | Billing has not started |
| 326216399989 | Rastellis Foods 3 | 5/29/2012 | 6/27/2012 | 6/27/2013 | 2,951.00 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 137070199989 | Rastellis Foods 1 | 5/29/2012 | 7/12/2012 | 7/12/2013 | 630.31 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 101054999988 | Rastellis Foods 2 | 5/29/2012 | 6/28/2012 | 6/28/2013 | 2,297.81 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 101054999970 | Rastellis Foods | 5/29/2012 | 6/20/2012 | 6/20/2013 | 283.71 | $ 3.00 | $ 3.00 | $ - | $ - | Billing has not started |
| 4526017009 | KOGELMAN DIST CO | 5/30/2012 | 7/9/2012 | 7/9/2013 | 228.66 | $ - | $ - | $ - | $ - | Billing has not started |
| 4506017003 | TOMMY BURKE PROVISIONS | 5/30/2012 | 7/9/2012 | 7/9/2013 | 39.43 | $ - | $ - | $ - | $ - | Billing has not started |
| TOTAL | | | | | | | | - | $ - | |

Recurring Commission Statement
Coastal Energy Consultants

| Account Number | Account Name | Contract Signed Date | Contract Start Date | Contract End Date | Org. Est Annual MWh | | Agent Fee | Contract Term | Recurring Payment | Recurring Payment Date | Updated Est Annual MWh |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08006644015000334994 | Cardinal Mooney High School 4 | 4/30/2012 | 6/14/2012 | 6/14/2014 | 8.30 | $ | 3.88 | 24 | 1 | 4/30/2013 | |
| 08006644010001501379 | Cardinal Mooney High School 5 | 4/30/2012 | 6/14/2012 | 6/14/2014 | 2.32 | $ | 3.88 | 24 | 1 | 4/30/2013 | |
| 08006644010000990671 | Cardinal Mooney High School | 4/30/2012 | 6/14/2012 | 6/14/2014 | 521.07 | $ | 3.88 | 24 | 1 | 4/30/2013 | |
| 08025695440001021426 | Valley Foods Inc | 5/7/2012 | 6/15/2012 | 6/15/2014 | 926.11 | $ | 4.04 | 24 | 1 | 5/7/2013 | |
| 08027762410001508201 | James M Coates | 5/7/2012 | 6/29/2012 | 6/29/2014 | 198.89 | $ | 6.04 | 24 | 1 | 5/7/2013 | |
| 08027255460001054540 | Saint Charles Church 7 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.82 | $ | 4.15 | 36 | 1 | 5/8/2013 | |
| 08027255460001054541 | Saint Charles Church 8 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $ | 4.15 | 36 | 1 | 5/8/2013 | |
| 08027255460001054542 | Saint Charles Church 5 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.75 | $ | 4.15 | 36 | 1 | 5/8/2013 | |
| 08027255460001054543 | Saint Charles Church 6 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $ | 4.15 | 36 | 1 | 5/8/2013 | |
| 08027255460001054927 | Saint Charles Church 9 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 373.03 | $ | 4.15 | 36 | 1 | 5/8/2013 | |
| 08027255460001056059 | Saint Charles Church | 5/8/2012 | 6/5/2012 | 6/5/2015 | 219.44 | $ | 4.15 | 36 | 1 | 5/8/2013 | |
| 08027255460001422621 | Saint Charles Church 10 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.00 | $ | 4.15 | 36 | 1 | 5/8/2013 | |
| 08027255465000028377 | Saint Charles Church 11 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.24 | $ | 4.15 | 36 | 1 | 5/8/2013 | |
| 08027255465000028399 | Saint Charles Church 2 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 235.52 | $ | 4.15 | 36 | 1 | 5/8/2013 | |
| 7931016006 | AUSTIN AUTO SERVICE | 5/21/2012 | 6/14/2012 | 6/14/2014 | 21.25 | $ | 3.84 | 24 | 1 | 5/21/2013 | |
| 08027255460001054540 | Saint Charles Church 7 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.82 | $ | 4.15 | 36 | 2 | 5/8/2014 | |
| 08027255460001054541 | Saint Charles Church 8 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $ | 4.15 | 36 | 2 | 5/8/2014 | |
| 08027255460001054542 | Saint Charles Church 5 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.75 | $ | 4.15 | 36 | 2 | 5/8/2014 | |
| 08027255460001054543 | Saint Charles Church 6 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $ | 4.15 | 36 | 2 | 5/8/2014 | |
| 08027255460001054927 | Saint Charles Church 9 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 373.03 | $ | 4.15 | 36 | 2 | 5/8/2014 | |
| 08027255460001056059 | Saint Charles Church 9 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 219.44 | $ | 4.15 | 36 | 2 | 5/8/2014 | |
| 08027255460001422621 | Saint Charles Church 10 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.00 | $ | 4.15 | 36 | 2 | 5/8/2014 | |
| 08027255465000028377 | Saint Charles Church 11 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.24 | $ | 4.15 | 36 | 2 | 5/8/2014 | |
| 08027255465000028399 | Saint Charles Church 2 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 235.52 | $ | 4.15 | 36 | 2 | 5/8/2014 | |

| Account | Name | Date | Date | Date | Value | | | | | | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0991016007 | Brookside Housing Associates | 6/26/2012 | 1/16/2013 | 1/16/2015 | 5.57 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1119093007 | Long Meadows Associates 4 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 7.33 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1219093027 | Long Meadows Associates 14 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 5.01 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1358077000 | East Park Gardens Condominium Associ | 6/26/2012 | 1/25/2013 | 1/25/2015 | 16.16 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1367063000 | Twin Lakes Group 3 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 4.98 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2287063005 | Twin Lakes Group 14 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 3.19 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2213076014 | PCS Chadaga dba Little Mountain Estate | 6/26/2012 | 1/18/2013 | 1/18/2015 | 0.81 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2126135002 | Mount Pleasant Housing, LP 6 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 38.12 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2096092001 | Wilshire Hills Associates 5 | 6/26/2012 | 1/24/2013 | 1/24/2015 | 3.51 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2084080019 | Mountain View Road Associates 3 | 6/26/2012 | 1/5/2013 | 1/5/2015 | 1.59 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2081129500 | Susabar Joint Venture 5 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 10.95 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2058072005 | East Park Gardens Condominium Associ | 6/26/2012 | 1/25/2013 | 1/25/2015 | 22.10 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1975093001 | Long Meadows Associates 13 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 8.17 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1879084000 | The Pennsylvania State University | 6/26/2012 | 1/26/2013 | 1/26/2015 | 612.42 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1868072003 | Susabar Joint Venture 11 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 3.25 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1793076015 | PCS Chadaga dba Little Mountain Estate | 6/26/2012 | 1/18/2013 | 1/18/2015 | 0.81 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1599941000 | PCS Chadaga dba Log Cabin Court | 6/26/2012 | 1/20/2013 | 1/20/2015 | 0.03 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1756092002 | Wilshire Hills Associates 6 | 6/26/2012 | 1/24/2013 | 1/24/2015 | 4.62 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1579297001 | Allendale Road Associates dba Rockledg | 6/26/2012 | 1/26/2013 | 1/26/2015 | 2.69 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1536092011 | Wilshire Hills Associates | 6/26/2012 | 1/24/2013 | 1/24/2015 | 21.46 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1578072000 | East Park Gardens Condominium Associ | 6/26/2012 | 1/25/2013 | 1/25/2015 | 16.52 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1409044007 | Towncrest Associates 6 | 6/26/2012 | 1/12/2013 | 1/12/2015 | 1.81 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1516092006 | Wilshire Hills Associates 3 | 6/26/2012 | 1/24/2013 | 1/24/2015 | 6.16 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1484079013 | Mountain View Road Associates 5 | 6/26/2012 | 1/5/2013 | 1/5/2015 | 0.71 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1509044009 | Towncrest Associates 2 | 6/26/2012 | 1/12/2013 | 1/12/2015 | 5.83 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0799091008 | Wesley Drive Joint Venture | 6/26/2012 | 1/26/2013 | 1/26/2015 | 26.37 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0807076017 | 1300 Market, LLC | 6/26/2012 | 1/10/2013 | 1/10/2015 | 589.04 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0827063007 | Twin Lakes Group 19 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 0.01 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0866074026 | Central PA Conference of United Metho | 6/26/2012 | 1/9/2013 | 1/9/2015 | 190.18 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0878072005 | East Park Gardens Condominium Associ | 6/26/2012 | 1/25/2013 | 1/25/2015 | 16.80 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 7583718000 | Mount Pleasant Housing, LP 10 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 27.50 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 7769441042 | Susabar Joint Venture 13 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 2.84 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 7770230019 | Stonehedge Condominium Association 4 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 1.56 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 7877061005 | 2505 North Front Street, LLC 2 | 6/26/2012 | 1/24/2013 | 1/24/2015 | 185.96 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 7880115003 | 1500 North Second Front Street | 6/26/2012 | 1/30/2013 | 1/30/2015 | 429.75 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 7887063002 | Twin Lakes Group 9 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 2.10 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 7907076043 | Lemoyne Square Plaza Properties | 6/26/2012 | 1/10/2013 | 1/10/2015 | 21.59 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 7919078002 | Morgan Manor Residences, Inc 4 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 221.45 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 7979078000 | Morgan Manor Residences, Inc 3 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 190.16 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 7997077001 | Mumma Realty Association, Inc 5 | 6/26/2012 | 1/24/2013 | 1/24/2015 | 3.69 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8053737016 | Stonehedge Condominium Association 5 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 1.39 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8181121011 | Susabar Joint Venture 14 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 1.91 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8247451009 | Mount Pleasant Housing, LP 11 | 6/26/2012 | 1/9/2013 | 1/9/2015 | 10.00 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8268069065 | Mumma Realty Association, Inc 6 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 72.92 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8276085019 | PCS Chadaga dba Heritage Estates 2 | 6/26/2012 | 1/23/2013 | 1/23/2015 | 14.31 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8340126489 | Morgan Manor Residences, Inc 2 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 486.50 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8360115017 | El Front Street Twins, LLC | 6/26/2012 | 1/30/2013 | 1/30/2015 | 48.98 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8380115013 | El Front Street Twins, LLC 2 | 6/26/2012 | 1/30/2013 | 1/30/2015 | 26.88 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8467063009 | Twin Lakes Group 15 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 2.92 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8552190000 | Mount Pleasant Housing, LP 9 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 30.12 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8628073001 | Susabar Joint Venture 7 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 4.85 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8727063003 | Twin Lakes Group 6 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 2.74 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8770129297 | Morgan Manor Residences, Inc | 6/26/2012 | 1/13/2013 | 1/13/2015 | 569.82 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 8971129501 | Susabar Joint Venture 12 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 2.39 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 9067063002 | Twin Lakes Group 10 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 3.76 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 9292624026 | Schoolhouse Partners LP | 6/26/2012 | 1/4/2013 | 1/4/2015 | 23.21 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 9295068002 | P C S Chadaga MD 3 | 6/26/2012 | 1/20/2013 | 1/20/2015 | 8.75 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 9327063006 | Twin Lakes Group 13 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 3.14 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 9334058006 | Oak Grove Garden Associates | 6/26/2012 | 1/19/2013 | 1/19/2015 | 34.69 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 9378072004 | East Park Gardens Condominium Associ | 6/26/2012 | 1/25/2013 | 1/25/2015 | 9.70 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 9436085003 | PCS Chadaga dba Heritage Estates | 6/26/2012 | 1/23/2013 | 1/23/2015 | 23.21 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 9613103002 | PCS Chadaga dba Log Cabin Court 2 | 6/26/2012 | 1/20/2013 | 1/20/2015 | 18.66 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 9667063004 | Twin Lakes Group 4 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 4.79 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 9727711005 | Mount Pleasant Housing, LP 13 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 6.19 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 9745834001 | Upper Allen Partners, LP, Winding Hills I | 6/26/2012 | 1/31/2013 | 1/31/2015 | 1.23 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 9810135006 | Hampden Summit Homeowners Associa | 6/26/2012 | 1/11/2013 | 1/11/2015 | 1.01 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9878072004 | East Park Gardens Condominium Associ | 6/26/2012 | 1/25/2013 | 1/25/2015 | 15.69 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 9884214009 | Mount Pleasant Housing, LP 2 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 14.66 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 9974601001 | Mount Pleasant Housing, LP 8 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 3.41 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 7318718005 | Mount Pleasant Housing, LP 17 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 6.88 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 7427064003 | Twin Lakes Group | 6/26/2012 | 1/10/2013 | 1/10/2015 | 12.36 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 7467063008 | Twin Lakes Group 11 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 3.00 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 7573303006 | Mount Pleasant Housing, LP 3 | 6/26/2012 | 1/9/2013 | 1/9/2015 | 13.44 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 7248073008 | Susabar Joint Venture 4 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 8.80 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 7318066015 | Pine Street LLC | 6/26/2012 | 1/25/2013 | 1/25/2015 | 887.27 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 7207063006 | Twin Lakes Group 5 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 1.90 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 7085759009 | Mount Pleasant Housing, LP 7 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 7.46 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 7027063008 | Twin Lakes Group 22 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 3.58 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6987063049 | Twin Lakes Group 2 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 5.47 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6971062018 | Mumma Realty Association, Inc 3 | 6/26/2012 | 1/16/2013 | 1/16/2015 | 47.91 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6948073001 | Susabar Joint Venture | 6/26/2012 | 1/11/2013 | 1/11/2015 | 32.95 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6927064002 | Twin Lakes Group 7 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 5.11 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6911062038 | Mumma Realty Association, Inc 4 | 6/26/2012 | 1/16/2013 | 1/16/2015 | 3.79 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6903285009 | Mount Pleasant Housing, LP 5 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 4.70 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6871062016 | Mumma Realty Association, Inc | 6/26/2012 | 1/16/2013 | 1/16/2015 | 35.24 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6867063005 | Twin Lakes Group 8 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 3.33 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6787902001 | Mount Pleasant Housing, LP 16 | 6/26/2012 | 1/9/2013 | 1/9/2015 | 20.18 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6786070000 | Hidden Lake Community Association 4 | 6/26/2012 | 1/9/2013 | 1/9/2015 | 0.33 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6771062014 | Mumma Realty Association, Inc 2 | 6/26/2012 | 1/16/2013 | 1/16/2015 | 25.11 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6747064004 | Twin Lakes Group 21 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 0.80 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6721759008 | Mount Pleasant Housing, LP 12 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 19.57 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6719093004 | Long Meadows Associates 9 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 9.85 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6717308002 | Mount Pleasant Housing, LP 15 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 0.01 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6651088001 | PCS Chadaga dba Penn Valley Village | 6/26/2012 | 1/12/2013 | 1/12/2015 | 77.87 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6539093006 | Long Meadows Associates | 6/26/2012 | 1/26/2013 | 1/26/2015 | 6.80 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6427830015 | P C S Chadaga MD | 6/26/2012 | 1/20/2013 | 1/20/2015 | 69.85 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6407064006 | Twin Lakes Group 12 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 1.07 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6359093008 | Long Meadows Associates 12 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 6.57 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6243999015 | Stonehedge Condominium Association | 6/26/2012 | 1/26/2013 | 1/26/2015 | 5.18 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6211490010 | Timber Ridge Associates 2 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 2.11 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6211072003 | Chestnut Court Condominium Associatic | 6/26/2012 | 1/16/2013 | 1/16/2015 | 11.29 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6207064002 | KAM Inc & Morris Massry 12 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 8.43 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6142085001 | PCS Chadaga MD dba Spring Garden Est | 6/26/2012 | 1/3/2013 | 1/3/2015 | 0.07 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6107064000 | KAM Inc & Morris Massry 9 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 11.26 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6099089000 | Wesley Drive Joint Venture 7 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 0.49 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 6079089022 | Wesley Drive Joint Venture 6 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 0.33 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 5727064007 | KAM Inc & Morris Massry 5 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 9.06 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 5651065025 | 845 Sir Thomas Court, LLC 2 | 6/26/2012 | 1/16/2013 | 1/16/2015 | 24.91 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 5631065038 | 845 Sir Thomas Court, LLC 3 | 6/26/2012 | 1/16/2013 | 1/16/2015 | 22.14 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 5611065023 | 845 Sir Thomas Court, LLC 7 | 6/26/2012 | 1/16/2013 | 1/16/2015 | 6.38 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 5571065065 | 845 Sir Thomas Court, LLC 4 | 6/26/2012 | 1/16/2013 | 1/16/2015 | 4.28 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 5531065027 | 845 Sir Thomas Court, LLC | 6/26/2012 | 1/16/2013 | 1/16/2015 | 1.60 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 5511064024 | 845 Sir Thomas Court, LLC 6 | 6/26/2012 | 1/16/2013 | 1/16/2015 | 18.39 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 5491064026 | 845 Sir Thomas Court, LLC 5 | 6/26/2012 | 1/16/2013 | 1/16/2015 | 39.51 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 5467064003 | KAM Inc & Morris Massry 11 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 10.06 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 5439093003 | Long Meadows Associates 10 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 9.96 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 5437869009 | Mount Pleasant Housing, LP 14 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 5.67 | $ 6.26 | $ 4.00 | $ 2.26 | | $ - | Billing has not started |
| 080047660750000070074 | Asia Plaza Inc | 6/25/2012 | 7/17/2012 | 7/17/2013 | 6.16 | $ 2.00 | $ 2.00 | $ - | | $ - | Billing has not started |
| 080047660750000350833 | Asia Plaza084 | 6/25/2012 | 7/17/2012 | 7/17/2013 | 9.80 | $ 2.00 | $ 2.00 | $ - | | $ - | Billing has not started |
| 080048823315300000221 | Wille L Hom dba King Wan Rest | 6/25/2012 | 7/27/2012 | 7/27/2013 | 139.00 | $ 2.00 | $ 2.00 | $ - | | $ - | Billing has not started |
| 080107544216900091346 | Li Wah | 6/25/2012 | 7/17/2012 | 7/17/2013 | 334.53 | $ 2.00 | $ 2.00 | $ - | | $ - | Billing has not started |
| 080129406816300000908 | Ho Wah | 6/25/2012 | 7/16/2012 | 7/16/2013 | 180.79 | $ 2.00 | $ 2.00 | $ - | | $ - | Billing has not started |
| 080047660716800091344 | Asia Plaza | 6/25/2012 | 7/17/2012 | 7/17/2013 | 234.29 | $ 2.00 | $ 2.00 | $ - | | $ - | Billing has not started |
| 080047660716600091349 | Asia Plaza Inc 2 | 6/25/2012 | 7/17/2012 | 7/17/2013 | 631.78 | $ 2.00 | $ 2.00 | $ - | | $ - | Billing has not started |
| 080047660716700085922 | Asia Plaza Inc 3 | 6/25/2012 | 7/17/2012 | 7/17/2013 | 0.39 | $ 2.00 | $ 2.00 | $ - | | $ - | Billing has not started |
| 9877633003 | First Commonwealth Federal Credit Uni | 6/28/2012 | 8/1/2012 | 8/1/2013 | 88.21 | $ 7.00 | $ 4.00 | $ 3.00 | | $ - | Billing has not started |
| 7708015004 | FIRST COMMONWEALTH | 6/28/2012 | 8/9/2012 | 8/9/2013 | 656.04 | $ 7.00 | $ 4.00 | $ 3.00 | | $ - | Billing has not started |
| 4781011009 | FIRST COMMONWEALTH FCU | 6/28/2012 | 8/29/2012 | 8/29/2013 | 114.73 | $ 7.00 | $ 4.00 | $ 3.00 | | $ - | Billing has not started |
| 1435002002 | FIRST COMMONWEALTH FCU 1 | 6/28/2012 | 8/20/2012 | 8/20/2013 | 302.74 | $ 7.00 | $ 4.00 | $ 3.00 | | $ - | Billing has not started |
| 08035804020006356245 | First Commonwealth Federal Credit Uni | 6/28/2012 | 8/13/2012 | 8/13/2013 | 82.87 | $ 7.00 | $ 4.00 | $ 3.00 | | $ - | Billing has not started |
| 6108070002 | DAUPHIN COUNTY | 6/29/2012 | 1/11/2013 | 1/11/2014 | 8,689.41 | $ 6.00 | $ 4.00 | $ 2.00 | | $ - | Billing has not started |
| TOTAL | | | | | | | | | 488 | $ | |

Recurring Commission Statement
Coastal Energy Consultants

| Account Number | Account Name | Contract Signed Date | Contract Start Date | Contract End Date | Org. Est Annual MWh | Agent Fee | Contract Term | Recurring Payment | Recurring Payment Date | Updated Est Annual MWh |
|---|---|---|---|---|---|---|---|---|---|---|
| 0800664015000334994 | Cardinal Mooney High School 4 | 4/30/2012 | 6/14/2012 | 6/14/2014 | 8.30 | $ 3.88 | 24 | 1 | 4/30/2013 | |
| 0800664010001501379 | Cardinal Mooney High School 5 | 4/30/2012 | 6/14/2012 | 6/14/2014 | 2.32 | $ 3.88 | 24 | 1 | 4/30/2013 | |
| 0800664010000990671 | Cardinal Mooney High School | 4/30/2012 | 6/14/2012 | 6/14/2014 | 521.07 | $ 3.88 | 24 | 1 | 4/30/2013 | |
| 0802569544000001021426 | Valley Foods Inc | 5/7/2012 | 6/15/2012 | 6/15/2014 | 926.11 | $ 4.04 | 24 | 1 | 5/7/2013 | |
| 0802776241000015008201 | James M Coates | 5/7/2012 | 6/29/2012 | 6/29/2014 | 198.89 | $ 6.04 | 24 | 1 | 5/7/2013 | |
| 0802725546000001054540 | Saint Charles Church 7 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.82 | $ 4.15 | 36 | 1 | 5/8/2013 | |
| 0802725546000001054541 | Saint Charles Church 8 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $ 4.15 | 36 | 1 | 5/8/2013 | |
| 0802725546000001054542 | Saint Charles Church 5 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.75 | $ 4.15 | 36 | 1 | 5/8/2013 | |
| 0802725546000001054543 | Saint Charles Church 6 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $ 4.15 | 36 | 1 | 5/8/2013 | |
| 0802725546000001054927 | Saint Charles Church 9 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 373.03 | $ 4.15 | 36 | 1 | 5/8/2013 | |
| 0802725546000001056059 | Saint Charles Church | 5/8/2012 | 6/5/2012 | 6/5/2015 | 219.44 | $ 4.15 | 36 | 1 | 5/8/2013 | |
| 0802725546000001422621 | Saint Charles Church 10 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.00 | $ 4.15 | 36 | 1 | 5/8/2013 | |
| 0802725546500028377 | Saint Charles Church 11 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.24 | $ 4.15 | 36 | 1 | 5/8/2013 | |
| 0802725546500028399 | Saint Charles Church 2 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 235.52 | $ 4.15 | 36 | 1 | 5/8/2013 | |
| 7931016006 | AUSTIN AUTO SERVICE | 5/21/2012 | 6/14/2012 | 6/14/2014 | 21.25 | $ 3.84 | 24 | 1 | 5/21/2013 | |
| 0802725546000001054540 | Saint Charles Church 7 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.82 | $ 4.15 | 36 | 2 | 5/8/2014 | |
| 0802725546000001054541 | Saint Charles Church 8 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $ 4.15 | 36 | 2 | 5/8/2014 | |
| 0802725546000001054542 | Saint Charles Church 5 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.75 | $ 4.15 | 36 | 2 | 5/8/2014 | |
| 0802725546000001054543 | Saint Charles Church 6 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $ 4.15 | 36 | 2 | 5/8/2014 | |
| 0802725546000001054927 | Saint Charles Church 9 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 373.03 | $ 4.15 | 36 | 2 | 5/8/2014 | |
| 0802725546000001056059 | Saint Charles Church | 5/8/2012 | 6/5/2012 | 6/5/2015 | 219.44 | $ 4.15 | 36 | 2 | 5/8/2014 | |
| 0802725546000001422621 | Saint Charles Church 10 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.00 | $ 4.15 | 36 | 2 | 5/8/2014 | |
| 0802725546500028377 | Saint Charles Church 11 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.24 | $ 4.15 | 36 | 2 | 5/8/2014 | |
| 0802725546500028399 | Saint Charles Church 2 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 235.52 | $ 4.15 | 36 | 2 | 5/8/2014 | |

**2011 Monthly Commission Statement**
**Coastal Energy Consultants**

| Account Number | Account Name | Contract Start Date | Contract End Date | Agent Fee | Billed MWh | | | Commission | | Notes: |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | May-12 | Jun-12 | | May-12 | Jun-12 | |
| 361485999979 | JCJ ENTERPRISES LLC | 02/14/2011 | 01/16/2013 | $ 3.00 | 0.05 | 0.05 | $ | 0.15 | $ 0.15 | |
| 361485999995 | JCJ Enterprises, LLC 1 | 06/15/2011 | 06/14/2013 | $ 3.00 | 17.18 | 21.53 | $ | 51.55 | $ 64.58 | |
| 204969099975 | Jay W Tawes 2 | 12/06/2011 | 12/06/2013 | $ 2.70 | 0.29 | 0.45 | $ | 0.79 | $ 1.22 | |
| 204969099991 | Jay W Tawes | 12/06/2011 | 12/06/2013 | $ 2.70 | 1.01 | 1.01 | $ | 2.74 | $ 2.73 | |
| TOTAL | | | | | 18.54 | 23.04 | $ | 55.23 | $ 68.68 | |

Recurring Commission Statement
Coastal Energy Consultants

| Account Number | Account Name | Accepted Date | Contract Start Date | Contract End Date | Est Annual MWh | Agent Fee | One Time Payment Fee | Recurring Payment Fee | Jun-12 | Jun-12 | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0802870830500067142 | Jasar Recycling, Inc | 4/11/2012 | 5/22/2012 | 5/22/2012 | 140.32 | $ 2.50 | $ 2.50 | $ - | 9.92 | $ - | |
| 0802870830001169196 | Jasar Recycling, Inc 5 | 4/11/2012 | 5/22/2012 | 5/22/2012 | 113.70 | $ 2.50 | $ 2.50 | $ - | 6.40 | $ - | |
| 0802834300000149217C | Jasar Recycling, Inc 4 | 4/11/2012 | 5/22/2012 | 5/22/2012 | 6.67 | $ 2.50 | $ 2.50 | $ - | 1.78 | $ - | |
| 0802834300001169189 | Jasar Recycling, Inc 1 | 4/11/2012 | 5/22/2012 | 5/22/2012 | 641.64 | $ 2.50 | $ 2.50 | $ - | 21.44 | $ - | |
| 0805799836000731786G | HAROLD FRIEDMAN INC 3 | 4/16/2012 | 5/23/2012 | 5/23/2012 | 1,415.17 | $ 4.00 | $ 4.00 | $ - | 120.90 | $ - | |
| 0805182097000731371B | FRIEDMANS GREAT BTR MRT | 4/16/2012 | 5/29/2012 | 5/29/2012 | 1,648.50 | $ 4.00 | $ 4.00 | $ - | 126.20 | $ - | |
| 0805251553000681239O | HAROLD FRIEDMAN INC 2 | 4/16/2012 | 5/11/2012 | 5/11/2012 | 54.14 | $ 4.00 | $ 4.00 | $ - | 4.20 | $ - | |
| 0805258758000700359 | BUTLER BI LO FOODS | 4/16/2012 | 5/7/2012 | 5/7/2013 | 1,845.04 | $ 4.00 | $ 4.00 | $ - | | $ - | Billing has not started |
| 0805405085000686902 | FMT FOODS INC | 4/16/2012 | 5/15/2012 | 5/15/2013 | 864.43 | $ 4.00 | $ 4.00 | $ - | 56.48 | $ - | |
| 0805486722000660279B | FRIEDMANS HAROLD INC 1 | 4/16/2012 | 5/22/2012 | 5/22/2013 | 54.86 | $ 4.00 | $ 4.00 | $ - | 4.53 | $ - | |
| 0805486756000602865 | FRIEDMANS HAROLD INC | 4/16/2012 | 5/22/2012 | 5/22/2013 | 0.00 | $ 4.00 | $ 4.00 | $ - | 0.00 | $ - | |
| 0805523162000689180B | FRIEDMANS CHICORA | 4/16/2012 | 5/24/2012 | 5/24/2013 | 875.13 | $ 4.00 | $ 4.00 | $ - | 78.60 | $ - | |
| 0805584629000681310B | FRIEDMANS WEST BRADY ST | 4/16/2012 | 6/1/2012 | 6/1/2013 | 980.22 | $ 4.00 | $ 4.00 | $ - | | $ - | Billing has not started |
| 4395002001 | EAST SIDE FAMILY BEV | 4/19/2012 | 5/21/2012 | 5/21/2013 | 58.59 | $ 1.18 | $ 1.18 | $ - | 5.18 | $ - | |
| 4455002001 | AIRPORT ROAD MOTOR INN | 4/19/2012 | 5/21/2012 | 5/21/2013 | 114.80 | $ 2.18 | $ 2.18 | $ - | 9.36 | $ - | |
| 4435002005 | CHARLES NOTI | 4/19/2012 | 5/21/2012 | 5/21/2013 | 9.14 | $ 2.18 | $ 2.18 | $ - | 0.84 | $ - | |
| 3289700704 | 5MG KULPSVILLE MOTOR INN | 4/23/2012 | 6/1/2012 | 6/1/2013 | 1,496.77 | $ 1.00 | $ 1.00 | $ - | | $ - | Billing has not started |
| 0803766276000064372 | The Brass Rail Inc | 4/27/2012 | 7/18/2012 | 7/18/2013 | 116.29 | $ 7.72 | $ 4.00 | $ 3.72 | | $ - | Billing has not started |
| 0800664401500034934 | Cardinal Mooney High School 4 | 4/30/2012 | 6/14/2012 | 6/14/2014 | 8.30 | $ 3.88 | $ 3.88 | $ - | | $ - | Billing has not started |
| 0800664401000150137O | Cardinal Mooney High School 5 | 4/30/2012 | 6/14/2012 | 6/14/2014 | 2.32 | $ 3.88 | $ 3.88 | $ - | | $ - | Billing has not started |
| 0800664401000090607I | Cardinal Mooney High School 3 | 4/30/2012 | 6/14/2012 | 6/14/2014 | 521.07 | $ 3.88 | $ 3.88 | $ - | | $ - | Billing has not started |
| 0802569544000102142G | Valley Foods Int | 5/7/2012 | 6/15/2012 | 6/15/2014 | 926.11 | $ 4.04 | $ 4.00 | $ 0.04 | | $ - | Billing has not started |
| 0802776241000150820I | James M Coates | 5/7/2012 | 6/29/2012 | 6/29/2014 | 198.89 | $ 6.04 | $ 4.00 | $ 2.04 | | $ - | Billing has not started |
| 0802725460001054540 | Saint Charles Church 7 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.82 | $ 4.15 | $ 4.00 | $ 0.15 | | $ - | Billing has not started |
| 0802725460001054541 | Saint Charles Church 8 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $ 4.15 | $ 4.00 | $ 0.15 | | $ - | Billing has not started |
| 0802725460001054542 | Saint Charles Church 5 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 0.75 | $ 4.15 | $ 4.00 | $ 0.15 | | $ - | Billing has not started |
| 0802725460001054543 | Saint Charles Church 6 | 5/8/2012 | 6/6/2012 | 6/6/2015 | 3.08 | $ 4.15 | $ 4.00 | $ 0.15 | | $ - | Billing has not started |
| 0802725460001054927 | Saint Charles Church 9 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 373.03 | $ 4.15 | $ 4.00 | $ 0.15 | | $ - | Billing has not started |
| 0802725460001056059 | Saint Charles Church | 5/8/2012 | 6/5/2012 | 6/5/2015 | 219.44 | $ 4.15 | $ 4.00 | $ 0.15 | | $ - | Billing has not started |
| 0802725460001422621 | Saint Charles Church 10 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.00 | $ 4.15 | $ 4.00 | $ 0.15 | | $ - | Billing has not started |
| 0802725465000028377 | Saint Charles Church 11 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 1.24 | $ 4.15 | $ 4.00 | $ 0.15 | | $ - | Billing has not started |
| 0802725465000028399 | Saint Charles Church 2 | 5/8/2012 | 6/5/2012 | 6/5/2015 | 235.52 | $ 4.15 | $ 4.00 | $ 0.15 | | $ - | Billing has not started |
| 3661300405 | LEHIGH FUELS INC | 5/9/2012 | 6/21/2012 | 6/21/2013 | 171.33 | $ 4.00 | $ 4.00 | $ - | | $ - | Billing has not started |
| 4241200709 | LEHIGH FUELS INC 2 | 5/9/2012 | 6/1/2012 | 6/1/2013 | 178.63 | $ 4.00 | $ 4.00 | $ - | | $ - | Billing has not started |
| 0800781882000246149S | TOP STAR INC 13 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 4.69 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 0801965974000549212O | TOP STAR INC 4 | 5/9/2012 | 6/25/2012 | 6/25/2013 | 16.64 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 0801965974000545624Z | TOP STAR INC 5 | 5/9/2012 | 6/25/2012 | 6/25/2013 | 274.02 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 0801965974000032309I4 | TOP STAR INC 9 | 5/9/2012 | 5/31/2012 | 5/31/2013 | 326.95 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 0801965974000246170T | TOP STAR INC 2 | 5/9/2012 | 6/18/2012 | 6/18/2013 | 85.83 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 0801965974000246151A | TOP STAR INC 10 | 5/9/2012 | 6/14/2012 | 6/14/2013 | 101.70 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 0801965974000246149A | TOP STAR INC 7 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 70.75 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 0801965974000246149J | TOP STAR INC 8 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 319.05 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 0801965974000244542S | TOP STAR INC 14 | 5/9/2012 | 5/31/2012 | 5/31/2013 | 240.45 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 0801965974000231981O | TOP STAR INC 12 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 117.83 | $ 3.00 | $ 3.00 | $ - | 8.90 | $ - | |
| 0801965974000220912B | TOP STAR INC 3 | 5/9/2012 | 6/8/2012 | 6/8/2013 | 89.25 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 0801965974000207942S | TOP STAR INC 1 | 5/9/2012 | 6/15/2012 | 6/15/2013 | -95.80 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 0801965974000208449 | TOP STAR INC 11 | 5/9/2012 | 5/29/2012 | 5/29/2013 | 443.18 | $ 3.00 | $ 3.00 | $ - | 33.08 | $ - | |
| 0801965974000603312T | TOP STAR INC 6 | 5/9/2012 | 6/8/2012 | 6/8/2013 | 1.50 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 7948001006 | TOP STAR INC 16 | 5/11/2012 | 6/11/2012 | 6/11/2013 | 279.31 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 0753051017 | TOP STAR INC 20 | 5/11/2012 | 6/18/2012 | 6/18/2013 | 250.23 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 5377015010 | TOP STAR INC 5 | 5/11/2012 | 6/22/2012 | 6/22/2013 | 45.37 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 7026038010 | Top Star, Inc 5 | 5/11/2012 | 6/7/2012 | 6/7/2013 | 219.47 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 7141090018 | Top Star, Inc | 5/11/2012 | 6/29/2012 | 6/29/2013 | 134.69 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 7600030016 | TOP STAR INC 11 | 5/11/2012 | 6/28/2012 | 6/28/2013 | 154.44 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 7629079015 | Top Star, Inc. 6 | 5/11/2012 | 6/12/2012 | 6/12/2013 | 135.66 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 8266009025 | TOP STAR INC 3 | 5/11/2012 | 6/7/2012 | 6/7/2013 | 96.94 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 8286009021 | TOP STAR INC 4 | 5/11/2012 | 6/7/2012 | 6/7/2013 | 11.42 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 8611079011 | Top Star, Inc. 2 | 5/11/2012 | 6/14/2012 | 6/14/2013 | 157.86 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 9073017007 | TOP STAR INC 2 | 5/11/2012 | 6/18/2012 | 6/18/2013 | 303.74 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 9143013011 | TOP STAR INC 13 | 5/11/2012 | 6/4/2012 | 6/4/2013 | 191.35 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |
| 9163013017 | TOP STAR INC 22 | 5/11/2012 | 6/4/2012 | 6/4/2013 | 116.19 | $ 3.00 | $ 3.00 | $ - | | $ - | Billing has not started |

| Account | Company | Date 1 | Date 2 | Date 3 | Amount | | Rate | | Rate | | Val | | | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5258018008 | TOP STAR INC 12 | 5/11/2012 | 6/25/2012 | 6/25/2013 | 64.37 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 5257812011 | TOP STAR INC 6 | 5/11/2012 | 6/28/2012 | 6/28/2013 | 81.77 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 4644108023 | TOP STAR INC 21 | 5/11/2012 | 6/5/2012 | 6/5/2013 | 221.64 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 0778018018 | TOP STAR INC 24 | 5/11/2012 | 6/25/2012 | 6/25/2013 | 143.19 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 0899028016 | TOP STAR INC 15 | 5/11/2012 | 6/26/2012 | 6/26/2013 | 307.94 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 1123012010 | TOP STAR INC 9 | 5/11/2012 | 6/4/2012 | 6/4/2013 | 13.18 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 1258027012 | TOP STAR INC 7 | 5/11/2012 | 6/25/2012 | 6/25/2013 | 211.42 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 1397054019 | TOP STAR INC 19 | 5/11/2012 | 6/22/2012 | 6/22/2013 | 262.65 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 1820087019 | TOP STAR INC 17 | 5/11/2012 | 6/28/2012 | 6/28/2013 | 199.46 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 2529035016 | Top Star, Inc. 7 | 5/11/2012 | 6/12/2012 | 6/12/2013 | 128.00 | $ | 3.00 | $ | - | | - | | | Billing has not started |
| 2677080010 | Top Star, Inc. 4 | 5/11/2012 | 6/22/2012 | 6/22/2013 | 190.36 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 3143026012 | TOP STAR INC 14 | 5/11/2012 | 6/4/2012 | 6/4/2013 | 339.06 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 3939821005 | TOP STAR INC 23 | 5/11/2012 | 6/26/2012 | 6/26/2013 | 246.63 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 7711003018 | TOP STAR INC 8 | 5/11/2012 | 6/14/2012 | 6/14/2013 | 76.25 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 7731003014 | TOP STAR INC 18 | 5/11/2012 | 6/14/2012 | 6/14/2013 | 155.07 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 9282005028 | TOP STAR INC 26 | 5/11/2012 | 7/2/2012 | 7/2/2013 | 228.29 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 4581089012 | Top Star, Inc. 3 | 5/11/2012 | 6/29/2012 | 6/29/2013 | 202.15 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 4035230056 | TOP STAR INC | 5/11/2012 | 6/21/2012 | 6/21/2013 | 92.03 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 4076012009 | TOP STAR INC 25 | 5/11/2012 | 6/21/2012 | 6/21/2013 | 202.04 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 4579016009 | TOP STAR INC 10 | 5/11/2012 | 6/21/2012 | 6/21/2013 | 342.65 | $ | 3.00 | $ | 3.00 | $ | - | | | Billing has not started |
| 7931016006 | AUSTIN AUTO SERVICE | 5/21/2012 | 6/14/2012 | 6/14/2014 | 21.25 | $ | 3.84 | $ | 3.84 | | | | | Billing has not started |
| PE0000097918015754... | Gibraltar Rock, Inc | 5/21/2012 | 6/26/2012 | 6/26/2015 | 3,279.88 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| PE00001099614315582... | Sil Concrete Inc | 5/21/2012 | 6/25/2012 | 6/25/2015 | 11.16 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| PE00001099614411552... | Sil Concrete Inc 2 | 5/21/2012 | 6/25/2012 | 6/25/2015 | 306.02 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 0800778735000001530... | Sil Kemp Concrete | 5/21/2012 | 7/10/2012 | 7/10/2015 | 437.47 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 0801022966000007128... | Silvi Concrete Corp | 5/21/2012 | 6/25/2012 | 6/25/2015 | 150.65 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 327736999993 | Sahara Sand Eagles Lake Reserve | 5/21/2012 | 6/27/2012 | 6/27/2015 | 2,225.31 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 332447999969 | Sahara Sand Plant 2 | 5/21/2012 | 6/27/2012 | 6/27/2015 | 1,458.15 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 332447999977 | Sahara Sand Plant | 5/21/2012 | 6/12/2012 | 6/12/2015 | 737.77 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 2122201702 | RIVERSIDE CONSTRUCTION 5 | 5/21/2012 | 7/3/2012 | 7/3/2015 | 384.84 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 4899101508 | RIVERSIDE CONST MATERIA | 5/21/2012 | 7/3/2012 | 7/3/2015 | 982.65 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 6762059018 | RIVERSIDE CONSTRUCTION | 5/21/2012 | 7/3/2012 | 7/3/2015 | 455.65 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 7990801603 | RIVERSIDE IND COMPLEX 1 | 5/21/2012 | 7/3/2012 | 7/3/2015 | 55.24 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 8918300501 | RIVERSIDE IND COMPLEX | 5/21/2012 | 7/3/2012 | 7/3/2015 | 130.64 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 8938500204 | SILVI CONCRETE PROD INC 1 | 5/21/2012 | 7/3/2012 | 7/3/2015 | 1,050.02 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 9503300804 | SILVI CONCRETE PROD INC | 5/21/2012 | 6/26/2012 | 6/26/2015 | 232.79 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 9763001003 | SILVI CONCRETE | 5/21/2012 | 6/26/2012 | 6/26/2015 | 368.62 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 3758021012 | FIGUEROAS MARKET | 5/24/2012 | 6/25/2012 | 6/25/2013 | 76.38 | $ | 5.02 | $ | 4.00 | $ | 1.02 | | | Billing has not started |
| 8466109006 | TRACI'S PARDISE INC | 5/29/2012 | 7/9/2012 | 7/9/2013 | 152.21 | $ | 4.00 | $ | 4.00 | $ | - | | | Billing has not started |
| 326216399989 | Rastellis Foods 3 | 5/29/2012 | 6/27/2012 | 6/27/2013 | 2,951.00 | $ | 5.50 | $ | 4.00 | $ | 1.50 | | | Billing has not started |
| 137070199989 | Rastellis Foods 1 | 5/29/2012 | 7/12/2012 | 7/12/2013 | 630.31 | $ | 5.50 | $ | 4.00 | $ | 1.50 | | | Billing has not started |
| 101054999988 | Rastellis Foods 2 | 5/29/2012 | 6/28/2012 | 6/28/2013 | 2,297.81 | $ | 5.50 | $ | 4.00 | $ | 1.50 | | | Billing has not started |
| 101054999970 | Rastellis Foods | 5/29/2012 | 6/20/2012 | 6/20/2013 | 283.71 | $ | 5.50 | $ | 4.00 | $ | 1.50 | | | Billing has not started |
| 4526017003 | KOGELMAN DIST CO | 5/30/2012 | 7/9/2012 | 7/9/2013 | 228.66 | $ | - | $ | - | $ | - | | | Billing has not started |
| 4506017003 | TOMMY BURKE PROVISIONS | 5/30/2012 | 7/9/2012 | 7/9/2013 | 39.43 | $ | - | $ | - | $ | - | | | Billing has not started |
| 2443702012 | MCTISH KUNKEL AND ASSOC 1 | 6/1/2012 | 7/13/2012 | 7/13/2013 | 263.12 | $ | 8.05 | $ | 4.00 | $ | 4.05 | | | Billing has not started |
| 2489407001 | MCTISH KUNKEL AND ASSOC | 6/1/2012 | 7/11/2012 | 7/11/2013 | 37.15 | $ | 8.05 | $ | 4.00 | $ | 4.05 | | | Billing has not started |
| 0804994487000318171... | Health Center, Everybody's | 6/21/2012 | 7/20/2012 | 7/20/2015 | 165.77 | $ | 5.19 | $ | 4.00 | $ | 1.19 | | | Billing has not started |
| 0801032701000528406... | GLENDON PROPERTIES INC | 6/26/2012 | 8/28/2012 | 8/28/2013 | 1.12 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 0801032694000511137... | GLENDON PROPERTIES INC 2 | 6/26/2012 | 8/28/2012 | 8/28/2013 | 108.04 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 9402694007 | Creekside Senior Condominiums | 6/26/2012 | 7/23/2012 | 7/23/2013 | 267.35 | $ | 7.00 | $ | 4.00 | $ | 3.00 | | | Billing has not started |
| 5317070004 | Mumma Realty Association, Inc 8 | 6/26/2012 | 1/24/2013 | 1/24/2015 | 425.49 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 5231087027 | PCS Chadaga dba Penn Valley Village 2 | 6/26/2012 | 1/12/2013 | 1/12/2015 | 24.52 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 5227064007 | KAM Inc & Morris Massry 2 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 7.57 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 5199093005 | Long Meadows Associates 7 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 13.29 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 5168073000 | Susabar Joint Venture 3 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 14.43 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 4987064008 | KAM Inc & Morris Massry 3 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 10.45 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 4843109002 | P C S Chadaga MD 2 | 6/26/2012 | 1/4/2013 | 1/4/2015 | 18.11 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 4786070008 | Hidden Lake Community Association 2 | 6/26/2012 | 1/9/2013 | 1/9/2015 | 2.47 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 4759093004 | Long Meadows Associates 15 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 5.53 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 4753537007 | Allendale Road Associates dba Rockledg | 6/26/2012 | 1/26/2013 | 1/26/2015 | 3.13 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 4747064001 | KAM Inc & Morris Massry 8 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 7.73 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 4699093004 | Long Meadows Associates 11 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 8.38 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 4537374006 | Towncrest Associates | 6/26/2012 | 1/12/2013 | 1/12/2015 | 4.71 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 4507064006 | KAM Inc & Morris Massry 4 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 11.49 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |
| 4399093008 | Long Meadows Associates 3 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 8.80 | $ | 6.26 | $ | 4.00 | $ | 2.26 | | | Billing has not started |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4227064006 | KAM Inc & Morris Massry 7 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 7.63 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 4207064000 | KAM Inc & Morris Massry 14 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 8.36 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 4181121017 | Susabar Joint Venture 10 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 3.01 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2419521003 | Mount Pleasant Housing, LP 4 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 0.08 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2440126485 | Morgan Manor Residences, Inc 5 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 68.34 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2503072019 | 1625 North Front Street, LLC | 6/26/2012 | 1/4/2013 | 1/4/2015 | 169.67 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2509044000 | Towncrest Associates 3 | 6/26/2012 | 1/12/2013 | 1/12/2015 | 7.08 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2538072009 | East Park Gardens Condominium Associ | 6/26/2012 | 1/25/2013 | 1/25/2015 | 14.56 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2559093008 | Long Meadows Associates 6 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 7.80 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2588442122 | P C S Chadaga dba Maple Lane Estates | 6/26/2012 | 1/3/2013 | 1/3/2015 | 24.52 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2659091006 | Wesley Drive Joint Venture 3 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 7.94 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2667063007 | Twin Lakes Group 17 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 2.61 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2767063009 | Twin Lakes Group 16 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 2.14 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2769044002 | Towncrest Associates 4 | 6/26/2012 | 1/12/2013 | 1/12/2015 | 7.57 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2805447332 | Susabar Joint Venture 15 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 8.63 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2824080017 | Mountain View Road Associates 6 | 6/26/2012 | 1/5/2013 | 1/5/2015 | 0.23 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2891057017 | 2807 North Front Street, LLC | 6/26/2012 | 1/16/2013 | 1/16/2015 | 77.86 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 2998072005 | East Park Gardens Condominium Associ | 6/26/2012 | 1/25/2013 | 1/25/2015 | 15.70 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3031057023 | 2717 North Front Street, LLC | 6/26/2012 | 1/16/2013 | 1/16/2015 | 119.06 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3039091009 | Wesley Drive Joint Venture 5 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 2.38 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3047063000 | KAM Inc & Morris Massry 15 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 0.97 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3067063006 | KAM Inc & Morris Massry | 6/26/2012 | 1/10/2013 | 1/10/2015 | 11.86 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3163505014 | Schoolhouse Partners LP 2 | 6/26/2012 | 1/4/2013 | 1/4/2015 | 18.56 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3164080016 | Mountain View Road Associates | 6/26/2012 | 1/5/2013 | 1/5/2015 | 2.93 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3239091003 | Wesley Drive Joint Venture 2 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 23.39 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3264080054 | Mountain View Road Associates 7 | 6/26/2012 | 1/5/2013 | 1/5/2015 | 7.36 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3289044009 | Towncrest Associates 5 | 6/26/2012 | 1/12/2013 | 1/12/2015 | 3.61 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3307063004 | KAM Inc & Morris Massry 10 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 10.52 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3399093007 | Long Meadows Associates 2 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 10.09 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3421075008 | Northwood Condo Office Center Associ | 6/26/2012 | 1/31/2013 | 1/31/2015 | 15.84 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3536092004 | Wilshire Hills Associates 4 | 6/26/2012 | 1/24/2013 | 1/24/2015 | 5.07 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3541109007 | Sekhar Chadaga 3 | 6/26/2012 | 1/3/2013 | 1/3/2015 | 2.73 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3547064007 | KAM Inc & Morris Massry 6 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 9.80 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3561109003 | Sekhar Chadaga | 6/26/2012 | 1/3/2013 | 1/3/2015 | 6.06 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3584080010 | Mountain View Road Associates 2 | 6/26/2012 | 1/5/2013 | 1/5/2015 | 2.62 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3676092008 | Wilshire Hills Associates 2 | 6/26/2012 | 1/24/2013 | 1/24/2015 | 5.27 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3741109001 | Sekhar Chadaga 2 | 6/26/2012 | 1/3/2013 | 1/3/2015 | 3.79 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3756092004 | Wilshire Hills Associates 7 | 6/26/2012 | 1/24/2013 | 1/24/2015 | 0.97 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3772558472 | Susabar Joint Venture 9 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 2.63 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3879093001 | Long Meadows Associates 8 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 7.78 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3881075004 | Northwood Condo Office Center Associ | 6/26/2012 | 1/31/2013 | 1/31/2015 | 8.44 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3883109003 | P C S Chadaga MD 4 | 6/26/2012 | 1/4/2013 | 1/4/2015 | 1.87 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3886077009 | Hidden Lake Community Association | 6/26/2012 | 1/9/2013 | 1/9/2015 | 20.20 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3901075002 | Northwood Condo Office Center Associ | 6/26/2012 | 1/31/2013 | 1/31/2015 | 6.55 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3948072001 | Susabar Joint Venture 2 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 16.97 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3967064001 | KAM Inc & Morris Massry 13 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 7.02 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3982102002 | Elizabethtown Association | 6/26/2012 | 1/4/2013 | 1/4/2015 | 12.95 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 3995816462 | Morgan Manor Residences, Inc 6 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 56.46 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 4023301004 | Stonehedge Condominium Association 2 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 2.96 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 4081109000 | Sekhar Chadaga 4 | 6/26/2012 | 1/3/2013 | 1/3/2015 | 3.96 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 4102037001 | P C S Chadaga dba Maple Lane Estates 3 | 6/26/2012 | 1/3/2013 | 1/3/2015 | 4.00 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 4122037007 | P C S Chadaga dba Maple Lane Estates 2 | 6/26/2012 | 1/3/2013 | 1/3/2015 | 8.06 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0181120016 | Susabar Joint Venture 6 | 6/26/2012 | 1/11/2013 | 1/11/2015 | 11.41 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0223599004 | Timber Ridge Associates | 6/26/2012 | 1/26/2013 | 1/26/2015 | 5.42 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0227063005 | Twin Lakes Group 20 | 6/26/2012 | 1/10/2013 | 1/10/2015 | 0.44 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0243184009 | Stonehedge Condominium Association 3 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 2.25 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0274855006 | Allendale Road Associates dba Rockledg | 6/26/2012 | 1/26/2013 | 1/26/2015 | 1.65 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0358072009 | East Park Gardens Condominium Associ | 6/26/2012 | 1/25/2013 | 1/25/2015 | 16.89 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0378072005 | East Park Gardens Condominium Associ | 6/26/2012 | 1/25/2013 | 1/25/2015 | 17.45 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0513103001 | PCS Chadaga dba Log Cabin Court 3 | 6/26/2012 | 1/20/2013 | 1/20/2015 | 0.68 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0551016007 | Brookside Housing Associates 2 | 6/26/2012 | 1/16/2013 | 1/16/2015 | 27.75 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0724310276 | ADG-Keystone Plaza Associates | 6/26/2012 | 1/11/2013 | 1/11/2015 | 987.37 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0744079016 | Mountain View Road Associates 4 | 6/26/2012 | 1/5/2013 | 1/5/2015 | 0.22 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0779091002 | Wesley Drive Joint Venture 4 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 5.29 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 1579093003 | Long Meadows Associates 5 | 6/26/2012 | 1/26/2013 | 1/26/2015 | 8.64 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |
| 0953076036 | PCS Chadaga dba Little Mountain Estate | 6/26/2012 | 1/18/2013 | 1/18/2015 | 0.76 | $ 6.26 | $ 4.00 | $ 2.26 | $ | - | Billing has not started |

EXHIBIT R

AEP COMMISSION REPORT
JUNE 2012

**2012 Commission Statement**
**Coastal Energy Consultants**

| | Jun-12 | | Jun-12 | | Notes: |
|---|---|---|---|---|---|
| One Time Commission Payment | 9,786.71 | $ | 17,584.83 | | *Up Front payments included when within 4 months of contract start date (for full list of accounts signed please refer to Recurring Payments tab) |
| Recurring Commission Payment | 487.81 | $ | - | | |
| Account Cancellation Reversals | - | $ | - | | |
| Monthly Commission Payment | 23.04 | $ | 68.68 | | |
| Total Commission Payment | 10,297.56 | $ | 17,653.51 | | |

| | | | |
|---|---|---|---|
| May 2012 Monthly Commission True-Up: | $ | 55.23 | |
| Commissiont Total: | $ | 17,708.74 | |

* Please reference One Time Payment and Recurring Payment tabs for account breakdowns

Up Front Commission Statement
Coastal Energy Consultants

| Account Number | Account Name | Accepted Date | Contract Start Date | Contract End Date | Est Annual MWh | Agent Fee | One Time Payment Fee | Term | Payment Cycle Month | Payment Cycle Year | Jun-12 | Jun-12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 326216399989 | Rastellis Foods 3 | 5/29/2012 | 6/27/2012 | 6/27/2013 | 2,951.00 | $ 5.50 | $ 4.00 | 12 | 5 | 2012 | 2,951.00 | $2,951.00 |
| 137070199989 | Rastellis Foods 1 | 5/29/2012 | 7/12/2012 | 7/12/2013 | 630.31 | $ 5.50 | $ 4.00 | 12 | 5 | 2012 | 630.31 | $630.31 |
| 101054999988 | Rastellis Foods 2 | 5/29/2012 | 6/28/2012 | 6/28/2013 | 2,297.81 | $ 5.50 | $ 4.00 | 12 | 5 | 2012 | 2,297.81 | $2,297.81 |
| 101054999970 | Rastellis Foods | 5/29/2012 | 6/20/2012 | 6/20/2013 | 283.71 | $ 5.50 | $ 4.00 | 12 | 5 | 2012 | 283.71 | $283.71 |
| 2443702012 | MCTISH KUNKEL AND ASSOC 1 | 6/1/2012 | 7/13/2012 | 7/13/2013 | 263.12 | $ 8.05 | $ 4.00 | 12 | 6 | 2012 | 263.12 | $1,052.49 |
| 4489407001 | MCTISH KUNKEL AND ASSOC | 6/1/2012 | 7/11/2012 | 7/11/2013 | 37.15 | $ 8.05 | $ 4.00 | 12 | 6 | 2012 | 37.15 | $148.60 |
| 0804394487000318171714 | Health Center, Everybody's | 6/21/2012 | 7/20/2012 | 7/20/2013 | 165.77 | $ 5.19 | $ 4.00 | 12 | 6 | 2012 | 165.77 | $663.07 |
| 0801032701000528 4064 | GLENDON PROPERTIES INC | 6/26/2012 | 8/28/2012 | 8/28/2013 | 1.12 | $ 7.00 | $ 4.00 | 12 | 6 | 2012 | 1.12 | $4.48 |
| 0801032694000511 1137 | GLENDON PROPERTIES INC 2 | 6/26/2012 | 8/28/2012 | 8/28/2013 | 108.04 | $ 7.00 | $ 4.00 | 12 | 6 | 2012 | 108.04 | $432.15 |
| 9402694007 | Creekside Senior Condominiums | 6/26/2012 | 7/23/2012 | 7/23/2013 | 267.35 | $ 7.00 | $ 4.00 | 12 | 6 | 2012 | 267.35 | $1,069.38 |
| 08004766075000070074 | Asia Plaza Inc | 6/25/2012 | 7/17/2012 | 7/17/2013 | 6.16 | $ 2.00 | $ 2.00 | 12 | 6 | 2012 | 6.16 | $12.33 |
| 08004766075000350833 | Asia Plaza084 | 6/25/2012 | 7/17/2012 | 7/17/2013 | 9.80 | $ 2.00 | $ 2.00 | 12 | 6 | 2012 | 9.80 | $19.60 |
| 08004882331530000221 | Wilie L Hom dba King Wan Rest | 6/25/2012 | 7/27/2012 | 7/27/2013 | 139.00 | $ 2.00 | $ 2.00 | 12 | 6 | 2012 | 139.00 | $278.00 |
| 08010754421690091346 | Li Wah | 6/25/2012 | 7/16/2012 | 7/16/2013 | 334.53 | $ 2.00 | $ 2.00 | 12 | 6 | 2012 | 334.53 | $669.06 |
| 08012940681630000908 | Ho Wah | 6/25/2012 | 7/16/2012 | 7/16/2013 | 180.79 | $ 2.00 | $ 2.00 | 12 | 6 | 2012 | 180.79 | $361.58 |
| 08004766071680091344 | Asia Plaza | 6/25/2012 | 7/17/2012 | 7/17/2013 | 234.29 | $ 2.00 | $ 2.00 | 12 | 6 | 2012 | 234.29 | $468.58 |
| 08004766071660091349 | Asia Plaza Inc 2 | 6/25/2012 | 7/17/2012 | 7/17/2013 | 631.78 | $ 2.00 | $ 2.00 | 12 | 6 | 2012 | 631.78 | $1,263.57 |
| 08004766071670085922 | Asia Plaza Inc 3 | 6/25/2012 | 7/17/2012 | 7/17/2013 | 0.39 | $ 2.00 | $ 2.00 | 12 | 6 | 2012 | 0.39 | $0.79 |
| 9877633003 | First Commonwealth Federal Credit Union | 6/28/2012 | 8/1/2012 | 8/1/2013 | 88.21 | $ 7.00 | $ 4.00 | 12 | 6 | 2012 | 88.21 | $352.82 |
| 7708015004 | FIRST COMMONWEALTH | 6/28/2012 | 8/9/2012 | 8/9/2013 | 656.04 | $ 7.00 | $ 4.00 | 12 | 6 | 2012 | 656.04 | $2,624.18 |
| 4781011009 | FIRST COMMONWEALTH FCU | 6/28/2012 | 8/29/2012 | 8/29/2013 | 114.73 | $ 7.00 | $ 4.00 | 12 | 6 | 2012 | 114.73 | $458.91 |
| 1435002002 | FIRST COMMONWEALTH FCU 1 | 6/28/2012 | 8/20/2012 | 8/20/2013 | 302.74 | $ 7.00 | $ 4.00 | 12 | 6 | 2012 | 302.74 | $1,210.94 |
| 08035804020006356245 | First Commonwealth Federal Credit Union 6 | 6/28/2012 | 8/13/2012 | 8/13/2013 | 82.87 | $ 7.00 | $ 4.00 | 12 | 6 | 2012 | 82.87 | $931.47 |
| TOTAL | | | | | | | | | | | 9,786.71 | $17,584.83 |

EXHIBIT S

AEP/BLUESTAR EMAIL REGARDING MIP AND VALLEY FARM MARKET

**Michael Mateja**

---

| | |
|---|---|
| **From:** | Matt Morgan <mmorgan@coastalenergyltd.com> |
| **Sent:** | Thursday, June 21, 2012 21:15 |
| **To:** | 'Michael Mateja' |
| **Subject:** | FW: BlueStar Energy - last months MIP and Valley Farm Market Missing - Follow Up |

Response from BSE for MIP and Valley Farm market.

Best regards,


Matt Morgan

Director of Energy Procurement

C - 610.360.5722 | O - 610.782.9100 x103 | F – 610.709.5780
Mmorgan@CoastalEnergyLTD.com

7535 Windsor Drive Suite 201 Allentown, PA 18195
www.CoastalEnergyLTD.com



CoastalEnergyConsultants

Restrictions and Disclaimer: The views and information contained in
and transmitted with this email (collectively, the message) are
confidential and proprietary and may be deemed subject to the
attorney-client privilege or work product privilege. This message is
intended for the named recipient only. Any reliance upon or review,
dissemination or distribution of this message without the express
consent of the named recipient or named sender is strictly prohibited.
If you are not the named recipient and do not have such consent,
please notify the sender immediately by return email. This message may
be an incomplete part of a broader communication or work product and
should under no circumstances be used or relied upon out of context.


**From:** Darren Beattie [mailto:dbeattie@bluestarenergy.com]
**Sent:** Thursday, June 21, 2012 4:12 PM
**To:** mmorgan@coastalenergyltd.com
**Subject:** BlueStar Energy - last months MIP and Valley Farm Market Missing - Follow Up

Matt

In response to last months MIP and Valley Farm Market missing on the commission report. They have noted it in the system and said it was a manual mistake and that it will show up on the next report. They have started flow, but they haven't been billed yet. Under the old agreement you would receive payment once the customer get's there first invoice, depending on the meter read date. It will show up in June's report.

Respectfully,

Darren Beattie
Channel Manager

BlueStar Energy Solutions
363 West Erie Street
7th Floor
Chicago, IL 60654

312.488.5098 Direct
866.BLUESTAR Toll-Free
312.488.5099 Fax

www.bluestarenergy.com

The information contained in this communication and any attachments are intended only for the use of the individual or entity to which it is addressed. All information within or attached is privileged, confidential and exempt from disclosure. If the reader of this message is not the intended recipient, or any employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication or attachments is strictly prohibited and may be unlawful. If you have received this message in error, please notify the original sender immediately by return email and delete this message, along with any attachments, from your computer. Thank you.

 Please consider your environmental responsibility before printing this e-mail

EXHIBIT T

AEP/BLUESTAR MIP CONTRACT

**BSE Solutions LLC**
Attachment 1 to the Agent Agreement

This Attachment 1 to the Agent Agreement between BSE Solutions LLC and Coastal
Energy upon execution shall be part of and will be governed by the active Agent
Agreement in place. This Attachment 1 is specific to the account(s) to be served by BSE
and the commission rate, expressed in cents per kWh, to be paid to Coastal Energy.
Payment terms are specified in the Agent Agreement.

| Account Name | Utility Account | Fee per kWh | Term |
|---|---|---|---|
| MIP Inc | 08004834120000994010 | $0.00300 | 4/16/2012 – 4/16/2015 |

Signed,

**BSE Solutions LLC**

Signature: _____

Name (print): _____

Title: _____

Dated: _____, 2012

**Coastal Energy**

Signature: _~~~~~~~~~~_

Name (print): _Matt Morgan_

Title: _Director of Energy Procurement_

Dated: _3 / 28_, 2012